**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TIMOTHY MULLINS

        Plaintiff,                          Civil Action No.:  2:20-CV-1883-NR

     v.                              Judge J. Nicholas Ranjan

THE CONSOL ENERGY, INC.
LONG TERM DISABILITY PLAN,

        Defendant.

---

# MEMORANDUM IN SUPPORT OF
# PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Benjamin W. Glass, III (VSB #23152)
Benjamin Glass, III & Associates, P.C.
3998 Fair Ridge Drive # 250
Fairfax VA 22033
(703) 591-9829
FAX: (703) 783-0686
Ben@BenGlassLaw.com
*Admitted Pro Hac Vice*

**TABLE OF CONTENTS**

Table of Contents............................................................................................................i

Table of Authorities......................................................................................................iii

I. Introduction...............................................................................................................1

II. Statement of Relevant Facts....................................................................................3

    1.      Mr. Mullins injured his ankle, and that set in motion a cascade of disabling conditions............................................................................................................3

    2.      The Social Security Administration's "fully favorable" decision...............................4

    3.      LTD claim termination at issue....................................................................................4

    4.      Lincoln improperly offset Mr. Mullins's disability benefit............................................5

    5.      The Policy language....................................................................................................6

    6.      Standard of Review – arbitrary and capricious............................................................6

III. Relevant Claim History.........................................................................................7

    a.      Mr. Mullins explained to Lincoln why he remained unable to work..........................8

    b.      The first records review: Dr. Patel.................................................................................9

    c.      The Transferrable Skills Analysis that "found" jobs for Mr. Mullins........................12

    d.      Lincoln hired a new records reviewer, Dr. Kohan, for the appeal..............................13

IV. Argument................................................................................................................15

    1.    The substantial evidence supporting Mr. Mullins's claim did not change. Neither did his condition...............................................................................................................15

    2.    Even if he were physically able to do some work, Lincoln's "suitable employment" determination was based on an undisclosed and incorrect assumption that Mr. Mullins was a highly experienced Mine Superintendent.......................................................18

3.  There are better tools for determining functional capacity than merely looking at medical records. Lincoln had real world options if it truly wanted an accurate picture of Mr. Mullins's functional capacity..........................................................................................22

4.  Consol has other options for coal miners who have the functional capacity to return to work besides abruptly terminating their disability benefits..............................................24

5.  Lincoln required Mr. Mullins to apply for SSDI, yet failed to fully consider his Social Security Disability award……....................................................................................25

6.  ERISA requires that Lincoln explain its reasoning and why it chose to rely on the opinions of its paper reviewers. How else can the Court  determine whether or not Lincoln's thinking process was deliberate and principled?..............................................26

7.  In a related abuse of discretion, Lincoln improperly offset Mr. Mullins's LTD payments by the SSDI award for his dependent children that was paid to his wife..........................29

V. Conclusion.......................................................................................................................30

## TABLE OF AUTHORITIES

**Cases:**

*Aetna Health Inc. v. Davila,*
542 U.S. 200 (2004)...............................................................................................................17

*Balas v. PNC Fin. Servs. Grp., Inc.,*
2012 WL 681711 (W.D. Pa. Feb. 29, 2012).........................................................................25

*Black & Decker Disability Plan v. Nord,*
538 U.S. 822 (2003)...............................................................................................................28

*Booton v. Lockheed Med. Ben. Plan,*
110 F. 3d 1461 (9th Cir. 1997).........................................................................................26, 27

*Bradley v. Liberty Life Assur. Co.,*
No. 15-387 (RBK/KMW), 2016 WL 3450816 (D.N.J. June 21, 2016)...................................23

*Bussian v. RJR Nabisco, Inc.,*
223 F.3d 286 (5th Cir. 2000)..................................................................................................29

*Carney v. Int'l Bhd. Of Elec. Workers,*
No. CIV.A.00-6270, 2002 WL 1060652 (E.D. Pa. May 23, 2002)........................................27

*Connelly v. Reliance Standard Life Ins. Co.,*
No. CIV.A. 13-5934, 2014 WL 2452217 (E.D. Pa. June 2, 2014)....................................15, 29

*Connor v. Sedgwick Claims Mgmt. Servs., Inc.,*
769 F. Supp. 2d 568 (D.N.J. 2011)....................................................................................18, 25

*Doe v. Standard Ins. Co.,*
852 F.3d 118 (1st Cir. 2017)...................................................................................................21

*Donovan v. Mazzola,*
716 F.2d 1226 (9th Cir. 1983).................................................................................................28

*Ebensen v. Life Ins. Co. of N. Am.,*
2016 WL 1089160 (M.D. Pa. Mar. 21, 2016).........................................................................29

*Funk v. Cigna Grp. Ins.,*
648 F.3d 182 (3d Cir. 2011)....................................................................................................25

*Gregg v. Transportation Workers of Am. Int'l,*
343 F.3d 833 (6th Cir. 2003)...................................................................................................28

*Haisley v. Sedgwick Claims Mgmt. Servs., Inc.,*
776 F. Supp. 2d 33 (W.D. Pa. 2011)..................................................................................18, 25

*Harper v. Aetna Life Ins. Co.,*
No. 10-1459, 2011 WL 1196860 (E.D. Pa. Mar. 31, 2011)....................................................15

*Hession v. Prudential Ins. Co. of Am.*,
  307 F. App'x 650 (3d Cir. 2008)........................................................................6, 23

*In re. Unisys Corp. Long-Term Disability Plan ERISA Litig.*,
  97 F.3d 710 (3d Cir. 1996).................................................................................30

*In re. Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996).................................................................................28

*Kaufmann v. Metro. Life Ins. Co.*,
  658 F. Supp. 2d 643 (E.D. Pa. 2009)....................................................................6

*Kelly v. Reliance Standard Life Ins. Co.*,
  2011 WL 6756932 (D.N.J. 2011)..........................................................................6

*Kinstler v. First Reliance Standard Life Ins.*,
  181 F.3d 243 (2d Cir. 1999)...............................................................................22

*Klinger v. Verizon Communications, Inc.*,
  No. CIV.A.05-CV-5312, 2007 WL 853833 (E.D. Pa. Mar. 14, 2007)...................24

*Lasser v. Reliance Standard Life Ins. Co.*,
  344 F.3d 381 (3d Cir. 2003)...............................................................................28

*McDonough v. Aetna Life Ins. Co.*,
  783 F.3d 374 (1st Cir. 2015)..............................................................................21

*Miller v. Am. Airlines, Inc.*,
  632 F.3d 837 (3d Cir. 2011)....................................................................15, 18, 21

*Mitchell v. Fortis Benefits Ins. Co.*,
  163 F. App'x 183 (4th Cir. 2005).........................................................................22

*Pini v. First Unum Life Ins. Co.*,
  981 F. Supp. 2d 386 (W.D. Pa. 2013).................................................................23

*Post v. Hartford Ins., Co.*,
  501 F.3d 154 (3d Cir. 2007)....................................................................15, 23, 28

*Reed v. Citigroup, Inc.*,
  658 Fed. App'x 112 (3d Cir. 2016).......................................................................18

*Robinson v. Aetna Life Ins. Co.*,
  443 F.3d 389 (5th Cir. 2006)..............................................................................21

*Schwarzwaelder v. Merrill Lynch & Company, Inc.*,
  606 F. Supp. 2d 546 (W.D. Pa. 2009)....................................................................7

*Scott v. Hartford Life & Acc. Ins. Co.*,
  No. CIV.A.03-3696, 2004 WL 1090994 (E.D. Pa. May 13, 2004)........................27

*Songer v. Reliance Standard Life Ins. Co.*,
 106 F. Supp. 3d 664 (W.D. Pa. 2015).........................................................................18

*Strott v. Dimensional Inv., LLC Health & Welfare Plan*,
 No. 2:13CV1245, 2015 WL 1299773 (W.D. Pa. Mar. 23, 2015)............................................18

*Sutley v. Int'l Paper Co.*,
 No. CIV.A.07-105, 2009 WL 703555 (W.D. Pa. Mar. 16, 2009)............................................27

**Statutes & Other Authorities:**

29 C.F.R. 2560.503-1(b)(5)......................................................................................17

## I.    Introduction

In this ERISA-governed long-term disability benefits claim, the Plan Administrator abused its discretion in terminating benefits for Timothy Mullins, a disabled coal miner, after paying him for 4 1/2 years. To make matters worse, the Plan Administrator has wrongfully made a claim against Mr. Mullins for an alleged overpayment of benefits to which it is not entitled.

Timothy Mullins was a coal miner in Buchanan County, in the far southwestern part of Virginia. He left school after the 10th grade and later earned his GED. He enlisted in the Army National Guard for a tour and was honorably discharged. As a civilian, he worked his way up through the ranks in the mining industry and last worked as an Underground Section Foreman for Consol. In that role, he was responsible for the safe operation of his crew of 10-15 people as they worked together to extract coal manually and by machine in the Buchanan Mine in southwestern Virginia.

Due to a host of medical conditions that began with a left ankle fracture in 2015 that did not heal and ultimately led to a complete ankle replacement, all doctors in the case agree that Mr. Mullins can no longer work as a coal miner. Consol began paying disability benefits in 2015, but terminated those benefits in 2019 after new doctors it hired reviewed medical records and reported that they thought Mr. Mullins had some, albeit limited, capacity to work. Consol then determined that he could transfer to other work at a sedentary or light duty physical demand level based on his education, training and experience.

This case is a dispute over whether Mr. Mullins can work and whether there is any suitable employment for him at all today. Mr. Mullins, his doctors and the Social Security Administration say there is not. Consol said there is, and claims to have identified three jobs that he could be employed at, full-time, today.

The Plan Administrator's determination that Mr. Mullins can work is arbitrary and capricious for four reasons:

1.      That decision is based upon very specific determinations made as to Mr. Mullins's functional capacity by doctors who never laid eyes on him and never asked for any tests that could measure specific functional capacity – things like how long he can sit, stand and walk, and how much he can safely lift.

2.      The Plan Administrator's decision to accept the conclusions of non-examining/non-testing physicians as to functional capacity over the opinions of the treating physician, the Social Security Administration, and Mr. Mullins's own self-reports did not have any rational basis. The Plan has never set forth any reason for crediting the opinions of their paper peer review doctors over everyone else.

3.      The Plan's decision to terminate benefits after paying them for 4 1/2 years was not based on any identified change in Mr. Mullins's condition. The Plan arbitrarily chose a different conclusion – "he can work" – from the same medical records it had accepted as proof of claim since 2015.

4.      In supporting its conclusion that Mr. Mullins should be working, the Plan Administrator identified three particular jobs, earning up to $103,200 per year, that it says Mr. Mullins could do. He has neither the training nor the experience to do any of those jobs. The Plan got this part of the case so wrong because it mistakenly determined that Mr. Mullins was the supervisor of the entire Buchanan Mine (an executive-level job requiring an array of technical and management skills). Mr. Mullins was a Section Foreman – a coal miner supervising about a dozen other coal miners. An important job, indeed, but one requiring few knowledge-based, non-

physically-demanding skills, and virtually none that would be reasonably transferable to a new occupation that would allow him to support himself and his family.

The Plan made one other determination that was an abuse of discretion: since the time that the Social Security Administration (SSA) has been paying Mr. Mullins and his family, the plan has offset Mr. Mullins's disability benefits by the SSA payments made to his children. Those offsets were improper and have resulted in a claimant overpayment claim by Consol, which must be resolved here.

## II.     Statement of Relevant Facts

### 1.  Mr. Mullins injured his ankle, and that set in motion a cascade of disabling conditions.

In June 2015, Mr. Mullins, now age 53, suffered a stress fracture complicated by a bone defect in his left ankle. He stopped working and was approved first for short term disability and then long term disability (LTD) benefits by Consol's Claims Administrator, Liberty Life Assurance Company of Boston, now Lincoln Financial Group. (AR3521).

The treatment plan was to let his ankle heal and return to work, but things did not go according to plan. After conservative measures and two surgeries in 2015 and 2016 failed, Mr. Mullins's left ankle was totally replaced in 2017. The extensive claim history shows that he regained some functionality and can stand and walk with a limp for brief periods, although he continues to experience pain and limited range of motion. Throughout his prolonged recovery, the extended time spent on crutches and in a surgical boot caused and aggravated other serious physical problems with his knees, back, neck, shoulders and hands, which have required multiple surgeries themselves. Lincoln summarized his surgical history:

> Mr. Mullins underwent the following surgeries: bilateral knee scope, left shoulder biceps repair, left hand surgery, thoracic surgery x 2, left foraminal discectomy C6-7 with subsequent revision, and right shoulder arthroscopy (January 18, 2018); left ankle

arthroscopy, exploration and debridement posterior tibial tendon (November 25, 2015); total ankle arthroplasty and revision (2016); and left ankle arthroplasty (February 10, 2017).

(AR574, Initial Termination Letter).

Mr. Mullins had a heart attack in 2017. Lincoln acknowledges that his doctors have also diagnosed him with arthritis, degenerative joint disease, osteoarthritis, disc degeneration, chronic pain syndrome, carpal tunnel syndrome, and a host of other arthritic and degenerative musculoskeletal conditions that plague his ankles, knees, hip, back, wrists, hands, and shoulders. (AR1642-43, Appeal Denial Letter). Today, Mr. Mullins uses a motorized wheelchair to get around at home and when he's out, although he can still navigate short distances with a cane. (AR1632, Appeal Denial Letter).

### 2. The Social Security Administration's "fully favorable" decision

The Social Security Administration (SSA) approved Mr. Mullins's claim for SSDI, finding a date of disability of June 11, 2015. (AR1673, SSA Notice of Award letter). The SSA Administrative Law Judge (ALJ) found him completely disabled from any gainful occupation under the rules of the SSA. (AR360-70, SSA Notice of Decision – Fully Favorable). Specifically, with regards to physical impairments, the ALJ found that the severity of Mr. Mullins's impairments were disabling due to degenerative changes in the lumbar spine, ankle pain, inability to bear weight, limited range of movement, as well as his need to use a cane for ambulation. (AR368). Mr. Mullins continues to receive SSDI benefits.

### 3. LTD claim termination at issue

On December 30, 2019, Lincoln sent Mr. Mullins a letter terminating his LTD benefits. (AR572-579, Initial Termination Letter). Lincoln said it had hired a new doctor to review his records. The doctor (Neil Patel, M.D.) noted Mr. Mullins's complex medical history and ongoing

physical issues and thought that Mr. Mullins would have some restrictions and limitations. Although he had never met Mullins, Lincoln's Dr. Patel was certain that Mr. Mullins would be able to work full-time, in part because he was also sure that despite the order by his treating doctor, Mr. Mullins did not actually need a motorized scooter or wheelchair. (AR575). Although not disclosed in the denial letter, Dr. Patel opined that based on the records, Mullins **had always been able to work full-time "safely and consistently" since his date of disability in 2015**. Dr. Patel wrote:

> From a Physical Medicine & Rehabilitation/Pain Medicine perspective, and based on the aforementioned clinical findings, with the indicated restrictions/limitations in place, it would be expected that the employee would be able to safely and consistently perform full-time (8 hours per day, 5 days per week) work activities from the Date of Disability of 6/12/15 through the present date.

(AR816, Dr. Patel Peer Review Report).

Lincoln used this new opinion as the basis for an occupational analysis and named several occupations it said Mullins could perform based on his training, education and experience. Mr. Mullins appealed, but Lincoln had a new doctor review his records again and upheld its decision, citing the same three occupations it identified in the initial termination letter as jobs he could do. Having exhausted his administrative remedies, Mr. Mullins filed his Complaint to dispute the wrongful termination of his LTD benefits. (Doc. #1).

### 4. Lincoln improperly offset Mr. Mullins's disability benefit

Lincoln initially calculated that Mr. Mullins's LTD claim was overpaid resulting from the Social Security award of disability benefits. (AR706). However, a significant portion of those benefits were actually benefits that Mr. Mullins's dependent children received. (AR726). And, while Mr. Mullins remained on claim, Lincoln continued to reduce his benefits by the amount of SSA benefits his children received. Those dependent benefits are paid to his children, not to Mr.

Mullins personally. (AR320). The Plan only allows offsets for other benefits received by a claimant, not by their dependents. (AR13).

### 5. The Policy language

Through his employment at Consol, Mr. Mullins was eligible for its Long Term Disability Plan, (AR7), which is an ERISA welfare benefit plan. (AR20). The full Summary Plan Description can be found at AR29-69. Lincoln administers claims for benefits and determines who qualifies for benefits. (AR22-25). The Plan is self-insured, meaning Consol pays any benefits owed, based on Lincoln's benefit determination. (AR21).

To qualify for benefits under the Plan, a claimant must be "Totally Disabled." (AR18). For the first twelve months, claimants are Totally Disabled if they are unable to perform their own occupation or any other reasonable occupation within Consol. (Id.). After that, claimants are Totally Disabled if they are unable to perform any "Suitable Employment" with any employer, which is any "position for which you were trained in vocational training, or which you are qualified by experience or education." (Id.).

### 6. Standard of Review – arbitrary and capricious

The parties stipulated that this claim is subject to ERISA's arbitrary and capricious standard of review. (Doc. #13).

Even under an arbitrary-and-capricious standard of review, courts reverse decisions based an opinion without a physical examination. *Hession v. Prudential Ins. Co. of Am.*, 307 F. App'x 650, 653 (3d Cir. 2008). *See also Kelly v. Reliance Standard Life Ins. Co.*, 2011 WL 6756932, at *6 (D.N.J. 2011) ("courts are troubled where a plan administrator denies a claim by relying on the paper review reports of consultants that oppose the conclusions of treating physicians"); *Kaufmann v. Metro. Life Ins. Co.*, 658 F. Supp. 2d 643, 650 (E.D. Pa. 2009) (reliance on a non-

examining physician's opinion that stands contrary to the opinions of the physicians who have actually treated the Plaintiff, and is premised on a records review alone, "is suspect and suggests that the insurer is looking for a reason to deny benefits"); *Schwarzwaelder v. Merrill Lynch & Company, Inc.*, 606 F. Supp. 2d 546, 559-60 (W.D. Pa. 2009) ("The Courts have frequently expressed concern where . . . the administrator denies a claim with reliance on the reports of paper review consultants, in opposition to the treating and examining physician's consistent and concurring opinions that the claimant is disabled.").

## III.     Relevant Claim History

The entire history of Mr. Mullins's claim dating back to 2015 includes prior denials and reinstatements and an award of benefits for Mr. Mullins's mental health conditions. The final termination that is at issue here is based entirely on Lincoln's determination that Mr. Mullins's physical conditions on their own do not prevent him from working at a suitable job. This case is not one where Lincoln is arguing that Mr. Mullins's physical conditions were once disabling but have improved to the point where he could do some work. Rather, Lincoln has terminated the claim because its records reviewers said that in their opinion, Mr. Mullins's physical conditions are not now, and never have been, disabling to the point where he could not work at some job full time. Mr. Mullins does not contest Lincoln's summary of his records. Instead, he argues that Lincoln's doctors made determinations about his functional capacity that were not consistent with the evidence they reviewed. Their conclusions were not even internally consistent (finding, for example, that his doctors were treating him appropriately, but their treatment recommendations were wrong), nor were they consistent with the SSA's determination that Mr. Mullins was physically disabled, or Lincoln's own prior determinations since 2015 that Mr. Mullins's physical conditions prevented him from working at any job.

### a. Mr. Mullins explained to Lincoln why he remains unable to work.

Mr. Mullins completed an Activities Questionnaire form dated September 27, 2019 as part of the claim evaluation that led to his LTD termination. (AR1365-67). Lincoln asked Mr. Mullins to, "[d]escribe in your own words, what prevents you from working in <u>any gainful employment</u>." Mr. Mullins explained, "Left ankle weak…pain…unable to concentrate do [sic] to pain, anxiety, depression, nerves…knees and hips and hands hurt do [sic] to activities…5 bulging discs in neck…pain in arms & shoulders." The next question asked, "Please describe your daily routine." Mr. Mullins wrote, "Up & down all during the night due to pain, anxiety, worry…watch some news when able to sit…not for long due to pain…cannot stand or walk because ankle swells & hurts bad!!" Mr. Mullins indicated that he is not able to travel or take vacations, pursue his hobbies, exercise or do volunteer work. His wife and children do most of the household chores, although he is able to bathe and dress himself. He uses a cane to go up and down stairs. He reported that he is able to sit around 30 min at a time, stand and walk a few minutes at a time. He sits for 3 to 4 hours a day total, stands for 1 hour and walks less than 1 hour. Because he sleeps poorly at night he takes naps during the day for about 30 minutes at a time, and spends off and on about 10 hours per day in bed. He uses a cane and wheelchair. He leaves the house about once per week for a doctor's appointment and once on the weekend for church. (AR1365).

This form is important because Mr. Mullins is telling Lincoln that after 4-plus years of being disabled, he's still not able to return to work, and he is explaining why. His medical and life picture had not changed much since he first began receiving benefits.

b.  **The first records review: Dr. Patel**

In December 2019, Lincoln hired a physical medicine/pain management doctor, Dr. Neil

Patel, M.D., to review Mr. Mullins's records. His complete report is at AR807-19. Dr. Patel

found that Mr. Mullins was not wrong or lying about his extensive medical history and ongoing

issues. Following a seven-page summary of the medical treatment Mr. Mullins had received

(AR809-15), Dr. Patel noted:

> The diagnoses supported by the medical evidence (including co-morbids) from the Date
> of Disability of 6/12/15 through the present date are right rotator cuff, right shoulder
> impingement syndrome, left hip bursitis, bilateral hip pain, bilateral primary osteoarthritis
> of hip, femoral acetabular impingement, lumbar radiculopathy, lumbosacral disc
> degeneration, lumbar postlaminectomy syndrome, sacroiliitis, pelvic degenerative joint
> disease, right knee degenerative joint disease, internal derangement of knee, chronic
> ankle pain, osteochondral defect of talus left, post-traumatic arthritis left ankle, stress
> fracture left medial malleolus, myofascial pain, neuropathic pain, non-ST-segment-
> elevation acute myocardial infarction (10/2017), long term use of opiate analgesic,
> polyarthralgia, rash, chronic pain syndrome, borrelia burgdorferi antibody positive, and
> moderate major depression.
>
> The conditions/diagnoses causing impairment are his low back pain, knee pain, shoulder
> pain, and neck pain, all of which are from degenerative changes. The claimant has
> radiological evidence of arthritic and degenerative changes of the cervical, shoulder,
> lumbar and knee regions. The claimant also has impairment due to his right wrist/hand
> pain from carpal tunnel syndrome.

(AR815).

> Dr. Patel concluded,
>
> [Mr. Mullins] has underwent multiple orthopedic surgeries to his shoulder, back, and
> knee regions. The conditions/diagnoses causing impairment are his low back pain, knee
> pain, shoulder pain, and neck pain, all of which are from degenerative changes. The
> claimant has radiological evidence of arthritic and degenerative changes of the cervical,
> shoulder, lumbar and knee regions. The claimant also has impairment due to his right
> wrist/hand pain from carpal tunnel syndrome. Based on the severity of these conditions,
> he would be functionally impaired; and would be supported for restrictions/limitations
> **from the Date of Disability of 6/12/15** through the present date.

(AR816, emphasis added).

Lincoln had approved and re-approved Mr. Mullins's LTD claim because it found that he was **unable** to work beginning on 6/12/15. Without explaining what had changed, Dr. Patel went on to say that Mr. Mullins was able to "**sustain a full-time work capacity** with the following restrictions and limitations in place." (Id. Emphasis added). He said that Mr. Mullins could sit for 30 minutes at a time, up to 6 hours in a day, stand for 15 minutes at a time, for a total of 2.5 hours in a day. (Id.) Dr. Patel, who never examined Mr. Mullins or watched him try to walk, said Mr. Mullins could walk for 30 minutes at a time, for a total of 4 hours in a day. (Id.)

Dr. Patel noted that Mr. Mullins's Orthopedist, Dr. McGarry, had recently stated in a September 17, 2019 office visit that Mr. Mullins's "[t]reatment plan includes avoid heavy lifting over 5 pounds…" (AR813). Dr. Patel also said, "the treatment plan is consistent with the standard of care." (AR817). With no testing, and without explaining why, Dr. Patel disagreed with Dr. McGarry, and opined that Mr. Mullins could lift, carry, push and pull up to 10 pounds frequently and up to 20 pounds occasionally. (AR816).

Dr. Patel noted that Mr. Mullins "cannot kneel, bend, stoop, climb, crawl, and squat, as this will further aggravate the claimant's back pain." (Id.) While Dr. Patel is surely correct about those limitations, he did not explain why he felt Mr. Mullins's pain was not, *and never had been*, aggravated already to the point where, as Mr. Mullins said, it prevented him from working reliably 8 hours per day, 40 hours per week for an employer. Dr. Patel did not explain how he could accurately evaluate Mr. Mullins's functional capacity so precisely, looking at just his medical records, which did not include a formal functional capacity evaluation.

Although Mr. Mullins's claim was initially due to his ankle fracture, which led to two surgeries and resulted in a total ankle replacement, (AR809), Dr. Patel's list of surgeries related to his functional impairment includes only "…multiple orthopedic surgeries to his shoulder,

back, and knee regions." (AR816). Dr. Patel did not list anything related to Mr. Mullins's ankle as a condition causing impairment ("[t]he conditions/diagnoses causing impairment are his low back pain, knee pain, shoulder pain, and neck pain, all of which are from degenerative changes." (AR815).)

Lincoln asked Dr. Patel whether "the motorized scooter ordered by Dr. McGarry is the best treatment option/tool for the claimant." (Id.) Dr. Patel said that no, it was not, because "[t]he medical records do not support any diagnoses causing impairments that would require the claimant to have a motorized scooter." (AR817). Dr. Patel noted, correctly, that Mr. Mullins is "neurologically intact," and that he "does not have any cardiopulmonary issues requiring a motorized scooter." (Ibid.) Dr. Patel did not explain why he thought Mr. Mullins's ankle replacement and associated pain were not causing, and never had caused, functional impairment. Dr. Patel did not discuss how he could tell, looking at the medical records only, that a man who "had a severely antalgic left gait, cane," "right upper extremity pain and numbness…right cervical radiculopathy," "MRI evidence of multilevel cervical spondylosis from C3-4 to C5-7….neck pain that radiates to the left shoulder…," (AR814) and "EMG/NCS show[ing] moderate slowing of right median nerve at wrist involving motor and sensory fibers, moderate slowing of right ulnar nerve at elbow…and multilevel right sided mid-cervical nerve root irritation" (AR810) would be able to use his cane constantly despite his hand, shoulder, neck and back issues and would not benefit from the increased mobility of a scooter/wheelchair. Dr. Patel did not explain why he thought "the treatment plan is consistent with the standard of care," (AR817) while also opining that Dr. McGarry was wrong about the scooter chair.

**c. The Transferrable Skills Analysis that "found" jobs for Mr. Mullins.**

Lincoln used only Dr. Patel's estimate of restrictions and limitations to conduct a "Transferrable Skills Analysis" to see whether there were jobs Mr. Mullins was qualified to do with his 10th grade education and work experience consisting entirely of hard labor jobs, including for the past 15 years working underground in a coal mine. The full TSA report is at AR854-61.

Lincoln's termination letter said that the TSA found there were three occupations that Mr. Mullins could perform. The letter gave the job titles (Production Planner; Supervisor, Terminal Operations; and Manager, Branch) and their respective national monthly wages ($7,252,26; $7,893.60; $8,614.66) and no other information. (AR575).

Lincoln did not disclose this in the denial letters, but the TSA report is based on Lincoln's determination that Mr. Mullins's work history for the prior 15 years was as a Mine Superintendent, Dictionary of Occupational Titles (DOT) code 181.117-014. (AR858). Lincoln's TSA assumed that in this job, Mr. Mullins would have acquired the knowledge, skills and abilities of a mine superintendent, which would then be transferrable to other, less physically demanding, jobs.

Timothy Mullins was never the superintendent of the Buchanan Mine. He was a Section Foreman. (AR657). Yet the TSA shows that in order to find suitable employment for Mr. Mullins based on the restrictions and limitations opined by Dr. Patel, Lincoln gave him credit for having skills that were not part of his job duties as Section Foreman. For example, Lincoln adjusted Mr. Mullins's transferrable skills profile to include "compiling, computing, copying and comparing data," because "Mine Superintendents…compute costs and budgets for payroll." (AR859). While that may be true of Mine Superintendents, this is not what Section Foremen do.

12

The list of "position particulars" that Consol gave Lincoln for Mr. Mullins's job as Section Foreman did not include anything remotely related to "computing costs and budgets for payroll." (AR934-36). Mr. Mullins has a 10th grade education and a GED. Consol never tasked him with "computing costs and budgets for payroll." In short, there is nothing in the record to suggest that Mr. Mullins had the education or experience to perform the duties of a Mine Superintendent.

An Adjusted Variables Summary report in the TSA lists the extensive changes Lincoln made to Mr. Mullins's personal ability profile based on its mistaken determination that he was the superintendent of the mine. (AR859-61). Having revised and inflated his work profile, Lincoln then found that the occupations of Production Planner; Supervisor, Terminal Operations; and Manager, Branch and their respective national monthly wages of $7,252,26; $7,893.60; $8,614.66 were jobs Mr. Mullins could actually go out and get in order to support his family in or near the mountains of southwestern Virginia, where the median household income in 2019 was $32,000. (Exhibit 1, US Census Bureau QuickFacts, Buchanan County, Virginia.).  Lincoln terminated Mr. Mullins's disability benefits.

**d. Lincoln hired a new records reviewer, Dr. Kohan, for the appeal.**

Mr. Mullins appealed. The appeal denial letter summarizes the long list of additional records Mr. Mullins submitted. (AR631-32).  Lincoln again chose not to have a doctor examine Mr. Mullins or have his abilities measured by a Functional Capacity Evaluation. Instead, Lincoln hired a new physical medicine/pain management doctor, Dr. Kevin Kohan, D.O., to conduct a second review of Mr. Mullins's records. (AR838-50). Dr. Kohan, importantly, found "[t]he severity and scope of [Mr. Mullins's pain] is consistent with the severity and scope of [his] medical conditions and intensity of treatment." (AR848-49). However, despite finding that Mr. Mullins's complaints "made sense" given his medical conditions, Dr. Kohan, like Dr. Patel, also

13

disagreed with both Mr. Mullins and Dr. McGarry about Mullins's functional capacity. Dr. Kohan also disagreed with Dr. Patel, finding that Mr. Mullins could sit with no restrictions at all; stand for 20 minutes at a time, up to 3 hours per day; and walk for 15 minutes at a time, up to 2 hours per day. Dr. Kohan agreed with Dr. Patel that Mr. Mullins could lift, carry, push and pull up to 10 pounds frequently and up to 20 pounds occasionally. Like Dr. Patel, he did not address Dr. McGarry's treatment plan limiting lifting to 5 pounds (except to say, in a seeming contradiction, "…the treatment provided is consistent with the standard of care for the apparent level of severity of the condition). (AR848).

Like Dr. Patel, Dr. Kohan thought that Mr. Mullins's records showed that he could work 8 hours per day, 40 hours per week with "no limiting endurance factor." (AR853).

In an Addendum report, Lincoln asked Dr. Kohan to "address the diagnostic testing and correlate the findings to Mr. Mullins' physical examination findings and reported symptoms." (AR851). It is not clear exactly what Lincoln wanted to know or why it was asking, given that Dr. Kohan already said that the diagnostic testing, physical examination findings and reported symptoms were consistent. He repeated that in the Addendum report. (AR851-52).

Lincoln chose to accept the conclusions of Dr. Kohan's records review as proof that it had been correct to rely on Dr. Patel's first records review. It did not discuss the differences of opinion between the two reviewers over Mr. Mullins's functional capacity, seemingly satisfied that they had the same bottom line: Mr. Mullins could work an 8-hour day, 40 hours per week, with some physical restrictions and limitations. The appeal denial letter said those same three occupations it identified earlier (Production Planner; Supervisor, Terminal Operations; and Manager, Branch; no further information) would be jobs that Mr. Mullins could get to support his family. Lincoln upheld the prior decision to terminate his claim.

14

IV.     **Argument**

**Lincoln's decision to terminate Mr. Mullins was arbitrary and capricious. It was not the result of a deliberate, principled reasoning process and is not supported by substantial evidence.**

"An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011); *see also Connelly v. Reliance Standard Life Ins. Co.*, No. CIV.A. 13-5934, 2014 WL 2452217, at *4 (E.D. Pa. June 2, 2014). Moreover, "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion." *Id.* at 848.

Examples of procedural anomalies that suggest arbitrariness include: (1) reversing a decision to award benefits without new medical evidence to support the change in position, (2) relying on the opinions of non-treating over treating physicians without reason, (3) conducting self-serving paper reviews of medical files, (4) failing to address all relevant diagnoses before terminating benefits, (5) relying on favorable parts while discarding unfavorable parts in a medical report, and (6) denying benefits based on inadequate information and lax investigatory procedures. *See Harper v. Aetna Life Ins. Co.*, No. 10-1459, 2011 WL 1196860, at *2 (E.D. Pa. Mar. 31, 2011) (citing *Miller,* 632 F.3d at 845; *Post v. Hartford Ins., Co.,* 501 F.3d 154, 164 (3d Cir. 2007).

1.   **The substantial medical evidence supporting Mr. Mullins's claim did not change. Neither did his condition.**

Lincoln repeatedly certified that Mr. Mullins met the plan's LTD definition of "Totally Disabled" from December 2015 until December 2019 and remained unable to work. For the first year of benefits, Lincoln found that he was unable to work at his own occupation or any other

15

reasonable occupation within Consol (which would be any other job inside the Consol organization at any physical demand level that he has the skills to perform). Then, for the following three years, it also found that he was unable to work in any occupation anywhere. In December 2019, though, Lincoln reversed its decision using the same medical information that it had used to approve his benefits. Nothing had changed in Mr. Mullins's condition from the date he first became disabled in June 2015, and Lincoln does not argue that it did. In fact, Mr. Mullins's records show that his condition had worsened; for example, earlier records documented that he needed a cane for ambulation, but more recent records showed that secondary to issues with his shoulders and hands, he needs a motorized wheelchair. (AR501-02). Lincoln identified that Mr. Mullins has several "degenerative" musculoskeletal conditions. (AR1642-43). Degenerative changes are permanent changes. They will get worse, not better, over time. (*see* Dr. Patel's report where he opines that Mr. Mullins's impairments are permanent, AR816).

Lincoln's peer reviewer, Dr. Patel, reviewed records dating back to 2015, (*see* full report at AR807-19), records from the same time period when Lincoln previously interpreted Mr. Mullins's medical records to find that he was Totally Disabled from his own or any other occupation. Dr. Patel reinterpreted those same records and found different and lesser restrictions and limitations than previous reviewers, even though Dr. Patel's report essentially shows that Mr. Mullins's condition has not changed since he first became disabled. Dr. Patel opined that the restrictions and limitations he found would be in place "from the Date of Disability of 6/12/15 through the present date [12/16/19]" and that those restrictions "are expected to be permanent." (AR816). In other words, Dr. Patel opined that nothing has changed from when Mr. Mullins first became disabled in 2015.

Dr. Patel's statement exposes the unreasonableness of his entire opinion. He is saying that even during the course of the surgeries and other procedures he endured regularly since 2015, Mr. Mullins was never restricted in his ability to do a sedentary or light duty job, 8 hours per day, 40 hours per week.

Similarly, after Mr. Mullins appealed the December 2019 determination, Lincoln's peer reviewer, Dr. Kevin Kohan also reviewed records dating back to when Mr. Mullins first became disabled. (*see* full report at AR838-49). Dr. Kohan, like Dr. Patel, simply reinterpreted Mr. Mullins's previous medical records and claimed to have discerned with precision a greater functional capacity than even Dr. Patel found for Mr. Mullins. (AR848).

Congress enacted ERISA to promote uniformity and consistency in claim determinations and to protect the interests of plan participants like Mr. Mullins. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Consistent with ERISA's purpose of uniformity in claims administration, *Davila*, 542 U.S. at 208, its regulations require administrators to apply plan provisions "consistently with respect to similarly situated claimants." 29 C.F.R. 2560.503-1(b)(5). Mr. Mullins is as close to a "similarly situated claimant" as possible – he is the *same* claimant. Lincoln applied the Plan provisions differently with respect to him when it used the policy terms to find him disabled from 2015 to 2019 and then used those same policy terms to deny his benefits, even though it had no new or different medical evidence. Dr. Patel specifically noted that the restrictions and limitations would be in place from 2015 to the present, showing no change in condition – yet Lincoln still reversed its decision and reinterpreted the same medical evidence to now conclude that Mr. Mullins can perform other occupations.

In the Third Circuit, "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an

17

irregularity that counsels towards finding an abuse of discretion." *Miller*, 632 F.3d at 845. *See also Reed v. Citigroup, Inc.*, 658 Fed. App'x 112, 117 (3d Cir. 2016); *Songer v. Reliance Standard Life Ins. Co.*, 106 F. Supp. 3d 664, 676 (W.D. Pa. 2015); *Strott v. Dimensional Inv., LLC Health & Welfare Plan*, No. 2:13CV1245, 2015 WL 1299773, at *9 (W.D. Pa. Mar. 23, 2015); *Connor v. Sedgwick Claims Mgmt. Servs., Inc.*, 769 F. Supp. 2d 568, 587-88 (D.N.J. 2011); *Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 49 (W.D. Pa. 2011).

Lincoln's decision to terminate Mr. Mullins' benefits, despite his steadily deteriorating condition, is arbitrary and capricious and warrants a reversal by this Court.

**2. Even if he were physically able to do some work, Lincoln's "suitable employment" determination was based on an undisclosed and incorrect assumption that Mr. Mullins was a highly experienced Mine Superintendent.**

The LTD policy protects Mr. Mullins as long as he is completely unable to engage in any suitable employment. "Suitable Employment" is defined as employment in "…a position you were trained in vocational training, or for which you are qualified by experience or education." (AR18). Mr. Mullins, everyone agrees, is unable to return to the work he was doing as a section foreman in the Buchanan Mine. Therefore, if Lincoln finds that Mr. Mullins has the physical capacity to work at another, less physically demanding job (which Mr. Mullins says he does not), then the policy requires that Lincoln identify "suitable employment" for him before deciding that he no longer meets the policy definition of disabled.

Lincoln stated that the TSA found there were three sedentary or light duty occupations that Mr. Mullins could perform: Production Planner; Supervisor, Terminal Operations; and Manager, Branch, with respective national monthly wages of $7,252,26; $7,893.60; and $8,614.66. (AR575, AR1634). Nothing about that determination passes the "real world" test. Mr. Mullins has a 10th grade education and a GED. His entire career has been spent in heavy manual

18

labor jobs. He has not worked at all since 2015, and prior to that he worked underground for 15 years as a coal miner. He has had no formal vocational training in Production Planning, Terminal Operations Supervising, or Branch Managing. He lives in southwest Virginia, where US Census data shows that the median household income is $32,000, meaning even totally healthy former coal miners with similar resumes are not finding jobs offering anything close to $7,200 - $8,600 as a monthly wage. (*see* Ex. 1.)

The TSA report is based on Lincoln's determination that Mr. Mullins's work history for the prior 15 years was as a Mine Superintendent, Dictionary of Occupational Titles (DOT) code 181.117-014. (AR858). **But that wasn't his job**. He was not the superintendent of the Buchanan Mine for the past 15 years, or ever. He was a Section Foreman. (AR657).

In 2013, Consol celebrated the 30th anniversary of the Buchanan Mine and the real mine superintendent, Brett Holbrook, gave an interview to the Bristol Herald Courier. (Ex. 2.) Mr. Holbrook reported that he had been with Consol for 32 years, and had worked at the Buchanan Mine for the past 13 years. The article reported that in the 30 years the Buchanan Mine had been open, it had pumped out more than 92 million tons of coal, making it the largest mine in Virginia. It employed 627 people. In 2016, Consol had an agreement to sell the Buchanan Mine for $420 million, including $398 million in cash. (Ex. 3.) Mr. Mullins was proud to be a small part of that, but he cannot take any credit for being the mine superintendent. He was a section foreman and supervised about a dozen people.

Lincoln did not provide any further information about the three occupations it found suitable for Mr. Mullins in either the denial letters or the TSA, but based on the DOT numbers in the TSA report (AR859), this is what the jobs are:

> TITLE(s): PRODUCTION PLANNER. Plans and prepares production schedules for
> manufacture of industrial or commercial products: Draws up master schedule to establish

19

sequence and lead time of each operation to meet shipping dates according to sales forecasts or customer orders. Analyzes production specifications and plant capacity data and performs mathematical calculations to determine manufacturing processes, tools, and human resource requirements. Plans and schedules workflow for each department and operation according to previously established manufacturing sequences and lead times. Plans sequence of fabrication, assembly, installation, and other manufacturing operations for guidance of production workers. Confers with department supervisors to determine status of assigned projects. Expedites operations that delay schedules and alters schedules to meet unforeseen conditions. Prepares production reports. May prepare lists of required materials, tools, and equipment. May prepare purchase orders to obtain materials, tools, and equipment. DOT CODE: 012.167-050. (Ex. 4.)

TITLE(s): SUPERVISOR, TERMINAL OPERATIONS (motor trans.) Manages terminal operations of passenger or freight motor transportation company: Observes personnel performing duties and studies terminal operations reports on revenues derived, costs of operation, accidents, and frequency of personal or merchandise claims for losses or damages, to determine changes in work practices and procedures necessary to improve operations and reduce claims. Inspects terminal facilities for conformance to prescribed standards of safety and cleanliness, and for maintenance or repair required, and initiates requisitions for corrective actions. Enforces worker compliance with established safety rules and regulations and measures to protect safety of employees and customers and security of merchandise, property, and equipment. Reviews accident reports and takes actions prescribed by company policy. Evaluates worker performance and recommends or initiates personnel actions. May process or attempt to resolve employee grievances according to union contract procedures. DOT CODE: 184.167-242. (Ex. 5.)

TITLE(s): MANAGER, BRANCH (any industry). Directs production, distribution, and marketing operations for branch plant, or assigned territory of industrial organization: Coordinates production, distribution, warehousing, and sales in accordance with policies, principles, and procedures established by MANAGER, INDUSTRIAL ORGANIZATION (any industry) 189.117-022. Confers with customers and representatives of associated industries to evaluate and promote improved and expanded services in area. Develops plans for efficient use of materials, machines, and employees. Reviews production costs and product quality, and modifies production and inventory control programs to maintain and enhance profitable operation of division. Reviews operations of competing organizations, and plans and directs sales program to develop new markets, using sales aids, advertising, promotional programs, and field services. Directs personnel program. Directs preparation of accounting records. Recommends budgets to management. May be designated according to title of area of jurisdiction as Manager, District (any industry); Manager, Local (any industry); Manager, Regional (any industry). DOT CODE: 183.117-010. (Ex. 6.)

Mr. Mullins worked underground mining coal with his crew. He did not work with a computer. He has a 10th grade education. He was exceptional at getting his crew underground

and safely back out again with enough coal to make the operation financially successful for Consol. That's it. His relatively high salary reflected the difficult and dangerous work he did for Consol, not his educational background or scope of his responsibilities and transferrable skills. He supervised a crew of 10-15 people, not an entire $400+ million mining operation.

In contrast, Brett Holbrook, the real Buchanan Mine Superintendent, has two degrees: a bachelor of science degree in mining engineering technology from the West Virginia Institute of Technology, and a bachelor of science degree in business administration from Tusculum College. (Ex. 7, Brett Holbrook profile, Bristol Herald Courier). Like Mr. Mullins, Mr. Holbrook worked as a Section Foreman earlier in his career, but he was promoted from that job to Mine Superintendent. (*Ibid*.) They are not the same job.

Brett Holbrook is qualified by his training, education and experience for the jobs Lincoln identified, but Timothy Mullins is not. Mr. Mullins was a coal miner. Neither his direct experience nor his GED would prepare him to start a later-in-life new career "[p]lan[ing] and prepar[ing] production schedules for manufacture of industrial or commercial products," "[m]anag[ing] terminal operations of passenger or freight motor transportation company," or "[d]irect[ing] production, distribution, and marketing operations for branch plant, or assigned territory of industrial organization." In order to justify its benefit termination, Lincoln used the wrong job description (Mine Superintendent) and made many adjustments to Mr. Mullins's transferrable skills profile based on it, which was an abuse of its discretion.

Indeed, numerous cases have reversed a termination of benefits based on an occupational analysis that ignores the duties the plaintiff can and did perform. *See*, *e.g.*, *Doe v. Standard Ins. Co.*, 852 F.3d 118, 124 (1st Cir. 2017) (citing *Miller*); *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 381 (1st Cir. 2015); *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 396 (5th Cir. 2006);

21

*Mitchell v. Fortis Benefits Ins. Co.*, 163 F. App'x 183, 189-91 (4th Cir. 2005); *Kinstler v. First Reliance Life Ins.*, 181 F.3d 243, 253 (2d Cir. 1999).

**3. There are better tools for determining functional capacity than merely looking at medical records. Lincoln had real world options if it truly wanted an accurate picture of Mr. Mullins's functional capacity.**

Dr. Patel, and later Dr. Kohan, opined that Mr. Mullins had a greater functional capacity than his treating physician Dr. McGarry, and the SSA, and Mullins himself said he did. As a responsible fiduciary, charged with acting in Mr. Mullins's best interests, Lincoln had to decide what to do next. It could have decided that since Dr. Patel had confirmed Mr. Mullins did have the medical conditions he claimed to have (which is really what a records review does best), the weight of the substantial evidence favored Mr. Mullins's assessment of his functional capacity. If Lincoln was unsure who to believe, the policy gave Lincoln the right to have a doctor of its choice examine Mr. Mullins.

> The LTD Claims Administrator reserves the right to have an examination conducted by the doctor of its choice, have you undergo vocational evaluation and training, or otherwise be examined, at no cost to you, while you are claiming LTD benefits. There is no limit on the number of times you can be required to do this.

(AR41).

Similarly, Lincoln could have required Mr. Mullins to undergo a Functional Capacity Evaluation (FCE), which would have directly measured his tolerances for lifting, standing, walking, sitting, etc. FCEs are administered by trained physical therapists, and any limitations due to pain complaints can be correlated with physical responses, such as increases in heart rate, blood pressure and breathing.

For the appeal, Lincoln chose instead to repeat the same paper records review with a different doctor. Then Lincoln chose to accept the functional capacity opinions of Dr. Patel and Dr. Kohan, even though neither doctor met Mr. Mullins and had not identified any

22

inconsistencies in his medical records. Instead of examining Mr. Mullins or ordering an FCE, Lincoln performed the TSA discussed above and said it found suitable employment for Mr. Mullins.

Of course, there is no requirement that administrators avail themselves of their right to obtain an independent medical examination. *See Pini v. First Unum Life Ins. Co.*, 981 F. Supp. 2d 386, 414 (W.D. Pa. 2013) (concluding, based on the circumstances, that the insurer did not need to obtain another examination). However, "failure to produce an independent medical examination of a claimant before denying his or her application for benefits may raise questions about the thoroughness and accuracy of the benefits determination." *Id.* (citation omitted). An in-person examination might have been particularly useful in this case, given that Dr. Patel merely reviewed and reinterpreted records dating back to 2015 – records that Lincoln had previously accepted as adequate proof of his claim.

An adverse determination based on a paper review rather than an independent medical examination prompts courts to "consider the circumstances that surround an administrator ordering a paper review." *Hession v. Prudential Ins. Co. of Am.*, 307 F. App'x 650, 654 (3d Cir. 2008). In fact, heavy reliance on a peer review, without giving credit to a claimant's treating physicians is a procedural irregularity. *Id.* ("Prudential [] relied heavily, if not exclusively, on Dr. Bauer's opinion . . . . [where] Hession's treating physicians opined strongly and repeatedly that she was unable to work full-time"). *See also Post v. Hartford Ins. Co.*, 501 F.3d 154, 166 (3d Cir. 2007) (finding a procedural irregularity where insurer relied heavily on peer review); *Bradley v. Liberty Life Assur. Co.*, No. 15-387 (RBK/KMW), 2016 WL 3450816, at *11 (D.N.J. June 21, 2016) ("Throughout this circuit, and indeed nationwide, the weight of authority is that courts are troubled where a plan administrator denies a claim by relying on the paper-review

23

reports of consultants that oppose the conclusions of treating physicians"); *Klinger v. Verizon Communications, Inc.*, No. CIV.A.05-CV-5312, 2007 WL 853833, at *3 (E.D. Pa. Mar. 14, 2007) (without an independent medical examination, administrators face the "uncomfortable argument . . . that the administrator gave greater weight to the opinions of medical experts who did not physically examine the plaintiff than to those who did.").

Here, Dr. Patel's opinion should have raised some questions at Lincoln, if only because he opined that Mr. Mullins **had never been unable to work a full-time job**, since the date he became disabled on 6/12/2015. That defies credibility. At a <u>minimum</u>, it does not account for the long list of surgeries Mr. Mullins underwent. (AR574). Yet, Lincoln arbitrarily adopted this new opinion with no discernable reasoning process at all, untroubled by the contradictions within the report itself (such as finding that Dr. McGarry was treating Mr. Mullins appropriately but was wrong about Mr. Mullins's lifting restriction of 5 pounds and need for a motorized wheelchair) and the reversal of Lincoln's prior repeated determinations that the same evidence Dr. Patel relied on had previously supported Mr. Mullins's disability claim.

4. **Consol has other options for coal miners who have the functional capacity to return to work besides abruptly terminating their disability benefits.**

In an interview with the Bristol Herald Courier marking the 30-year anniversary of Buchanan Mine, Jack Richardson, vice president of Consol's Central Appalachia Operations said, "Really, the best resource we have is not the [metallurgical] coal or the methane gas we capture... it's the people." (Ex. 2.) The disability benefit plan Consol established to protect its "best resources" gives Lincoln an array of options to help people like Mr. Mullins return to work. It promises, "[t]he Claims Administrator will also assist you and the Company with your return-to-work plan, through a joint effort with you, your treating physician, and the Claims Administrator. The goal will be to return you to work at the very earliest opportunity you are

24

able to perform meaningful work." (AR41). Consol's LTD Plan promises a robust program for "Vocational Evaluation and Training During Receipt of LTD Benefits." (AR35-36). The program is designed to ensure that Consol employees who cannot return to their own job are able to receive training for a new job while receiving their disability benefit. Importantly, the program ensures that even if the new job pays less than the LTD benefit, Consol would make up the difference: "[f]ollowing successful completion of Company approved vocational training and attainment of full-time Suitable Employment, if your gross income from full-time Suitable Employment and Other Income or Benefits available to you does not provide at least your Monthly LTD Benefit, the Plan may provide you with benefits that, together with your Other Income or Benefits and full-time Suitable Employment gross income, will give you your Monthly LTD Benefit." (AR36).

Consol never invited Mr. Mullins into its vocational training program, likely because it knew his coal mining skills, coupled with his gale of physical problems, means that a successful transition to other "meaningful work" and suitable employment was not possible.

5. **Lincoln required Mr. Mullins to apply for SSDI, yet failed to fully consider his Social Security Disability award.**

Consol's policy requires claimants to apply for Social Security benefits, and Consol benefits financially from an award of government benefits by offsetting the LTD benefits it pays. (AR39). Courts in the Third Circuit, including this Court, have held that failure to consider a favorable Social Security determination weighs in favor of a court finding the administrator's determination arbitrary and capricious. *Balas v. PNC Fin. Servs. Grp., Inc.*, 2012 WL 681711, at *12 (W.D. Pa. Feb. 29, 2012); *Haisley*, 776 F. Supp. 2d at 51; *Connor*, 796 F. Supp. 2d at 585-86; *Funk v. Cigna Grp. Ins.*, 2010 WL 3522085, at *3, n.8 (D.N.J. Aug. 31, 2010), rev'd in part, vacated in part, 648 F.3d 182 (3d Cir. 2011).

Here, Lincoln's denial letter says, in a single, boilerplate paragraph, that it "fully considered" Mr. Mullins's SSA award. (AR576-77). But Lincoln provides no more information about how it "fully considered" the SSA determination than it did about how it "found" three lucrative jobs that would be suitable employment for Mr. Mullins. Dr. Patel's review simply states, "[o]n 4/3/2018, there is a letter from Social Security Administration. The notice of decision is Fully Favorable." (AR815). Dr. Patel does not explain why he disagrees with the SSA determination, nor does he discuss any of the findings by the SSA's Administrative Law Judge (ALJ). Neither does Lincoln. Anywhere.

The ALJ found, among other things, that Mr. Mullins met the SSA's definition of disability due to the severity of his physical health impairments. (AR368). The ALJ gave a well-reasoned analysis of Mr. Mullins's medical records, explaining how Mr. Mullins's physical impairments prevent him from working. (AR368-70). Some of those reasons included spinal degeneration, inability to bear weight, limited range of movement, and Mr. Mullins's need for a cane to walk. (AR368). However, despite Lincoln's claim that it fully considered the ALJ's well thought out opinion, there's no evidence that it did anything more than select the boilerplate "considered the SSA determination" text to include in the denial letter. Lincoln leaves the Court with no reasoning to assess its failure to credit the SSA's determination.

6. **ERISA requires that Lincoln explain its reasoning and why it chose to rely on the opinions of its paper reviewers. How else can the Court determine whether or not Lincoln's thinking process was deliberate and principled?**

Administrators cannot insulate themselves from liability simply by hiring a third-party physician to review the file. ERISA requires a "meaningful dialogue between ERISA plan administrators and their beneficiaries." *Booton v. Lockheed Med. Ben. Plan,* 110 F.3d 1461, 1463 (9th Cir. 1997) ("In simple English, what [ERISA's regulations] call for is a *meaningful dialogue*

between ERISA plan administrators and their beneficiaries."). *See also*, *Sutley v. Int'l Paper Co.*, No. CIV.A.07-105, 2009 WL 703555, at *12 (W.D. Pa. Mar. 16, 2009) ("ERISA's notice provisions require a Plan Administrator to engage in a 'meaningful dialogue' with the participant by explaining the denial of benefits 'and clarifying what information would be necessary to bolster the claim'"); *Scott v. Hartford Life & Acc. Ins. Co.*, No. CIV.A. 03-3696, 2004 WL 1090994, at *5 (E.D. Pa. May 13, 2004) (citing *Booton*, 110 F.3d at 1463) (ERISA required Hartford to engage in what the Ninth Circuit has described as a "meaningful dialogue" with plaintiff in which it explained its decision and clarified what information would be necessary to bolster her application); *Carney v. Int'l Bhd. of Elec. Workers*, No. CIV.A.00-6270, 2002 WL 1060652, at *5 (E.D. Pa. May 23, 2002) (citing *Booton*, 110 F.3d at 1463) (The purposes behind these rules dealing with notice are to encourage prompt review of claims and communication between the applicants and the plan administrator which will facilitate rational decision-making)

A reasonable fiduciary would explain, in the denial letter, why it thought Dr. Patel's paper-file review was more convincing than the opinions of Mr. Mullins's own doctors. Yet Lincoln wholeheartedly adopted Dr. Patel's opinion without any effort to explain why it found him more reliable than the experts and evidence that supported Mr. Mullins's claim. Lincoln gives the Court no basis on which to determine whether Lincoln's decision to adopt the paper review opinions over the opinions of Mr. Mullins, his doctors, the SSA and Lincoln's own prior reviewers makes sense here.

Lincoln's failure is especially troubling because Dr. Patel said that Mr. Mullins's condition had remained unchanged since 2015 – which is when Lincoln previously agreed that his conditions met the policy's definition of Totally Disabled from both his own and any suitable employment.

The June 2020 final denial letter continued the theme of rehashing the opinions of Lincoln's peer reviewers without explaining why Lincoln gave the opinions of those non-examining reviewers more weight than physicians who have treated Mr. Mullins's since 2015. (*compare* AR807-19 and AR838-50 with AR630-41).

Lincoln was not required to defer to the opinions of Mr. Mullins's treating physicians over the opinions of its own hired physicians. *Post v. Hartford Ins. Co.*, 501 F.3d 154, 166 (3d Cir. 2007). *See also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). However, "courts must still consider the circumstances that surround an administrator ordering a paper review [by a non-treating physician]." *Post*, 501 F.3d at 166. And administrators cannot arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of the claimant's physicians. *Nord*, 538 U.S. at 834. If Lincoln disagreed with the opinions of Mr. Mullins's doctors, it was required to explain the "scientific basis" for its disagreement. *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2003) ("…once a claimant makes a *prima facie* showing of disability through physicians' reports…then the burden will lie with the insurer to support the basis of its objection."). Here, for example, Lincoln's doctors gave no scientific reason why they disagreed with Dr. McGarry and specifically thought that Mr. Mullins could safely life more than 5 pounds and did not need a motorized wheelchair.

In order to comply with ERISA's "meaningful dialogue" requirement, administrators must review and assess the opinions of the experts it hires and cannot passively adopt them without question. *In re. Unisys Sav. Plan Litig.*, 74 F.3d 420, 435-36 (3d Cir. 1996). *See also Gregg v. Transportation Workers of Am. Int'l*, 343 F.3d 833, 843 (6th Cir. 2003) (*citing, Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983) ("An independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their

28

responsibilities are fulfilled."); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000).

Moreover, "relying on the opinions of non-treating over treating physicians without reason" is a

procedural irregularity that tends to show arbitrary and capricious behavior. *Connelly v. Reliance*

*Standard Life Ins. Co.*, No. CIV.A.13-5934, 2014 WL 2452217, at *4 (E.D. Pa. June 2, 2014).

*See also Ebensen v. Life Ins. Co. of N. Am.*, 2016 WL 1089160, at *3 (M.D. Pa. Mar. 21, 2016).

> **7. In a related abuse of discretion, Lincoln improperly offset Mr. Mullins's LTD payments by the SSDI award for his dependent children that was paid to his wife.**

Lincoln initially calculated that Mr. Mullins's claim was overpaid resulting from the

Social Security award of disability benefits. (AR706). However, a significant portion of those

benefits were actually benefits that Mr. Mullins's dependent children received. (AR726). And,

while Mr. Mullins remained on claim, Lincoln continued to reduce his benefits by the amount of

SSA benefits his children received. Those dependent benefits are paid to his children, not to Mr.

Mullins personally. (AR320). The SSA letter awarding benefits is addressed to Mr. Mullins's

wife. It is clear that those benefits are for the exclusive benefit of his children: "[w]e have chosen

you to be [Mr. Mullins's son's] representative payee. Therefore, you will receive his checks and

use the money for his needs." (Ibid.)

The Plan says that LTD benefits are offset by "Federal Social Security Act benefits . . .

which *you receive* or which entitles *you* to benefits." (AR13) (emphasis added).

As a matter of law, plan language that states, long term disability benefits "you receive

may be adjusted if you receive . . . disability income from other sources, such as Social Security"

provides that the administrator may only reduce benefits "for disability benefits which the

participant himself receives from other sources, such as Social Security. It does not provide for

29

adjustments for disability benefits which a participant's dependents receive from other sources."
*In re. Unisys Corp. Long-Term Disability Plan ERISA Litig.*, 97 F.3d 710, 715-17 (3d Cir. 1996).

The language in the Consol plan is essentially the same as that in *Unisys*, where the Third Circuit held, as a matter of law, that the provision only applied to SSA benefits that the participant personally received, not to benefits the participant's dependent received from the SSA. Therefore, the Plan may only offset benefits to its participants for SSA benefits that those claimants personally receive, not the benefits of their dependents.

Unless Mr. Mullins has been singled out, which itself would be an ERISA violation, it is not unreasonable to believe that Lincoln and Consol are guilty of wrongfully withholding benefits from many other coal miners and Consol employees based on an award of SSDI benefits to their dependents.

## V. Conclusion

Consol promoted, trusted and depended on Mr. Mullins as a section foreman. He was responsible for the lives of his crew and the safe operation of his section of the mine every day while he was working. Neither Lincoln nor Dr. Patel nor Dr. Kohan presented any evidence that Mr. Mullins was wrong or untruthful about the extent of his functional impairment. Mr. Mullins, his doctors, the SSA, and both of Lincoln's current reviewers agree on a lot. They agree that he has an extensive list of serious medical conditions that can reasonably be expected to cause his chronic pain. They agree that his complaints of pain are supported by test and exam results and are consistent with the treatment he has been receiving. They agree that further improvement is not likely. They agree that as a result of his pain and associated medical conditions, Mr. Mullins has restrictions and limitations on his activities and could not return to the job he was doing as a coal miner. Although they largely agree on all the evidence, they seemingly disagree on whether

30

the cumulative weight of his pain and impairments continue to keep Mr. Mullins out of work in any suitable employment. Without explaining why, Lincoln chose to rely on Dr. Patel and Dr. Kohan over Mr. Mullins, Dr. McGarry, and the SSA.

Lincoln handled Mr. Mullins's claim arbitrarily and capriciously through a parade of procedural irregularities, which this Court and others in the Third Circuit have held to be unlawful under ERISA. First, Lincoln terminated benefits based solely on the review of Dr. Patel, who acknowledged that Mr. Mullins's restrictions and limitations have remained unchanged since 2015 but opined that Mr. Mullins could work full time, and that he had been able to work full time since his date of disability in 2015. Then, Lincoln used Dr. Patel's restrictions and limitations for a Transferrable Skills Analysis which it based on an occupation Mr. Mullins never held and was not remotely qualified for, Mine Superintendent. Although the disagreement about Mr. Mullins's claim was about his functional capacity for work, Lincoln did not have him examined in person or order a Functional Capacity Evaluation. Lincoln chose to terminate Mr. Mullins's benefits rather than offer any vocational services, including income replacement if he was unable to get a job earning at least what he received in disability benefits. The denial letters failed ERISA's notice provisions by failing to explain any discernable reasoning process that led Lincoln to disagree with the opinions of the Social Security Administration, Mr. Mullins's treating physicians, and Mr. Mullins himself.

For those reasons, Mr. Mullins respectfully requests that this Court reverse Lincoln's decision, order the removal of any offset for SSA dependent benefits (and repayment of benefits already offset by those amounts), reinstate benefits or, in the alternative, remand the claim to Lincoln for further consideration, and award pre- and post-judgment interest, and attorneys' fees.

Respectfully submitted,

BY:   /s/ Benjamin W. Glass, III
Benjamin W. Glass, III (VSB #23152)
*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that I have, on June 15, 2021, filed a copy of the foregoing document electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

BY:    /s/ Benjamin W. Glass, III
       Benjamin W. Glass, III (VSB #23152)
       *Admitted Pro Hac Vice*