IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY MULLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case 2-20-cv-1883-NR |
| v. | ) | |
| | ) | |
| THE CONSOL ENERGY, INC. LONG | ) | |
| TERM DISABILITY PLAN, | ) | |
| | ) | |
| Defendant. | ) | |

---

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

David J. Laurent (PA 33150)
William P. Lewis (PA 316527)
BUCHANAN INGERSOLL & ROONEY PC
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA  15219-4413
Telephone:  412-562-8800
Fax:  412-562-1041
david.laurent@bipc.com
william.lewis@bipc.com

*Attorneys for Defendant*

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS .................................................................................. 3

    A.    The LTD Plan Gives the Claims Administrator Discretionary Authority to Make Eligibility Determinations. ................................................................. 3

    B.    Under the LTD Plan, Plaintiff was Eligible for Continuing LTD Benefits Only if he was "Completely Unable to Engage in any Suitable Employment." ................. 4

    C.    Plaintiff Receives LTD Benefits Through March 13, 2020. .................................. 5

        1.    Lincoln Approves Plaintiff for LTD Benefits. ............................................. 6

        2.    The Social Security Administration Denies Plaintiff's First Application for Disability Benefits ...................................................................... 6

        3.    Lincoln Terminates and Subsequently Reinstates Plaintiff's Long Term Disability Benefits. .................................................................... 7

        4.    The Social Security Administration Grants Plaintiff's Second Application for Disability Benefits. .......................................................... 9

        5.    Lincoln Terminates Plaintiff's Long Term Disability Benefits a Second Time. ......................................................................... 9

        6.    Lincoln Terminates Plaintiff's Long Term Disability Benefits a Third Time. ........................................................................ 11

        7.    Lincoln Denies Plaintiff's Appeal. ........................................................... 13

III.  STANDARD OF REVIEW OF BENEFIT DECISIONS UNDER ERISA ..................... 15

IV.   ARGUMENT ................................................................................................... 16

    A.    Substantial Evidence Supports Lincoln's Decision to Terminate Plaintiff's LTD Benefits. .............................................................................. 16

    B.    Lincoln Properly Relied on the Medical Opinions of its Peer Review Doctors, Which Were Based on Plaintiff's Complete Medical Record. ........................... 18

        1.    Lincoln Did Not Abuse its Discretion by Relying on the Opinions of its Peer Review Doctors. ................................................... 18

        2.    Lincoln Reasonably Credited its Peer Review Doctors' Opinions over That of Dr. McGarry. ........................................................ 22

    C.    Lincoln Reasonably Considered But Chose Not to Rely on Plaintiff's Social Security Award. ......................................................................... 25

    D.    Lincoln Did Not Abuse its Discretion by Terminating Plaintiff's Benefits After Having Provided Them for Over Four Years. .............................................. 27

    E.    Substantial Evidence Supports Lincoln's Finding that Plaintiff Could Perform Suitable Employment. ......................................................................... 28

1.      Substantial Evidence Supports Lincoln's Finding that Plaintiff Had
        Sufficient Vocational Experience to Perform Suitable Employment. ...... 29

2.      The Error in Describing Plaintiff's Prior Job Was Not Material. ............. 32

3.      The Cases Plaintiff Relies Upon Are Distinguishable. ............................ 33

F.    Plaintiff's Claim in Count II of the Complaint is Not Ripe for Review. .............. 34

V.   CONCLUSION .................................................................................................................. 36

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Addington v. Senior Vice President of Human Resources Consol Energy Incorporated*,
841 Fed. Appx. 443 (3d Cir. 2020) .................................................................. *passim*

*Addington v. Senior Vice President-Human Res., CONSOL Energy, Inc.*,
2019 U.S. Dist. LEXIS 43830 (W.D. Pa. Mar. 15, 2019), aff'd, 841 Fed.
Appx. 443 (3d Cir. 2020) .................................................................................... 21

*Black & Decker Disability Plan v. Nord*,
538 U.S. 822 (2003) ............................................................................................ 20

*Black v. Long Term Disability Ins.*,
582 F.3d 738 (7th Cir. 2009) .............................................................................. 25

*Bluman v. Plan Adm'r & Trs.*,
491 F. App'x 312 (3d Cir. 2012) ................................................................... 5, 19

*Burk v. Broadspire Servs., Inc.*,
342 Fed. Appx. 732 (3d Cir. 2009) ..................................................................... 25

*Bussian v. RJR Nabisco, Inc.*,
223 F.3d 286 (5th Cir. 2000) .............................................................................. 21

*Doe v. Standard Ins. Co.*,
852 F.3d 118 (1st Cir. 2017) .............................................................................. 33

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir. 1983) ............................................................................ 21

*Fleisher v. Standard Ins. Co.*,
679 F. 3d 116 – 21 (3d Cir. 2012) ...................................................................... 15

*Gregg v. Transportation Workers of Am. Int'l*,
343 F.3d 833 (6th Cir. 2003) .............................................................................. 21

*Hess v. Reg-Ellen Mach. Tool Corp.*,
423 F.3d 653 (7th Cir. 2005) .............................................................................. 35

*Hession v. Prudential Ins. Co. of Am.*,
307 Fed. Appx. 650 (3d Cir. 2008) ................................................................ 21, 22

*Johnson v. UMWA Health & Ret. Funds*,
125 F. App'x 400 (3d Cir. 2005) ............................................................. 15, 28, 34

*Kinstler v. First Reliance Life Ins.*,
181 F.3d 243 (2d Cir. 1999)................................................................................. *passim*

*Lasser v. Reliance Standard Life Inc. Co.*,
344 F.3d 38 (3d Cir. 2003)....................................................................................21, 22

*McDonough v. Aetna Life Ins. Co.*,
783 F.3d 374 (1st Cir. 2015)........................................................................................33

*Metropolitan Life Ins. Co. v. Glenn*,
554 U.S. 105 (2008)......................................................................................................21

*Mitchell v. Fortis Benefits Ins. Co.*,
163 F. App'x 183 (4th Cir. 2005) ................................................................................33

*Nichols v. Verizon Commc'ns, Inc.*,
78 F. App'x 209 212 (3d Cir. 2003) ............................................................................20

*O'Conner v. PNC Fin. Servs. Grp., Inc.*,
2016 WL 2941196 (E.D. Pa. May 20, 2016) ..............................................................25

*Pearson-Rhoads v. Aetna Life Ins. Co.*,
2011 WL 5116633 (E.D. Pa. Oct. 28, 2011)...............................................................19

*Robinson v. Aetna Life Ins. Co.*,
443 F.3d 389 (5th Cir. 2006) ......................................................................................33

*Sandoval v. Aetna Life & Cas. Ins. Co.*,
967 F.2d 377 (10th Cir. 1992) ....................................................................................34

*Schlegel v. Life Ins. Co. of N. Am.*,
269 F.Supp.2d 612 (E.D. Pa. 2003) ............................................................................19

*Estate of Schwing v. Lilly Health Plan*,
562 F.3d 522 (3d Cir. 2009)........................................................................................22

*Shatto v. Liberty Life Assurance Co.*,
2016 U.S. Dist. LEXIS 131097 (E.D. Pa. Sep. 26, 2016) ..........................................29

*In re. Unisys Sav. Plan Litig.*,
74 F.3d 420 (3d Cir. 1996)...........................................................................................21

I.      **<u>INTRODUCTION</u>**

The Court should dismiss Plaintiff's claim for additional long term disability benefits

under the Consol Energy, Inc. Long Term Disability Plan ("LTD Plan").  The LTD Plan confers

discretionary authority on the Plan Administrator and, by extension, the Claims Administrator, to

decide benefit eligibility, construe the terms of the plan, and conduct reviews and appeals of its

benefits determinations.  Therefore, to prevail, Plaintiff had to demonstrate that the Claims

Administrator's decision to terminate his benefits effective March 13, 2020 was arbitrary and

capricious.  Plaintiff failed to meet this standard.

Plaintiff received benefits under the LTD Plan for over four years after injuring his left

ankle, and then incurring various other functional impairments involving his back, knee,

shoulder, neck, and ankle, as well as a mental impairment.  On December 30, 2019, however,

Lincoln Financial Group ("Lincoln"), the Claims Administrator, determined that,

notwithstanding Plaintiff's physical impairments, Plaintiff could perform sedentary work and,

given his vocational experience, he no longer satisfied the definition of Total Disability.

Nonetheless, Lincoln acknowledged that Plaintiff continued to suffer a mental

impairment that satisfied the definition of Total Disability until March 13, 2020, when the one

year limit on benefits due to a mental impairment expired.  Therefore, Lincoln informed Plaintiff

that his benefits would be terminated effective March 13, 2020.  Under the terms of the LTD

Plan, Plaintiff appealed this decision, but Lincoln denied the appeal.

Plaintiff then filed this lawsuit, arguing that Lincoln abused its discretion for four

reasons; however, as set forth more fully below, the Court should reject all four arguments,

principally because substantial evidence supports Lincoln's decision and the Third Circuit

recently rejected two of the very same arguments ***<u>in another case involving the same LTD Plan</u>***,

*See Addington v. Senior Vice President of Human Resources Consol Energy Incorporated,* 841 Fed. Appx. 443 (3d Cir. 2020) (non-precedential).[1]

**First**, contrary to Plaintiff's argument, Lincoln "was not required 'to accord special deference to the opinions of the treating physicians,'" and legitimately relied on the opinions of consulting experts that Lincoln retained even though they never personally examined Plaintiff. *Addington,* 841 Fed. Appx. at 448.

**Second**, contrary to Plaintiff's argument, Lincoln rationally relied on the opinions of the consulting experts that Lincoln retained.  Each of those experts expressly opined that Plaintiff could perform sedentary work.  In contrast, none of Plaintiff's doctors ever expressed a clear opinion on that issue and, in any event, crediting Lincoln's experts over one or more of Plaintiff's doctors was not an abuse of discretion.  As the Court explained in *Addington,* "[t]o the extent that Addington challenges specific conclusions drawn by physicians and analysts employed by or contracted with by Liberty, we decline to 'substitute [our] own judgement for that of the defendants in determining eligibility for benefits.'"  *Id.*

The same holds true for Lincoln's decision to credit its consulting experts' opinions over those expressed in a two-year old decision by the Social Security Administration ("SSA").  As the Court said in *Addington*, "Liberty did explain in those letters why it was taking a different position from the SSA, stating on both occasions that its review included vocational and medical assessments that were not considered by SSA."  *Id*.  The same is true here.

**Third**, contrary to Plaintiff's assertion, the fact that Plaintiff had been receiving benefits for several years before Lincoln terminated the benefits was largely due to two events that no

---

[1] Although the *Addington* decision is non-precedential, the LTD Plan submits that it is highly persuasive given that it involved the very same plan terms and many of the same issues.

2

longer applied as of March 13, 2020:  Plaintiff had recovered from ankle surgery he had in 2017 and he no longer qualified for one year of Total Disability benefits based on a mental impairment (those benefits were exhausted as of March 13, 2020).

**Fourth**, contrary to Plaintiff's argument, the Administrative Record contains substantial evidence supporting Lincoln's determination that Plaintiff could perform Suitable Employment (as defined in the LTD Plan) and, therefore, no longer qualified as disabled.  Under the terms of the LTD Plan, the Claims Administrator was not required to identify jobs that Plaintiff could actually secure in his local area.  Moreover, notwithstanding the mistake in identifying his last job title, Plaintiff's vocational experiences, as reflected in the Administrative Record, demonstrated that he could perform one or more of the jobs the Claims Administrator identified.

For all of these reasons and those discussed below, Plaintiff's Complaint should be dismissed.

## II.      STATEMENT OF FACTS

### A.      The LTD Plan Gives the Claims Administrator Discretionary Authority to Make Eligibility Determinations.

The Consol Energy, Inc. Health and Welfare Plan document ("Plan Document") (AR 55-69) includes, as a component plan, the Consol Energy Inc. Long Term Disability Plan Summary Plan Description ("LTD Plan").  (AR30-55).[2]  The Plan Document expressly incorporates the more detailed provisions of the LTD Plan for the various benefits provided thereunder.  (*See* Plan Document, Section 4.1, AR60).

---

[2] The documents cited to herein are contained in the parties' Joint Appendix consisting of all plan documents and the Administrative Record pertaining to Plaintiff's claim for long-term disability benefits.  Pursuant to this Court's Order at ECF No. 18, once briefing is completed the parties will file an unsealed, deferred joint appendix consisting of all cited documents, with any confidential medical, financial, and personal identifying information redacted.

Pursuant to the terms of the LTD Plan, the Plan Administrator of the LTD Plan is the Senior Vice President of Human Resources for Consol Energy, Inc.  The Claims Administrator is Liberty Life Assurance Company of Boston, which later become Lincoln Financial Group ("Lincoln").[3]  (AR21-22).

The Plan Document gives the Plan Administrator discretionary authority as it relates to the interpretation, application, and the procedures of the LTD Plan (AR61-62). The LTD Plan similarly grants discretion to the Plan Administrator.  (AR13, 14, 16).

The Plan Administrator, in turn, delegated discretionary authority to Lincoln as the Claims Administrator to construe all terms, provisions, conditions and limitations of the LTD Plan. (AR20).

Based on these LTD Plan provisions, the parties stipulated that the Claims and Plan Administrator had discretionary authority and that, as a result, the Court should apply the arbitrary and capricious standard of review.  (ECF No. 13).

**B.     Under the LTD Plan, Plaintiff was Eligible for Continuing LTD Benefits Only if he was "Completely Unable to Engage in any Suitable Employment."**

The LTD Plan provides benefits to eligible employees who are Totally Disabled as defined by the Plan.  The LTD Plan states in this regard as follows:

> ***To be eligible for LTD benefit payments, you must become Totally Disabled (which term is defined in the Definitions section of this SPD) while you are covered under the LTD Plan***.  You must remain under the care of a licensed and qualified physician with a course of treatment appropriate for your Total Disability. You also must submit proof of your continued Total Disability when it is requested by the LTD Claims Administrator, and meet all the other terms and conditions for benefit payments.  (Emphasis added).  (AR9).

---

[3] Lincoln Financial Group acquired Liberty Life Assurance Company of Boston in or about May 2018 and assumed its responsibilities as Claims Administrator under the Plan.  For ease of reference, Defendant will refer to Consol's Claims Administrator as "Lincoln" throughout its briefing.

The LTD Plan defines "Total Disability" as follows:

To be considered Totally Disabled, you must meet the following requirements: ***During the first 12 months of your Total Disability following the 26 week Qualifying Total Disability Period***, you must be unable to perform the material and substantial duties of your regular occupation or any reasonable alternative offered by the Company . . .

***After the first 18 months of your Total Disability (all the time you spend completing the Qualifying Total Disability Period will count in the 18 months) you must be completely unable to engage in any Suitable Employment.  Your Total Disability must be the same Total Disability that you had during the Qualifying Disability Period***.  (Emphasis added).  (AR18).

The LTD Plan, in turn, defines "Suitable Employment" as follows:

Suitable Employment ***is full-time or part-time employment in a position for which you were trained in vocational training, or for which you are qualified by experience or education***.  This may be inside or outside of the Company.  For purposes of compensation/benefit calculations, the ***Plan (and Claims) Administrator has sole discretion to determine what is Suitable Employment*** for any individual and what is a reasonable compensation for that position . . . (Emphasis added).  (AR18).

Accordingly, Plaintiff was entitled to STD benefits for up to twenty-six (26) weeks (the Qualifying Disability Period) and then LTD benefits under the LTD Plan for up to twelve (12) months so long as he could not perform his regular job; ***however, after the end of that 18-month period, he would remain Totally Disabled only so long as he was "completely unable to engage in any Suitable Employment***." (AR18).  Moreover, to be considered Totally Disabled after the first 18-month period, the disabling condition must have been "***the same Total Disability that you had during the Qualifying Disability Period***."   Consequently, impairments that arose after Plaintiff exhausted the twenty-six (26) weeks of STD coverage could not be considered in determining whether Plaintiff was Totally Disabled under the LTD Plan.

### C.    Plaintiff Receives LTD Benefits Through March 13, 2020.

The Administrative Record shows that Plaintiff received STD for six months (from June 12, 2015 through December 16, 2015) and then LTD benefits for over four years – from

December 17, 2015, through March 13, 2020 (when Lincoln determined that Plaintiff no longer satisfied the definition of Total Disability).  (AR3476; AR3524).  The claim documents consist of, *inter alia*, claim correspondence, medical documents and treatment records obtained by Lincoln, appeal records submitted on behalf of Plaintiff by his counsel, multiple Transferrable Skills Analyses, and multiple Peer Review Reports.  (*See* AR71-3546).

### 1.      Lincoln Approves Plaintiff for LTD Benefits

Plaintiff worked for Consol as a Section Supervisor from April 12, 2010 through June 11, 2015.  (AR862).  Plaintiff ceased working for Consol after sustaining an injury to his left ankle.  (AR3520).  On June 24, 2015, Lincoln approved Plaintiff for short term disability benefits.  (AR3477-3476).  When Plaintiff's short term disability benefits were exhausted after six months, Lincoln approved Plaintiff for long term disability benefits pursuant to the LTD Plan, starting December 17, 2015.  *Id*.

At the time he was granted LTD benefits, Plaintiff's diagnoses included a stress fracture of the left foot and ankle, osteochondritis affecting the left ankle, and moderate to severe lumbar region radiculopathy.  (AR775; AR3478; AR3514; AR3518-3519).  Plaintiff also had a history of treatment for anxiety and depression.  (AR211; AR1299).  Therefore, because the LTD Plan extended coverage beyond eighteen months ***only*** for disabling conditions that existed during twenty-six (26) weeks of STD benefits, the above listed diagnoses were the only impairments that could be considered in determining whether Plaintiff remained Totally Disabled after the first twelve months of LTD Plan coverage were exhausted.  (AR18).

### 2.      The Social Security Administration Denies Plaintiff's First Application for Disability Benefits

On December 23, 2015, Plaintiff submitted an application for Social Security Disability Insurance (SSDI) benefits.  (AR1337-1340).  In his application, Plaintiff maintained that he was

6

unable to work because of "left ankle problems, osteochondral defect of talus, osteoarthritis, degenerative disc disease, cervical post-laminectomy syndrome, thoracic nerve injury, anxiety, depression, pre-diabetes, chronic SI joint pain, and dyspnea on exertion."  (AR1299).

The Social Security Administration ("SSA") denied Plaintiff's application for benefits. (AR1298-1300).  While the SSA noted that Plaintiff's condition "results in some limitations in [his] ability to perform work related activities," the SSA notwithstanding concluded that Plaintiff's condition was "not severe enough to keep [him] from working."  (AR1299).  Plaintiff appealed the SSA's denial of SSDI benefits.  (AR1296).

### 3.    Lincoln Terminates and Subsequently Reinstates Plaintiff's Long Term Disability Benefits.

Meanwhile, by letter dated November 21, 2016, Lincoln advised Plaintiff that it would terminate his benefits effective December 16, 2016, because he no longer satisfied the more stringent definition of Total Disability under the Plan required for LTD benefits extending beyond twelve (12) months.  (AR209-214).[4]

In reaching its determination, Lincoln relied upon a Peer Review Report from Dr. Todd Graham, an Independent Board Certified Physician in Physical Medicine and Rehabilitation with a sub-specialty in Pain Medicine.  (AR769-777).  Based on his review of Plaintiff's medical history to date, Dr. Graham concluded that Plaintiff was capable of working full-time subject to certain restrictions due to Plaintiff's moderate to severe lumbar degenerative disc disease, radiculopathy, and continued issues with Plaintiff's left ankle, which otherwise necessitated various weight bearing restrictions.  (AR210).

---

[4] After 12 months of LTD benefits, the LTD Plan definition for Total Disability changed from being unable to perform one's "regular occupation" to "any Suitable Employment."  (AR18).

7

Dr. Graham advised that Plaintiff was capable of working full-time with the following restrictions:

- *May lift, push, and pull 10 pounds frequently, up to 20 pounds occasionally,*
- *No reaching below waist level,*
- *No restriction on reaching at waist level or above shoulder level,*
- *May sit for one hour intervals, maximum six hours per shift,*
- *May stand and walk 15 minutes per hour, maximum two hours per shift,*
- *No climbing of ladders,*
- *Occasional climbing of stairs,*
- *No crawling, squatting, kneeling, stooping or crouching,*
- *No restrictions on gripping, grasping, fingering keying or fine manipulation.* (AR210).

Lincoln also relied on a Peer Review Report by Dr. Devendra Thakur, an Independent Board Certified Physician in Psychiatry, who opined that based on his review of Plaintiff's psychiatric records, Plaintiff was not suffering from any psychiatric impairment or limitations that would render him incapable of full-time employment. (AR210-211). Finally, Lincoln confirmed that, to date, no additional surgeries were scheduled by any of Plaintiff's providers. (AR3505).

After conducting a vocational review based on the above-recommended restrictions, Lincoln concluded that Plaintiff was capable of full-time employment as a Transportation-Maintenance Supervisor, a Dispatcher (non-emergency), and a Supervisor-Production Control. (AR212-213).

By letter dated December 16, 2016, Plaintiff appealed Lincoln's denial of LTD benefits. In his appeal, Plaintiff attached a psychological evaluation dated September 7, 2016, where Plaintiff's treating psychologist opined that Plaintiff was "unable to work at this time" due to a major depressive disorder. (AR247-272). Lincoln also received information that Plaintiff underwent a total ankle replacement on February 10, 2017, performed by Dr. Aaron Scott. (AR3499-3500).

8

In light of this additional information, Lincoln, by letter dated February 27, 2017, informed Plaintiff that it had reinstated his LTD benefits, finding that "the information received on appeal supports a level of impairment to preclude work capacity." (AR308; AR3499-3500). A file note reflects Lincoln's action plan to follow up in three to four months for a medical review of ongoing rehabilitation. (AR3499).

Plaintiff experienced setbacks in his rehabilitation when he was involved in a motor vehicle accident in August of 2017 and as a result suffered a rotator cuff tear to his right shoulder, which required surgery. (AR3490). Plaintiff subsequently suffered a heart attack on November 11, 2017, which delayed his rotator cuff surgery until a date in early 2018, and otherwise slowed the pace of his overall rehabilitation. *Id*.

### 4. The Social Security Administration Grants Plaintiff's Second Application for Disability Benefits.

On April 30, 2018, the SSA reversed its prior decision denying Plaintiff's application for SSDI benefits. Relying on Plaintiff's updated treatment history, the SSA identified the following impairments affecting Plaintiff: degenerative disc disease, degenerative joint disease of the knee and ankle, osteoarthritis, affective/depressive disorder, drug and alcohol abuse, and anxiety disorder. (AR327). The SSA concluded that Plaintiff was disabled within the meaning of the Social Security Act since June 11, 2015, and awarded Plaintiff SSDI benefits retroactive to December 2015. (AR331).

### 5. Lincoln Terminates Plaintiff's Long Term Disability Benefits a Second Time.

On November 8, 2018, Lincoln, for the second time, terminated Plaintiff's LTD benefits. Lincoln relied on a Peer Review Report by Dr. Lawrence Albers, who surmised that "from a psychiatric perspective, there is insufficient observable clinical data to support an incapacitating psychiatric disorder or the need for any restrictions or limitations while receiving mental health

9

care." (AR353).  Lincoln also relied on a Peer Review Report from Dr. David Bomar, who opined as follows:

> The records support no more than occasional standing or walking at least through the end of 2017.  The records supported no lifting over ten pounds and no overhead reaching with the right arm from 9/12/17 to 3/13/18.  The available records do not support upper extremity restrictions beyond this time.  *Id.*

By letter dated February 20, 2019, Plaintiff again appealed the termination of his LTD benefits.  Plaintiff maintained that he remained disabled based on the SSA's granting of SSDI benefits, updated psychological evaluations (dated December 10, 2018 and January 14, 2019) finding that he continued to suffer from moderate to marked impairment for work-related mental activities, updated physical therapy records, and steroid injections proscribed for his hip. (AR357-411).

By letter dated March 14, 2019, Lincoln reopened Plaintiff's claim for LTD benefits, finding that Plaintiff remained disabled ***principally due to his mental health conditions***.  Indeed, the letter informing Plaintiff that his benefits were being reinstated reminded Plaintiff that, under the LTD Plan, benefits for Total Disability due to Mental Illness are capped at 12 months.[5] (AR536-537).

Lincoln further encouraged Plaintiff to submit any information he would like considered in the event Plaintiff felt he remained disabled due to "non-mental or nervous diagnosis." (AR537).  As such, Lincoln's letter signaled that, absent Plaintiff's mental health conditions (which had a one-year cap on benefits), Lincoln did not view Plaintiff's physical limitations as totally disabling.

---

[5] Claim notes dated March 14, 2019 also reflect Lincoln's decision to grant Plaintiff the full twelve-month mental health benefit limitation was based on the "significant psych issues" the SSA identified in its award of SSDI benefits.  (AR3537-3538).

10

Notably, through March 14, 2019, only two of Plaintiff's mental health providers – not his primary care physician, ankle surgeon, or his pain management specialist – considered Plaintiff incapable of working in any occupational setting.  (AR250-253; AR1351-1353).

### 6.   Lincoln Terminates Plaintiff's Long Term Disability Benefits a Third Time.

At the close of 2019, Lincoln conducted a third review of Plaintiff's continued eligibility for LTD benefits and determined that benefits should terminate once the Plan's Mental Health Limitation was fully paid out as of March 13, 2020.  (AR572-579).  Lincoln relied on a Peer Review Report by Dr. Neil Patel, a physician Board Certified in Physical Medicine & Rehabilitation with a sub-specialty in Pain Medicine.  At the outset, Dr. Patel acknowledged that Plaintiff "reported impairment related to repetitive injuries from working in a coal mine including chronic neck pain, shoulder pain, back pain radiating to the bilateral legs, knee pain, and ankle pain . . . [and that] the medical records also indicate the claimant has a history of substance abuse, depression, and anxiety."  (AR809).  Dr. Patel's report further recognized that Plaintiff had been awarded SSDI benefits retroactive to December 2015.  (AR815).

After a comprehensive review of Plaintiff's complete medical file, which included dozens of records reflecting Plaintiff's ongoing treatment and rehabilitation in the eighteen months following Plaintiff's SSDI award, Dr. Patel concluded that Plaintiff was functionally impaired due to his low back pain, knee pain, shoulder pain, neck pain (all due to degenerative changes), and right wrist/hand pain from carpal tunnel syndrome.  (AR815).  Like each of the previous Peer Review doctors, Dr. Patel expected that Plaintiff's functional impairments would be permanent.  *Id*.

11

Notwithstanding these impairments, Dr. Patel (like the prior Peer Review doctors) concluded that Plaintiff could sustain a full-time work capacity with the following restrictions and limitations:

- *Lifting, carrying, pushing and pulling up to 10 lbs frequently, and up to 20 lbs occasionally,*
- *Reaching in all planes, with overhead reaching occasionally*
- *Typing/fingering/using hands for fine manipulations for up to 15 minutes at a time, with ability to take a five-minute break before resuming these activities,*
- *Sitting for up to 30 minutes at a time, with the ability to change positions for comfort for up to 6 hours in a day*
- *Standing for up to 15 minutes at a time, for a total of 2.5 hours in a day*
- *Walking for up to 30 minutes at a time, for a total of 4 hours in a day*
- *No kneeling, bending, stooping, climbing, crawling, and squatting.*  (AR816).

Dr. Patel's recommended work restrictions diverged slightly from the treatment plan proscribed by Dr. Timothy McGarry, one of Plaintiff's orthopedic doctors.  While Dr. McGarry's treatment plan purportedly included "avoiding heavy lifting over 5 pounds until instructed otherwise"[6] and use of a motorized scooter, Dr. Patel concluded that Plaintiff was capable of lifting, carrying, pushing and pulling up to 10 pounds frequently and up to 20 pounds occasionally.  (AR816).  Dr. Patel also disagreed that a motorized scooter ordered by Dr. McGarry was the best treatment option/tool for Plaintiff given that Plaintiff was neurologically intact and did not have any cardiopulmonary issues requiring a motorized scooter.  (AR816-817).

Before offering his assessment, Dr. Patel ***called and sent letters*** to Dr. McGarry and another orthopedic surgeon who had treated Plaintiff (Dr. Fullager) to confirm that they agreed with his findings that Plaintiff, though functionally impaired, was capable of sustaining a full-time work capacity subject to the above-identified restrictions and limitations.  (AR575).  ***Neither Dr. McGarry nor Dr. Fullager responded to Dr. Patel's inquiries***. *Id*.

---

[6] As set forth more fully below, the five pound restriction appears to have been a carryover from his ankle surgery and not a current restriction.

After receiving Dr. Patel's Peer Review Report, Lincoln referred Plaintiff's file for a Transferrable Skills Analysis / Vocational Review Report.  Taking Dr. Patel's recommended restrictions and limitations into consideration, the Vocational Review Report supplemented the prior vocational review by identifying three positions Plaintiff had the skills and ability to perform:  Production Planner, a Terminal Operations Supervisor, and a Branch Manager. (AR575).

### 7.   Lincoln Denies Plaintiff's Appeal.

By letter dated April 20, 2020, Plaintiff once again appealed the termination of his LTD benefits, and provided over one hundred pages of medical records from multiple providers in support of his appeal.  (AR497; AR3529).  After receiving treatment records through April 9, 2020, Lincoln confirmed with Plaintiff's counsel that it had all relevant treatment records necessary to complete its review.  (AR3528).

Lincoln reviewed the records that Plaintiff submitted in support of his appeal and, based on its review, made the following notation in the claim file:

> …2/27/2020 FOV ***FROM INTERVENTIONAL PAIN MANAGEMENT WHICH NOTES NORMAL POSTURE, NORMAL GAIT, PAIN LEVEL 5/10, NORMAL CHEST AND LUNG EXAM, 5/5 NORMAL MUSCLE STRENGTH LEFT AND R LOWER EXTREMITY, NO IMPAIRMENT OF TANDEM WALKING, STRAIGHT LEG RAISING TEST NEGATIVE*** 4/9/2020 OVN FROM DR. MCGARRY FOR R KNEE PAIN, NO SURGICAL PROCEDURES, ***5/5 MOTOR STRENGTH, 5/5 STRENGTH R AND L QUADRICEPS AND HAMSTRING, STABILITY NORMAL R AND L KNEE, FLEXION 100 DEGREES R KNEE ROM, 115 DEGREES L KNEE ROM, MODERATELY R ANTALGIC GAIT. PLAN STEROID INJECTION AND ASPIRATION R KNEE,*** F/U PRN* 3/3/2020 LETTER FROM DR. MCGARRY TO HOVEROUND STATING PATIENT IS MOTIVATED AND WILLING TO USE POWER MOBILITY DEVICE (SCOOTER) IN HIS HOME.  (Emphasis added). (AR3529)

Lincoln also retained Dr. Keven Kohan, D.O. – also Board Certified in Physical Medicine & Rehabilitation/Pain Medicine – to review Plaintiff's updated file.  (AR837-853).  Dr.

13

Kohan's Peer Review Report identified sixty-two distinct medical records that he reviewed. (AR838).

Dr. Kohan assessed Plaintiff's treatment history and medical records through April 9, 2020 and offered the following assessment of Plaintiff's condition:

> There is medical evidence supporting functional impairment caused by the claimant's low back, left ankle and right knee issues for the time period of 3/14/20 to present, therefore restrictions are warranted and listed below.  Regarding the claimant's cervical spine and right shoulder impairments, although they were limiting in the past, the medical records from the time period under review do not show objective findings supporting continued functional impairment.  (AR847).

Due to the ongoing functional impairment to Plaintiff's low back, left ankle, and right knee issues, Dr. Kohan advised that Plaintiff was capable of working full-time with the following restrictions:

- *Standing up to 20 minutes at a time, up to 3 hours total per day*
- *Walking up to 15 minutes at a time, up to 2 hours total per day*
- *Lifting frequently up to 10 lbs., occasionally up to 20 lbs.*
- *Carrying frequently up to 10 lbs., occasionally up to 20 lbs.*
- *Pushing frequently up to 10 lbs., occasionally up to 20 lbs.*
- *Pulling frequently up to 10 lbs., occasionally up to 20 lbs.*
- *Climbing stairs occasionally*
- *Stooping never*
- *Kneeling never*
- *Crouching never*
- *Crawling never*
- *Sitting unrestricted*
- *Reaching unrestricted at desk level bilateral upper extremities (BUEs), occasionally above shoulder and below waist level BUEs*
- *Use lower extremities for foot controls unrestricted RLE, never left lower extremity (LLE)*
- *Fine manipulation unrestricted BUEs*
- *Simple and firm grasping: unrestricted BUEs* (AR635-636).

Lincoln also performed another vocational assessment based on the restrictions Dr. Kohan outlined and once again concluded that Plaintiff had the skills and ability to perform the following occupations on a full-time basis: Production Planner, Terminal Operations Supervisor,

14

and Branch Manager. (AR637). A claim note dated June 17, 2020, confirmed that "[t]he review of the file and the information received on appeal does not alter the previous claim determination." (AR3526).

By letter dated June 17, 2020, Lincoln informed Plaintiff of its decision to maintain its denial of LTD benefits beyond March 13, 2020. (AR630-641). Lincoln acknowledged that the medical evidence supported some impairment with associated restrictions and limitations, but concluded that the medical record "does not support a total inability to function in an occupational setting." (AR637). Lincoln further noted that during its review of Plaintiff's claim, it obtained from social media information indicating a level of activity and functionality inconsistent with what Plaintiff reported to his treating providers. (AR638; AR622-627; AR679).

## III.   STANDARD OF REVIEW OF BENEFIT DECISIONS UNDER ERISA

The parties stipulated that this claim is subject to ERISA's arbitrary and capricious standard of review. (ECF No. 13). Under that highly deferential standard,

> An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence, or erroneous as a matter of law. An administrator's factual findings are not arbitrary and capricious when they are supported by substantial evidence. We have defined 'substantial evidence' to mean relevant evidence that a reasonable mind might accept." (Footnotes omitted).

*Addington*, 841 Fed. Appx. at 447. *See also Fleisher v. Standard Ins. Co.,* 679 F. 3d 116, 120 – 21 (3d Cir. 2012).

Moreover, the Third Circuit "has made clear that the record for arbitrary and capricious review of ERISA benefits denial is the record made before the Plan administrator, which cannot be supplemented during the litigation." *Johnson v. UMWA Health & Ret. Funds*, 125 F. App'x 400, 405 (3d Cir. 2005).

15

IV.     **ARGUMENT**

A.     **Substantial Evidence Supports Lincoln's Decision to Terminate Plaintiff's LTD Benefits.**

Substantial evidence, consisting of a Peer Review medical opinion and Vocational Analyses, supports Lincoln's December 30, 2019 decision to terminate Plaintiff's benefits effective March 13, 2020.  Substantial evidence, consisting of another Peer Review medical opinion and a thorough review of the file, also supports Lincoln's June 17, 2020 decision to uphold that determination.

Lincoln first retained Dr. Patel in December 2019 to conduct a Peer Review Analysis of Plaintiff's complete medical records and Plaintiff's Social Security Disability award from the SSA.  Dr. Patel concluded that Plaintiff remained functionally impaired, but also concluded that notwithstanding his impairments, Plaintiff could perform sedentary work in an occupational setting.  (AR815-816).

Lincoln also retained a vocational consultant who provided a December 2019 Vocational Review that identified three positions for which Plaintiff was qualified to perform.  (AR575).

When Plaintiff appealed Lincoln's decision to terminate his benefits effective March 13, 2020, Lincoln had a second Board Certified physician – Dr. Kohan – review Plaintiff's treatment history and medical file.  Dr. Kohan, who reviewed sixty-two distinct medical records contained in Plaintiff's claims file, including over one-hundreds of pages of medical records submitted by Plaintiff's counsel as part of the appeal, agreed with Dr. Patel that Plaintiff remained functionally impaired and that he was capable of sedentary work.[7]

---

[7] Insofar that Dr. Kohan's recommended limitations and restrictions differed slightly from those proscribed by Dr. Patel, the slight differences are hardly surprising given that Dr. Kohan's review took into account an additional six months of treatment history along with of the additional medical records submitted by Plaintiff's counsel as part of the appeal.  In any event,

16

Significantly, not one of the consulting review physicians, and none of Plaintiff's treating physicians, opined that Plaintiff was incapable of sedentary work due to his physical impairments.

Moreover, contrary to Plaintiff's characterization, Lincoln did not simply rubber stamp the conclusions of its consulting physicians without giving due consideration to the medical record. This is confirmed by the fact that Lincoln ***twice before*** reinstated benefits despite prior Peer Reviews concluding that Plaintiff was capable of full-time work (with appropriate restrictions).

**First**, Lincoln restored benefits in 2017 after Plaintiff produced treatment records (that had not been considered by the Peer Reviewer physician) confirming that he was scheduled for a total ankle replacement. Lincoln also restored benefits in 2019 (subject to the Plan's mental health limitation) in light of the SSA award and treatment notes from various mental health providers, showing that Plaintiff was limited by severe depression and anxiety (an issue not considered by the Peer Reviewer physician). As a result, Plaintiff received the full mental health benefit under the Plan, resulting in continued benefit payments through March 13, 2020.

**Second**, Lincoln declined to reinstate Plaintiff's benefits after March 13, 2020, because Plaintiff's updated treatment history did not support Plaintiff's contention that he was Totally Disabled (within the meaning of the LTD Plan) due to any physical impairment unrelated to his mental health prognosis (for which he received the maximum benefit). Rather, consistent with the findings of Dr. Patel and Dr. Kohan, Lincoln concluded that, after a thorough and independent review of Plaintiff's entire claim, there was no medical documentation to support a

---

Dr. Kohan's ultimate prognosis was consistent with Dr. Patel's conclusion that Plaintiff's was capable of sedentary work.

finding that Plaintiff's symptoms were so severe that they rendered him unable to perform the duties of all occupations, thereby taking him outside the definition of "Totally Disabled" under the LTD Plan.

In sum, at the time of the final, post-appeal determination on June 17, 2020, Lincoln had considered a full medical record (including Social Security findings and treating physician opinions), as well as multiple Peer Reviews and Vocational Reviews.  Both the December 30, 2019 and the June 17, 2020 determinations took into account information that exceeded what had been previously presented, available, and considered.  As such, Lincoln's decision terminating Plaintiff's LTD claim effective March 13, 2020 was supported by substantial evidence.

> **B.    Lincoln Properly Relied on the Medical Opinions of its Peer Review Doctors, Which Were Based on Plaintiff's Complete Medical Record.**

Plaintiff argues that Lincoln's termination of his benefits was arbitrary and capricious because Lincoln relied on the reports of "paper review" consultants and failed to give appropriate consideration to the opinions of his treating physician – specifically, the opinion of Dr. McGarry - who purportedly recommended that Plaintiff "avoid lifting 5 pounds" (this characterization of Dr. McGarry's opinion is discussed more fully below) and supported Plaintiff's request for a motorized wheelchair.  (AR516-518; AR501-502).  Plaintiff faults Lincoln for not explaining the "scientific basis" for its disagreement with Dr. McGarry's prognosis.  Plaintiff's contentions, however, have no legal foundation and are not supported by the record.

> **1.    Lincoln Did Not Abuse its Discretion by Relying on the Opinions of its Peer Review Doctors.**

Lincoln did not abuse its discretion by relying on the opinions of its medical consultants, even though those opinions were based on a "paper review" and purportedly disagreed with one Plaintiff's treating physicians, Dr. McGarry.

18

**First**, as the Third Circuit explained in *Addington,* 841 Fed. Appx. at 448:

> Addington relies principally on the opinion of his primary physician who consistently opined that Addington is totally disabled.  ***However, Liberty was not required to "accord special deference to the opinions of treating physicians*.**  ***To the extent that Addington challenges specific conclusions drawn by physicians contracted with by Liberty, we decline to 'substitute [our] own judgment for that of the defendants in determining eligibility plan benefits*.**"  Our role is to determine whether Liberty's decision to deny Addington benefits was arbitrary and capricious.  On these facts, we cannot conclude that Liberty's decision was so. (Emphasis added and footnotes omitted).

*See also Pearson-Rhoads v. Aetna Life Ins. Co.*, 2011 WL 5116633, at \*12 (E.D. Pa. Oct. 28, 2011) ("That the conclusions of Aetna's consultants were based on a paper review, rather than a physical examination, does not show that Aetna acted arbitrarily and capriciously"); *Schlegel v. Life Ins. Co. of N. Am.*, 269 F.Supp.2d 612, 627-28 (E.D. Pa. 2003) (administrator reasonably relied solely on a review of records by its own non-treating physicians); *Bluman v. Plan Adm'r & Trs.*, 491 F. App'x 312, 315-16 (3d Cir. 2012) ("While [the consulting physician's] opinion diverged from the opinions of [plaintiff's] treating physicians, that professional disagreement did not prevent [the claims administrator] from relying on the [consulting physician's] report.").

Here, the evidence supporting Lincoln's benefits is even more compelling than the facts relied upon by Liberty in *Addington,* where the Third Circuit upheld Liberty's (Lincoln's predecessor) decision to terminate benefits based on the opinions of consulting peer review physicians even though one of the claimant's treating physicians unequivocally maintained that the claimant was totally disabled.  Here, none of Plaintiff's treating physicians opined that he was incapable of sedentary work.

**Second**, both Dr. Patel and Dr. Kohan, as well as Lincoln in its claims notes, and again in its correspondence to Plaintiff's counsel, addressed Dr. McGarry's purported five pound limitation and his support of Plaintiff's request for a motorized scooter.  Thus, as in *Addington,* it

19

was not an abuse of discretion for Lincoln to credit Drs. Patel and Kohan over Dr. McGarry and conclude that Plaintiff was capable of performing sedentary work.

**Third**, Dr. McGarry ordered the motorized wheelchair for Plaintiff due in large part to post-traumatic arthritis in Plaintiff's shoulders caused by the 2017 motor vehicle accident. (AR501-502).  Plaintiff's shoulder injuries, however, do not serve as a valid basis for reinstating Plaintiff's LTD benefits.  As explained in Section II.B above, under the LTD Plan, impairments that arise after the initial twenty-six (26) weeks of STD coverage (like Plaintiff's shoulder injuries) have no bearing on Plaintiff's disability status under the LTD Plan and should not be considered in determining whether Plaintiff remains Totally Disabled.

And insofar that Dr. McGrarry ordered the motorized wheelchair to address impairments dating back to Plaintiff's initial claim for disability benefits, both Dr. Patel and Dr. Kohan disagreed that it was the best treatment option/tool for Plaintiff.  (AR816-817; AR847).  Notably, Dr. Kohan opined that Plaintiff's updated medical records do not support his need for a motorized wheelchair, observing that "[m]any of the information [sic] included in [Dr. McGarry's] letter for obtaining motorized wheelchair (upper extremity weakness, hand abnormalities, restricted shoulder motions and neurogenic claudication) were not mentioned in his or any other provider's recent notes."  (AR847).

**Fourth**, Lincoln had no obligation to explain why it credited "reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  *See also Nichols v. Verizon Commc'ns, Inc.*, 78 F. App'x 209 212 (3d Cir. 2003) (discussing *Black & Decker* and stating that a plan administrator is "justified in placing reliance on the opinions of its own consulting doctors and need not provide a special explanation of its decision to do so.").

20

**Fifth**, in arguing for what amounts to a heightened standard of review, Plaintiff mistakenly relies on case law wholly inapplicable in these circumstances.  To support his contention that Lincoln must defend its decisions with "scientific reason[s]", Plaintiff cites cases addressing when ERISA fiduciaries may properly rely on the advice of financial advisors in the management of a plan.  *See e.g. In re., Unisys Sav. Plan Litig.*, 74 F.3d 420 (3d Cir. 1996); *Gregg v. Transportation Workers of Am. Int'l*, 343 F.3d 833 (6th Cir. 2003); *Donovan v. Mazzola*, 716 F.2d 1226 (9th Cir. 1983); *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000).

Plaintiff's reliance on these and similar cases, however, is misplaced, as they do not address opinions by medical experts or eligibility determinations for ERISA benefits.  *See Addington v. Senior Vice President-Human Res., CONSOL Energy, Inc.*, 2019 U.S. Dist. LEXIS 43830, *19 (W.D. Pa. Mar. 15, 2019), aff'd, 841 Fed. Appx. 443 (3d Cir. 2020) (non-precedential) (holding that breach of fiduciary duty cases involving financial advisors "are of questionable applicability" in cases addressing a plan administrator's reliance on medical experts to make a benefits determination).

**Sixth**, Plaintiff also mistakenly relies on case law that applied a "heightened standard of arbitrary and capricious review" in evaluating the decisions of plan administrators who deny benefits based on the reports of consulting physicians.  *See e.g. Lasser v. Reliance Standard Life Inc. Co.*, 344 F.3d 38 (3d Cir. 2003); *Hession v. Prudential Ins. Co. of Am.*, 307 Fed. Appx. 650 (3d Cir. 2008).  The Third Circuit no longer applies the "heightened standard of arbitrary and capricious review" when consulting experts are involved.

Following the Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Third Circuit directed that "courts reviewing the decisions of ERISA plan

administrators or fiduciaries in civil enforcement actions . . . **should apply a deferential abuse of discretion standard of review across the board** and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009).

Moreover, the cases applying the heightened scrutiny are distinguishable on their facts. For example, in *Lasser*, the Court concluded that the plan administrator's benefit denial was unsupported by substantial evidence where the claimant offered *prima facie* proof of disability (in the form of three treating physicians who said he was disabled, and where two of the plan's own consulting physicians agreed that the claimant was disabled). *Lasser*, 344 F.3d at 391.

In *Hession*, the court held that the administrator's decision was arbitrary and capricious where the claimant's treating physicians "opined strongly and repeatedly that she was unable to work full-time," and where the consulting physician failed to identify any appropriate restrictions or limitations on the claimant's physical abilities due to her impairments. *Hession*, 307 Fed. Appx. at 656.

Unlike these cases, all of Lincoln's Peer Review doctors agreed that Plaintiff was not totally disabled and identified appropriate restrictions for Plaintiff's resumption of work.

Accordingly, Lincoln did not act arbitrarily or capriciously when it terminated Plaintiff's benefits based on the Peer Review Reports of its consulting physicians, who concluded that Plaintiff was capable of sedentary work.

> 2. **Lincoln Reasonably Credited its Peer Review Doctors' Opinions over That of Dr. McGarry.**

Plaintiff relies heavily on the following statement in Dr. McGarry's office notes of September 17, 2019: "Avoid heavy lifting (anything over 5 lbs.)." (AR517). However, Lincoln reasonably credited Dr. Patel's and Dr. Kohan's opinions that Plaintiff could do somewhat more.

22

**First**, when read in context, Dr. McGarry's statement actually appears to be a carryover from Plaintiff's post-operational care plan after undergoing ankle surgery in February 2017:

> Plan:  Counseling – Post-Op Total Ankle Arthroplasty
> I counseled the patient regarding the following:
> Postop Care*:  **I counseled the patient to continue current wound care to the**
> **incision**.  Activity precautions were also discussed.  Follow prescriptions as
> written.  **It is advisable to elevate the involved ankle on 3 – 4 pillows during**
> **sleep and keep protective splints or casts on and dry.**  *Avoid heavy lifting*
> *(anything over 5 lbs.) until instructed otherwise.  Postoperative wound care may*
> *require debridement of nonviable tissues* …. (Emphasis added).  (AR517).

Put simply, there is no indication in Dr. McGarry's notes that Plaintiff still was dealing with "wound care" or had any protective splints or casts, which were clearly post-operative directives; so there is no reason to treat the five pound restriction any differently.

**Second**, even if Dr. McGarry intended the five pound lifting restriction to remain in effect three years after surgery, which is denied, he apparently dropped that restriction in early April 2020.  The five pound lifting restriction was included, word for word, in Dr. McGarry's office visit notes of October 22, 2019 (AR514), December 12, 2019 (AR511), January 6, 2020 (AR508), and March 3, 2020 (AR504), ***but was not included in his office notes of April 9, 2020*** (AR498-99).

**Third**, the five pound lifting restriction found in Dr. McGarry's office notes was not consistent with his more recent objective findings (which again suggests that it was not a current restriction).  For example, in his September 17, 2019 office visit notes, Dr. McGarry included the following observations:

> Left Ankle Additional ROM: Patient dorsiflex to 15 degrees planta flex to 25
> degrees.  Good subtalar motion as well.
>
> Skin:
> Left Ankle:  well healed wound
>
> Inspection:

Left Ankle: Normal alignment, no deformity, no tenderness, no warmth, no masses.

Left Ankle Dorsiflexion:  Strength 5/5, normal muscle tone.
Left Ankle

Left Ankle Plantarflexion:  Strength:  5/5, normal muscle tone.

Stability:
Left Ankle:  Stable

Special:
Left Ankle:  Normal
Tests:
X-Ray Interpretation Ankle

….
X-rays of the left ankle were ordered and obtained, demonstrating the following findings:  Ankle prosthesis appears to be well-balanced no type of catastrophic loosening.  No fracture or subluxations.  (AR517-18).[8]

**Fourth**, even if Dr. McGarry intended the five pound restriction to be a continuing one, which is denied, the differences between Dr. McGarry's opinion and those of Drs. Patel and Kohan were not that stark.  Drs. Patel and Kohan concluded that Plaintiff could lift up to 10 pounds (and 20 pounds occasionally).  Thus, their difference with Dr. McGarry was simply one of degree of limitation, a topic that surely can be subject to reasonable debate.

Moreover, Drs. Patel and Kohan were not alone in their assessment of Plaintiff's lifting capacity, as the orthopedic surgeon who actually performed Plaintiff's 2017 ankle surgery – Dr. Aaron Scott – twice affirmed that Plaintiff (post-surgery) could lift up to 10 pounds (and 25 pounds occasionally).  (AR2795-2798; AR3072-3074).

---

[8] Dr. McGarry made the same observations (excluding the reference to the X-Ray) in each of his office notes of October 22, 2019 (AR513-14), December 12, 2019 (AR511), January 6, 2020 (AR508), and March 3, 2020 (AR504).

**Fifth**, Plaintiff has not identified any statements by Dr. McGarry (or any one of Plaintiff's other medical providers) expressly stating that Plaintiff was incapable of sedentary work on account of his physical impairments. Both Dr. Patel and Dr. Kohan reached out to Dr. McGarry to confirm whether he agreed with their conclusion that Plaintiff was capable of sedentary work, but never received a reply. (AR575; AR848).

For all of these reasons, Lincoln did not abuse its discretion by crediting its Peer Review doctors' opinions that Plaintiff could perform sedentary work.

> **C.**     **Lincoln Reasonably Considered But Chose Not to Rely on Plaintiff's Social Security Award.**

Lincoln's did not abuse its discretion by choosing to rely on the latest opinions from its Peer Review doctors over the findings in Plaintiff's 2018 award of Social Security Benefits.

**First**, a decision by the Social Security Administration does not determine entitlement to benefits under the terms and conditions of the LTD Plan. *See Black v. Long Term Disability Ins.*, 582 F.3d 738, 748 (7th Cir. 2009) (explaining that the Social Security Administration's disability determination is not dispositive where "the Social Security Act's disability standard is different from that in the ERISA Plan"). *See also O'Conner v. PNC Fin. Servs. Grp., Inc.*, 2016 WL 2941196, at *6 (E.D. Pa. May 20, 2016) ("[T]he Third Circuit has recognized in a non-precedential, but persuasive, decision a determination of 'disability' by the Social Security Administration ('SSA') is not binding on the plan administrator where the administrator's decision is governed by the plan terms rather than the SSA statute, which is also the case here." (*citing Burk v. Broadspire Servs., Inc.*, 342 Fed. Appx. 732, 783 (3d Cir. 2009)).

**Second**, Plaintiff's Social Security determination was made in April 2018, almost two years before the ultimate claim determination being disputed here. In the interim, Lincoln conducted multiple peer reviews and vocational reviews that took into account Plaintiff's

subsequent treatment and rehabilitation.  As Lincoln stated when it denied Plaintiff's most recent

appeal:

> Lincoln acknowledges that the Social Security Administration (SSA) found Mr. Mullins to be disabled and awarded him Social Security Disability (SSD) benefits effective December, 2015.  Lincoln requested and received updated medical records from Mr. Mullins' providers and then conducted medical evaluations with an independent physicians Board Certified in Physical Medicine & Rehabilitation/Pain Medicine as well as a vocational review.  Based on the additional reviews conducted after the approval of Mr. Mullins' SSD award we determined that Mr. Mullins' is no longer disabled per the terms and provisions of the CONSOL Energy's LTD Plan.  (AR638).

The Third Circuit considered a similar situation in *Addington* and found that Liberty

reasonably chose not to rely on an earlier SSA award:

> ***Addington's belief that Liberty failed to consider the SSA's decision to award him disability benefits is unsubstantiated.  Addington acknowledges that Liberty stated in its letters to him in September 2016 and January 2017 that it had considered the SSA's ruling in denying his claim.  However, he characterizes Liberty's statement as "boilerplate language*.**" Addington relies, ultimately, on Sixth Circuit precedent holding that a reviewing court "should weigh [a plan administrator's failure to explain why it is taking a position different from the SSA] in favor of a finding that the decision was arbitrary or capricious." ***<u>However, Liberty did explain in those letters why it was taking a different position from the SSA, stating on both occasions that its review included vocational and medical assessments that were not considered by the SSA</u>***.  (Emphasis added, footnote omitted).

841 Fed Appx. at 448.

Here, as in *Addington*, Lincoln considered additional information beyond that provided to

the SSA – *i.e.*, the updated and complete medical records that had been submitted by Plaintiff's

counsel, the various Peer Reviews, and the vocational reviews.  Accordingly, Liberty did not

abuse its discretion in denying Plaintiff's claim for continued LTD Benefits notwithstanding his

prior award of SSDI benefits.

**D.      Lincoln Did Not Abuse its Discretion by Terminating Plaintiff's Benefits After Having Provided Them for Over Four Years.**

Lincoln did not abuse its discretion by terminating Plaintiff's benefits after having provided them for over four years. Plaintiff contends that, because he once qualified for benefits and did not improve, it necessarily follows that the Claims Administrator made a mistake terminating his benefits. Plaintiff is wrong. A close review of Plaintiff's history of receiving benefits shows that, after the definition of Total Disability narrowed following his receipt of benefits through the end of 2016, two intervening and temporary events led to the continuation of his benefits: ankle surgery in early 2017 and the onset of a mental impairment, for which Total Disability benefits were capped at one year.

Under the terms of the LTD Plan, once Plaintiff had received LTD benefits for 12 months, the definition of Total Disability became more restrictive, changing from being unable to perform his regular job to being unable to perform any Suitable Employment. (AR18). At that point, Lincoln terminated Plaintiff's benefits, finding that he failed to meet the more restrictive definition. (AR209).

Nonetheless, Plaintiff appealed that decision and, in support of the appeal, provided information showing that he now had a mental impairment and was about to have ankle surgery. (AR247-272). Based principally on his ankle surgery, Lincoln reinstated benefits. (AR3499-3500).

In November 2018, Lincoln again terminated Plaintiff's benefits, and again Plaintiff appealed, supporting his appeal this time with documents showing that he was now disabled due to a mental impairment. (AR357-411). Based on this evidence, Lincoln reinstated benefits, but reminded Plaintiff that benefits for Total Disability due to a mental impairment were capped at one year. (AR536-537).

27

Finally, at the end of 2019, as Plaintiff's Total Disability payments due to his mental impairment were about to expire, Lincoln again evaluated Plaintiff's condition and concluded that, but for his mental impairment, he would not be considered Totally Disabled under the LTD Plan because he could perform Suitable Employment. Thus, Lincoln terminated Plaintiff's benefits on March 13, 2020, when he exhausted his Total Disability benefits based on his mental impairment. (AR573-579).

In sum, once Plaintiff completed his first year of benefits and the definition of Total Disability narrowed, Lincoln continued his benefits for the next three years only because of two intervening events: (a) his 2017 ankle surgery, and (b) his mental impairment. Thus, once Plaintiff had recovered from his ankle surgery, and had exhausted his Total Disability benefits based on his mental impairment, Lincoln did not abuse its discretion by considering new evidence which again supported and confirmed its long-held belief that, in the absence of his mental impairment, and without any upcoming surgeries, Plaintiff could perform Suitable Employment.

### E.    Substantial Evidence Supports Lincoln's Finding that Plaintiff Could Perform Suitable Employment.

Substantial evidence supports Lincoln's finding that Plaintiff could perform Suitable Employment.

Plaintiff contends that, even if he is capable of sedentary work, Lincoln still abused its discretion in terminating his benefits because it otherwise failed to identify "Suitable Employment" that he was capable of performing. Plaintiff argues that the three positions identified in Lincoln's December 17, 2019 vocational review (Production Planner; Supervisor, Terminal Operations; and Manager, Branch) (AR858-861), were a poor fit in light of his

28

vocational training, education and experience.[9]  Plaintiff further complains that the vocational

review misidentified his prior position with Consol as a Mine Superintendent, whereas his actual

position was that of Section Foreman.

Plaintiff's contention that Lincoln's benefits determination should be overturned because

he cannot realistically secure or perform the positions identified in Lincoln's vocational review

lacks merit.

### 1.    Substantial Evidence Supports Lincoln's Finding that Plaintiff Had Sufficient Vocational Experience to Perform Suitable Employment.

The LTD Plan does not require Lincoln to positively identify positions that Plaintiff can

secure before terminating benefits.  To the contrary, under the LTD Plan, benefits are payable

only if Plaintiff is "completely unable to engage in any Suitable Employment," with "Suitable

Employment" defined as "*a full-time or part-time position for which you were trained in*

*vocational training, or for which you are qualified by experience or education.  This may be*

*inside or outside the Company*." (Emphasis added).  (AR18).  The LTD Plan further grants

Lincoln the "sole discretion to determine what is Suitable Employment for an individual."  *Id.*

Lincoln's finding that Plaintiff was capable of sedentary work and could perform at least

three different jobs was sufficient to show that he could perform Suitable Employment.  (AR593,

---

[9] To support his argument that Lincoln failed to identify "Suitable Employment," Plaintiff attaches to his brief seven exhibits consisting of US Census data, news articles, and DOT occupational job descriptions.  Plaintiff, however, did not present any of this information during the administrative proceedings.  Because they are not part of the administrative record, Plaintiff should not be permitted to rely on these exhibits to challenge Lincoln's vocational assessments. *See Johnson v. UMWA Health & Ret. Funds*, 125 F. App'x 400, 405 (3d Cir. 2005) ("the record for arbitrary and capricious review of ERISA benefits denial is the record made before the Plan administrator, which cannot be supplemented during the litigation."); *Shatto v. Liberty Life Assurance Co.*, 2016 U.S. Dist. LEXIS 131097, at 45-47 (E.D. Pa. Sep. 26, 2016) (refusing to consider DOT job descriptions that the plaintiff did not present during the administrative proceedings and otherwise rejecting plaintiff's contention that the claims administrator incorrectly identified alternative occupations which plaintiff could perform).

637). Plaintiff contends that he cannot realistically secure any of the positions identified in Lincoln's December 17, 2019 vocational review because he lives in southwest Virginia, where the wages are much lower than those estimated in the functional analysis, and his only experience is that of a foreman in an underground coal mine.

However, Lincoln need not demonstrate that such jobs are available in his community or that he has been specifically trained to perform any of them. Instead, the "Suitable Employment" analysis is met if the individual has the physical capability to perform at least sedentary work, and can perform the job based on his vocational experience. Substantial evidence supports Lincoln's findings that he had the vocational experience to perform jobs at the sedentary level.

Lincoln's initial (November 16, 2016) vocational assessment of Plaintiff (the "2016 Vocational Review") concluded that he could perform several jobs based on his vocational experience. The assessment describes that experience as follows:

> Mr. Mullins called me back and indicated he supervised 10-15 people. He was a working supervisor and was responsible to perform similar duties as the people he supervised. He conducted training and safety inspections. He extracted coal manually and by machine with his crew. He set up ventilation systems built roof support, and made sure they were working. He had to acquire state certifications for First Class Mine Foreman, General Coal Miner, Methane Gas Detection; Electrical Certification and Advanced First Aide. He told me his work was very heavy and he was on his feet all day.
> ….
>
> **TRANSFERABLE SKILLS**
> Through his work, education, training, and/or life experience, the following are some of the skills demonstrated by Mr. Mullins:
>
> **Management Skills:**
> - Management of Material Resources – Obtaining and seeing to the appropriate use of equipment, facilities, and materials to do certain work.
> - Time Management — managing one's own time and the time of others.
> - Critical Thinking — using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions, or approaches to problems.

30

- Monitoring — Monitoring/Assessing performance of yourself, other individuals, or organizations to make improvements or take corrective action.

**Mechanical Skills**
- Use of hand tools
- Operation of equipment

**Training Skills:**
- Instructing individuals and groups on how to improve performance/adhere to regulations.

**Effective Communication Skills:**
- Reading Comprehension — Understanding written sentences and paragraphs in work related documents.
- Speaking — talking to others to convey information effectively.
- Coordination — adjusting actions in relation to others' actions.
- Active Listening — Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times.
- Writing — Communicating effectively in writing as appropriate for the needs of the audience.

**Clerical/Computer Skills**:
- Maintaining records, logs and forms
- Report writing and documentation
- Applying math skills to read and interpret reports and analyze data.
- Know and apply basic computer skills  (AR863-864).

Lincoln's second (December 17, 2019) vocational assessment (the "2019 Vocational Review") described Plaintiff's skills and abilities as follows:

Planning and directing work of others; knowing technical details of specialty area; working with different kinds of people in a variety of situations; making decision that may affect work activities, costs, or safety of others; using charts, maps, blueprints, or plans; and using numbers to plan budgets.  Obtaining and seeing to the appropriate use of equipment and materials to do certain work; assessing performance [of] individuals; communicating with others in a professional and tactful manner; and basic computer skills.  (AR858).

In short, Plaintiff's experience as a coal mine foreman necessarily demonstrated that he can supervise other workers in an industrial setting, including addressing safety issues, identifying work performance expectations, meeting production schedules, and communicating

31

with others.  This vocational experience, along with his sedentary physical capabilities, sufficiently demonstrated that Lincoln did not abuse its discretion when it concluded that he could perform Suitable Employment.

### 2. The Error in Describing Plaintiff's Prior Job Was Not Material.

Although Plaintiff points to a mistake in Lincoln's vocational expert's characterization of Plaintiff's job as a Mine Superintendent in the 2019 Vocational Review, that mistake was not material to Lincoln's ultimate determination that Plaintiff could perform Suitable Employment given the actual job duties and experience set forth by the vocational experts.

Even though the 2019 Vocational Review misidentified Plaintiff's position with Consol as "Mine Superintendent", the vocational case manager referenced and otherwise relied on the earlier vocational report completed in November 2016, which correctly identified Plaintiff's job duties as "Section Supervisor."  (AR862-865).  The 2016 Vocational Review concluded that Plaintiff, based on his work, education, training, and/or life experience, possessed transferable management skills (management of material resources, time management, critical thinking, supervisory), communication skills (speaking, coordinating, writing), and clerical/computer skills.  The 2016 Vocational Review further determined that Plaintiff was qualified to work as a Transportation-Maintenance Supervisor, a Dispatcher (non-emergency) and as a Supervisor-Production Control.

In keeping with the 2016 Vocational Review, the 2019 Vocational Review agreed that Plaintiff possessed supervisory, communication, and clerical/computing skills.  (AR859).  While the 2016 and 2019 Vocational Reviews each identify three different occupations that Plaintiff is qualified to perform, this difference does not invalidate the 2019 Vocational Review, which based its determinations on the same basic skillset as the 2016 Vocational Review.

Moreover, insofar that the misidentification of Plaintiff's job description in the 2019 Vocational Review may have influenced the vocational case manager's pairing of occupations to Plaintiff's qualifications in the 2019 Vocational Review, the error is immaterial to Lincoln's final claim determination given that the 2016 Vocational Review (which correctly identified Plaintiff's job title) *also* concluded that Plaintiff was capable of Suitable Employment based on equivalent functional limitations.  (AR863-864).

Accordingly, notwithstanding the later mistake regarding Plaintiff's job title, Plaintiff's previously established vocational experience, along with his sedentary restrictions, constitute substantial evidence that he could perform Suitable Employment.

### 3.    The Cases Plaintiff Relies Upon Are Distinguishable.

The cases that Plaintiff relies upon to contend that Plaintiff's 2019 Vocational Review was flawed due to the misidentification of his job title are distinguishable because they involved plans that required evidence showing the claimant could perform his or her prior job.  *See e.g. Doe v. Standard Ins. Co.*, 852 F.3d 118 (1st Cir. 2017); *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374 (1st Cir. 2015); *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389 (5th Cir. 2006); *Mitchell v. Fortis Benefits Ins. Co.*, 163 F. App'x 183 (4th Cir. 2005); *Kinstler v. First Reliance Life Ins.*, 181 F.3d 243 (2d Cir. 1999).  None of the cases (all from other Circuits) addressed plan language that predicated termination of ERISA benefits on a claimant's ability to find *any* suitable employment (within any functional limitations).  *Rather*, each of these cases addressed the termination or denial of "own occupation" disability benefits – which by definition require that the claims administrator determine whether the claimant was disabled from his/her *current* duties/occupation.  Lincoln, however, did not need to find that Plaintiff was disabled from his position as Section Supervisor/Foreman – but only needed to find, as it did, that Plaintiff was no longer "completely unable to engage in ***any*** Suitable Employment."  (AR18).

33

In sum, Lincoln did not abuse its discretion by finding that Plaintiff could perform Suitable Employment.

### F.        Plaintiff's Claim in Count II of the Complaint is Not Ripe for Review.

Plaintiff seeks an Order compelling the LTD Plan to repay offsets it took due SSDI benefits his children received.  However, this claim is not ripe for review because (a) Plaintiff never raised this issue during the administrative process and, therefore, waived it, and (b) the offset that Plaintiff owes to LTD Plan for his own SSDI benefits exceeds the amount the Plan offset for SSDI benefits paid to his dependents, meaning that unless the Court directs the Plan to reinstate his benefits, there is no need to address the offset issue because he cannot recover anything on that claim alone.

Under the LTD Plan, benefits are to be offset by any Federal Social Security Act benefits that the plan beneficiary receives or is entitled to receive.  (AR13).  Thus, when Plaintiff received an award of SSDI benefits, which was paid to him retroactively, he immediately owed the Plan an equal amount because he had been overpaid.

Lincoln first advised Plaintiff of the overpayment on September 10, 2018, and requested re-payment of those amounts that should have been subject to offset.  (AR706).  However, in bringing the underlying lawsuit, Plaintiff, for the first time, alleges that Lincoln erred by including in its offset calculations SSDI payments made on behalf of Plaintiff's dependent children.  (*See* Count II of the Complaint at ECF No. 1).  Nonetheless, Count II of the Complaint is not ripe for review by the Court for two reasons.

**First**, Plaintiff did not challenge Lincoln's calculation of the SSDI offsets during the administrative review process.  Plaintiff's failure to raise this claim before the plan administrator resulted in waver of the same for purposes of appeal.  *See Johnson v. UMWA Health & Ret. Funds*, 125 F. App'x 400, 405 (3d Cir. 2005) ("the record for arbitrary and capricious review of

ERISA benefits denial is the record made before the plan administrator, which cannot be supplemented during the litigation"); *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992) ("In determining whether the plan administrator's decision was arbitrary and capricious, the district court generally may consider only the arguments and evidence before the administrator at the time it made that decision." (citations omitted)); *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 552 (7th Cir. 2005) (rejecting new arguments advanced by plaintiff on appeal because "review is limited to the record before the administrative committee").

**Second**, this issue is moot unless the Court directs the LTD Plan to reinstate benefits. The document that Plaintiff cites to show that Lincoln claimed an offset for SSDI payments made to Plaintiff's children actually reflects that the amount claimed for the children was $37,323.97, whereas the amount claimed for Plaintiff himself (which is not being disputed) was $74,469.97. (AR 726). Therefore, even if the LTD Plan incorrectly sought an offset for SSDI payments to Plaintiff's children, the amount to be refunded to him would be fully offset by the amount Plaintiff himself still owes. Moreover, since the Plan did not assert a counterclaim to recover this amount, Plaintiff is not currently at risk for the unpaid amounts. Therefore, unless the Court decides to reverse Lincoln's decision to terminate benefits, there is no reason to consider the offset issue.[10]

Moreover, even if the Court considers the claim to be ripe, Lincoln properly applied the LTD Plan required offset that included all amounts received as a result of Plaintiff's SSDI Award, including those paid to his children. The LTD provides in this regard as follows:

---

[10] Indeed, to issue a ruling on the exact amounts that may be owed would require additional evidence regarding the exact amount of the offset to be refunded not contained in the Administrative Record. Plaintiff recognizes as much by requesting that the Court remand this claim to Lincoln for further determination. However, no such remand is warranted unless the Court first reverses Lincoln's decision to terminate benefits.

**Governmental Plans, Programs or Laws**

- These include Federal Social Security act benefits (both disability and old age …or any other government sponsored plan, program or law ***from which you receive or which entitles you to receive benefits*** …."

**Other Income or Benefits Available to You**

As indicated in various sections of this Plan, you are required to apply for all other income and benefits that are available to you while receiving benefits under this Plan. ***The term, "Other Income or Benefits," as set forth in this section and used in this Plan, shall therefore not only include income or benefits which you actually received or will receive, but also other income and benefits which would, in the sole discretion of the Plan Administrator, be available to you***. This would include, but not be limited to income, compensation or benefits from employment for which you are or can become qualified because of your education, training or experience, or because of vocational evaluation and training offered by the Company under this Plan. (Emphasis added).  (AR14-15).

Plaintiff relies on the former provision, but ignores the latter one, which is broader.  Based on this provision, Lincoln did not abuse its discretion in reading the phrase, "be available to you," to encompass SSDI benefits paid to Plaintiff's children as a direct result of his SSDI Award.

## V.    CONCLUSION

For the reasons set forth above, this Court should grant Defendant's Motion for Summary Judgment, by dismissing the Complaint with prejudice.

36

Date:  July 13, 2021                          Respectfully submitted,

                                              */s/ David J. Laurent*
                                              David J. Laurent (PA 33150)
                                              david.laurent@bipc.com
                                              William P. Lewis (PA 316527)
                                              william.lewis@bipc.com

                                              BUCHANAN INGERSOLL & ROONEY PC
                                              Union Trust Building
                                              501 Grant Street, Suite 200
                                              Pittsburgh, PA  15219-4413
                                              Telephone:  412-562-8800
                                              Fax:  412-562-1041

                                              *Attorneys for Defendant*