**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TIMOTHY MULLINS

        Plaintiff,

    v.

THE CONSOL ENERGY, INC.
LONG TERM DISABILITY PLAN,

        Defendant.

Civil Action No.:  2:20-CV-1883-NR

Judge J. Nicholas Ranjan

---

# REPLY BRIEF IN SUPPORT OF MOTION TO REVERSE THE ADMINISTRATOR'S DECISION AND BRIEF IN OPPOSITION TO CONSOL'S MOTION TO AFFIRM THE ADMINISTRATOR'S DECISION

---

Benjamin W. Glass, III (VSB #23152)
Benjamin Glass, III & Associates, P.C.
3998 Fair Ridge Drive # 250
Fairfax VA 22033
(703) 591-9829
FAX: (703) 783-0686
Ben@BenGlassLaw.com
*Admitted Pro Hac Vice*

i

**TABLE OF CONTENTS**

**Page**

Table of Contents...........................................................................................................................i

Table of Authorities......................................................................................................................ii

I. Introduction................................................................................................................................1

    a.  Suitable Employment.....................................................................................................1

    b.  Functional Capacity.......................................................................................................2

II. Argument...................................................................................................................................2

    A.  Lincoln did not identify Suitable Employment for Timothy Mullins.................................2

    B.  The 2016 Vocational Review is not relevant in 2019/2020...................................................4

    C.  Mr. Mullins's own occupation is important.......................................................................5

    D.  After mistakenly identifying Mr. Mullins's job as Mine Superintendent, Lincoln did not correctly identify Suitable Employment positions.............................................................6

    E.  Lincoln did not ask his doctors whether Mr. Mullins could work at a sedentary job..........7

    F.  The 2019 Claim Reinstatement and Mental Health Limitation.........................................10

    G.  "Social Media Information"...............................................................................................12

    H.  Can Mr. Mullins safely lift 5 lbs. or 10 lbs.? Does it matter?..........................................13

    I.  Consol refuses to acknowledge established standards under ERISA................................15

    J.  Consol leans heavily into the fact that it recently won on an unrelated matter to somehow say that it should not pay benefits to Mr. Mullins...............................................................17

    K.  Consol reinterprets the Plan inconsistently with Lincoln's interpretation.........................18

    L.  The improper Dependent SSDI offset issue is ripe for review..........................................19

III. Conclusion................................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abram v. Carill, Inc.*,
395 F.3d 882 (8th Cir. 2005)..............................................................................................10

*Addington v. Senior Vice President of Human Resources Consol Energy Inc.*,
841 F. App'x 443 (3d Cir. 2020)........................................................................................17

*Addington v. Senior Vice President-Hum. Res., Consol Energy, Inc.*,
No. CV 17-444, 2019 WL 3414285 (W.D. Pa. July 29, 2019)..........................................17

*Addington v. Senior Vice President-Hum. Res., Consol Energy, Inc.*,
No. CV 17-444, 2019 WL 3416098 (W.D. Pa. Mar. 15, 2019)..........................................17

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004)...........................................................................................................18

*Bluman v. Plan Adm'r & Trs.*,
491 F. App'x 312 (3d Cir. 2012).........................................................................................14

*Bluman v. Plan Adm'r & Trs.*,
No. CIV.A08-0415GEB/DEA, 2010 WL 2483884 (D.N.J. June 4, 2010).............................14

*Cottillion v. United Ref. Co.*,
781 F.3d 47 (3d Cir. 2015)....................................................................................................5

*Grossmuller v. Int'l Un., United Auto., Aero*,
715 F.2d 853 (3d Cir. 1983)...........................................................................................7, 19

*Hess v. Reg-Ellen Mach. Tool Corp.*,
423 F.3d 653 (7th Cir. 2005)..............................................................................................19

*Hession v. Prudential Ins. Co. of Am.*,
307 F. App'x 650 (3d Cir. 2008)........................................................................................16

*Hughes v. Hartford Life & Accident Ins. Co.*,
368 F. Supp. 386 (D. Conn. 2019)......................................................................................10

*In re. Unisys Corp. Long-Term Disability Plan ERISA Litig.*,
97 F.3d 710 (3d Cir. 1996).................................................................................................20

*Kaufmann v. Metro. Life Ins. Co.*,
658 F. Supp. 2d 643 (E.D. Pa. 2009)............................................................................16, 17

*Kelly v. Reliance Standard Life Ins. Co.*,
2011 WL 6756932 (D.N.J. 2011)........................................................................................16

*Lasser v. Reliance Standard Life Ins. Co.*,
344 F.3d 38 (3d Cir. 2003)............................................................................................15, 16

*O'Conner v. PNC Fin. Servs. Group*,
    No. 15-5051, 2016 WL 2941196 (E.D. Pa. May 20, 2016)......................................................7

*Person-Rhoads v. Aetna Life Ins. Co.*,
    NO. CIV.A. 10-1076, 2011 WL 5116633 (E.D. Pa. Oct. 28, 2011)......................................14

*Salomaa v. Honda Long Term Disability Plan*,
    642 F.3d 666 (9th Cir. 2011)...............................................................................................10

*Schlegel v. Life Ins. Co. of N. Am.*,
    269 F. Supp. 2d 612 (E.D. Pa. 2003)...................................................................................14

*Schwarzwaelder v. Merrill Lynch & Company, Inc.*,
    606 F. Supp. 2d 546 (W.D. Pa. 2009)..................................................................................17

*Shatto v. Liberty Life Assurance Co. of Bos.*,
    No. CV 14-5653, 2016 WL 5374106 (E.D. Pa. Sept. 26, 2016),.......................................6, 7

*Strott v. Dimensional Inv., LLC Health & Welfare Plan*,
    No. 2:13CV1245, 2015 WL 1299773 (W.D. Pa. Mar. 23, 2015)........................................16

*Vance v. Ball State Univ.*,
    570 U.S. 421 (2013)...............................................................................................................5

*Viera v. Life Ins. Co. of N. Am.*,
    No. CIV.A. 09-3574, 2012 WL 3194394 (E.D. Pa. Aug. 6, 2012).......................................10

*Wolf v. Nat'l Shopmen Pension Fund*,
    728 F.2d 182 (3d Cir. 1984).................................................................................................19

**Statutes & Other Authorities:**

29 C.F.R. § 2560.503-1(h)(2)(iii).................................................................................................10

29 U.S.C. § 152(11)........................................................................................................................5

81 F. Reg. 92 (Dec. 19, 2016).....................................................................................................10

## I.    Introduction

In order to qualify for long term disability benefits, Timothy Mullins must be "completely unable to engage in any Suitable Employment." There are two distinct components of that definition: (1) <u>Functional ability to work</u> ("completely unable to engage"); and (2) <u>a position to work at</u> ("in any Suitable Employment"). "Suitable Employment" is defined as a "position for which you were trained in vocational training, or for which you are qualified by experience or education." (AR18).

### a.  Suitable Employment

Taking the second requirement first, Consol acknowledges that when it terminated Mr. Mullins's benefits, the vocational report it relied on to determine Suitable Employment was based on a mistake in identifying Mr. Mullins's job. (Def. Br at 32). That should end this case, because by misidentifying Mr. Mullins's job, Lincoln incorrectly identified his vocational training and experience, and therefore, the positions it found to match the training and experience that Mr. Mullins <u>does not have</u> would not be Suitable Employment for him.

Consol argues that it should be allowed in litigation to rely on an older vocational report completed in 2016, (*id.*); however, Lincoln overturned the claim denial that was based on that report in February 2017, finding that Mr. Mullins was not able to return to work at any of the jobs listed in the 2016 vocational report. (AR3500). Consol proposes that Mr. Mullins's claim remain closed now based on this vocational review that was not cited in the current denial letters, that was over three years out of date at the time of the current denial letters, and that was used to support a prior denial that was itself overturned on appeal. That would not be reasonable under ERISA.

1

### b. Functional Capacity

Consol argues that its determination about Mr. Mullins's functional capacity was supported by substantial evidence, and acknowledges that its substantial evidence consists mainly of two paper peer reviews. (Def. Br. at 16). Consol explains that, since Mr. Mullins left work, Lincoln approved, terminated, reinstated, terminated, reinstated and ultimately terminated his disability benefits (finding in turn that he could not, could, could not, could, could not and could perform Suitable Employment). (Def. Brief at 6-11). The final termination was based on a records review by Dr. Neil Patel, who opined, implausibly, that throughout the complicated history of all those denials and reinstatements, as far back as the date of disability in June 2015, Mr. Mullins had <u>always</u> been able to work full-time at a sedentary job. (AR815).

The medical records and Lincoln's past claim management contradict that conclusion. Consol explains at length that it was not required to give any weight to Mr. Mullins's doctors, (Def. Br at 18-25), and relies on several unreported cases to support the position that it did not need to examine Mr. Mullins in person. (Def. Br. at 24). Those cases are easily distinguishable, because in this case *even Lincoln's peer reviewers* have recognized that the objective medical evidence supports functional impairment (and that Mr. Mullins's restrictions and limitations are permanent). Consol's position that Lincoln can extrapolate from the medical records alone to disagree with the treating doctor, and accurately determine that Mr. Mullins could, for example, lift two to four times <u>more</u> than the 5 pound restriction in his records, is not reasonable.

### II.     Argument

### A.  Lincoln did not identify Suitable Employment for Timothy Mullins.

Consol argues that "The LTD Plan does not require Lincoln to positively identify positions that Plaintiff can secure before terminating benefits," (Def. Br. at 29), and further that "Lincoln

need not demonstrate that [Mr. Mullins] has been specifically trained to perform any [Suitable Employment]." (Def. Br. at 30).  That does not align with the policy language, though, which defines Suitable Employment as "a full-time or part-time <u>position</u> for which you were <u>trained in vocational training</u>, or for which you are qualified by experience or education." (*Id*.) (emphasis added). The Plan language deliberately and specifically ties Suitable Employment to "a position." The definition sets parameters on what kind of position counts as Suitable Employment:

- A position for which you were trained in vocational training; or
- A position for which you are qualified by experience; or
- A position for which you are qualified by education.

The Plan language plainly <u>does</u> require that the Plan identify "a position" in order to find that there is Suitable Employment for claimants like Mr. Mullins who are unable to return to their own occupations.

Similarly, the Plan <u>does</u> require Lincoln to show that Mr. Mullins has been trained for the positions it identifies, or that he has the experience or education to perform them.  Presumably, that is why Lincoln conducts vocational analyses prior to terminating benefits and does not stop its claim determination at the functional capacity estimation alone. Otherwise, there would be no purpose for the "Suitable Employment" qualifier in the Plan definition of Disability. While the Plan does give Lincoln the discretion to determine what is Suitable Employment, Lincoln (and Consol) must follow the language of the Plan. Lincoln cannot simply opine that Mr. Mullins "could work at some sedentary job somewhere." It has to identify <u>a position</u> that Mr. Mullins has been trained for in vocational training, or that is a match for his education and experience.

While the policy does not require that Lincoln identify Suitable Employment for Mr. Mullins in the community where he lived and worked his very dangerous job on behalf of Consol, there is no reason to believe that six-figure jobs (like the ones Lincoln "found" for Mr. Mullins)

3

for former coal miners with Mr. Mullins's education and experience exist anywhere else in the U.S. Even completely healthy former coal miners have difficulty finding less physically demanding jobs, which has been the well-known subject of a national debate for many years.

As he discussed in his opening brief at 1 and 18-21, Mr. Mullins has a 10th grade education. He earned his GED. His entire work experience is in mining, since 2000 working underground in coal mines. His only vocational training has been in how to extract coal safely from a coal mine.

### B.  The 2016 Vocational Review is not relevant in 2019/2020.

Consol acknowledges that the foundation of the 2019 and 2020 vocational analyses that "found" three positions for Mr. Mullins was flawed because Lincoln misidentified Mr. Mullins's job with Consol as Mine Superintendent. (Def. Br. 32). Consol argues that mistake was "not material," however, because three years earlier, a different vocational analysis found different jobs Mr. Mullins could do. (*Id.*). That November 16, 2016 vocational assessment, which was not cited in the December 30, 2019 termination letter or the June 17, 2020 appeal denial letter, claimed to have identified Transferrable Skills for Mr. Mullins, including Management Skills, Mechanical Skills, Training Skills, Effective Communication Skills, and Clerical/Computer Skills. (AR863-64). Consol cannot rely on that prior vocational report to prevail in litigation, for two reasons.

First, Mr. Mullins appealed the benefit termination that was based on this 2016 analysis and Lincoln reinstated his benefits. (AR308). For the 2019 termination and 2020 appeal, Lincoln conducted a new vocational analysis which, as discussed in Mullins's opening brief at 12-13 and 18-21, it based on the mistaken determination that Mr. Mullins's job was Mine Superintendent. Lincoln never explained its reasoning, but clearly it determined that a new vocational analysis was necessary and chose not to rely on the 2016 vocational report for the 2019 termination. Since

Lincoln chose not to rely on the positions it identified in 2016 during the administrative process, it cannot now reasonably rely on that same report in litigation.

Second, the 2016 Vocational Review, like the 2019 review, ascribes knowledge, skills and abilities to Mr. Mullins that he simply does not have through his 10th grade education, experience as a coal miner, or vocational training in how to extract coal. Mr. Mullins is not, and has never been, qualified for managerial or higher executive positions, or even lower-level clerical jobs.[1] No amount of discretion allows Consol to omit plain language in the Plan and refuse to consider Mr. Mullins's actual education, job experience, and vocational training. *Cottillion v. United Ref. Co.*, 781 F.3d 47, 55 (3d Cir. 2015) ("Even under [an arbitrary and capricious] standard, an administrator's 'interpretation may not controvert the plain language of the document.'").

### C.  Mr. Mullins's own occupation is important.

Consol argues that the cases Mr. Mullins cites to illustrate the flaws in the 2019 vocational review are inapplicable because they involve "own occupation" disability vocational reviews. (Def. Br. at 38-39). Again, the Plan says that to be considered Suitable Employment, a position must be one "for which you were trained in vocational training, or for which you are qualified by

---

[1] Mr. Mullins's job as a "working supervisor [who] was responsible to perform similar duties as the people he supervised" (AR863) is inconsistent with ERISA's definition of "supervisor."

> The term "supervisor" means any individual **having authority**, in the interest of the employer, **to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees**, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not a merely routine or clerical nature, but requires the use of independent judgment."

29 U.S.C. § 152(11). While that definition applies to ERISA discrimination cases, it serves to illustrate a point: to gain managerial/supervisory skills, an employee needs to have the ability to exercise at least some level managerial or supervisory discretion. *See also Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (for Title VII purposes an employee is a "supervisor" "if he or she is empowered by the employer to take tangible employment action."). Mr. Mullins never had any level of managerial discretion. His duties were the same job tasks that his coworkers on his team also conducted: "extract[ing] coal." (AR862).

5

experience or education." (AR18). In order to determine experience and vocational training especially, the administrator must be accurate about the claimant's past job(s). In Mr. Mullins case, his job since 2000 has been in coal mines. He worked as a Section Foreman, but never as the Mine Superintendent. Lincoln cannot accurately assess his qualifications if it invents vocational experience that Mr. Mullins never had. A holding that administrators must use the correct job title for the *own occupation* review but not for *any occupation* reviews (which seems to be Consol's position here), would allow for absurd results in claim determinations. Similar to what happened to Mr. Mullins, a claim administrator could find that a claimant was disabled for purposes of the own occupation review, but then invent qualifications and experience for the any occupation review, finding that the claimant actually performed an entirely different occupation, such as CEO or Mine Superintendent.

**D. After mistakenly identifying Mr. Mullins's job as Mine Superintendent, Lincoln did not correctly identify Suitable Employment positions.**

Even after acknowledging that Lincoln was mistaken and Mr. Mullins was not the Mine Superintendent of the Buchannan Mine, Consol maintains that the jobs Lincoln found in its Vocational Report based on his profile (Production Planner, Terminal Operations Supervisor, and Branch Manager) were correct. (Def. Br. at 13, 14, 28). Consol would limit the Court's information about those positions to the job titles and National Monthly Wages alone, because that is all Lincoln included in the administrative record (*see* AR575, 638). (Def. Br. at 29, n. 9).

Consol relies on an unpublished case, *Shatto v. Liberty Life Assurance Co. of Bos.*, No. CV 14-5653, 2016 WL 5374106 (E.D. Pa. Sept. 26, 2016), to claim that Mr. Mullins cannot submit Dictionary of Occupational Titles (DOT) descriptions to support his argument that based on the incorrect job description that Lincoln used for him, the corresponding jobs Lincoln identified were not Suitable Employment. In that case, the "Plaintiff did not present evidence of DOT job

6

descriptions during the administrative proceedings." *Id.* But, here, Lincoln already had these DOT job descriptions and, in fact, claims that it relied on the DOT to make its vocational determinations, (*see* AR858) ("The following documentation was reviewed: … DOT").

Because the DOT was before Lincoln during the administrative review of Mr. Mullins claim and Lincoln relied on the DOT to make its determination, it is not now improper for Mr. Mullins to present that same source to support his case. While ERISA claims are typically limited to the information that was before the administrator at the time it made its determination, that limitation derives from Congress's intent to encourage internal resolution procedures without requiring the need to go to court. *See Grossmuller*, 715 F.2d at 857; *O'Conner v. PNC Fin. Servs. Group*, No. 15-5051, 2016 WL 2941196 (E.D. Pa. May 20, 2016). This case is different because Lincoln already had the DOT before it during its review, so this is not new evidence.

Other than its seemingly reflexive objection to including material that Lincoln omitted from the administrative record, Consol offers no substantive reason why this Court should not consider the complete DOT job descriptions for the jobs Lincoln said Mr. Mullins could perform based on his (incorrect) vocational training, education and experience. As Mr. Mullins discussed at length in his opening brief at 18-20, nothing about his education or his career mining coal would prepare him adequately for any of the positions Lincoln said were Suitable Employment, which becomes even clearer within the full scope of the DOT description for each job.

**E.  Lincoln did not ask Mr. Mullins's doctors whether he could work a sedentary job.**

Turning to the functional capacity argument, Consol notes that "none of Plaintiff's treating physicians opined that he was incapable of sedentary work.," (Def. Br. at 19), but omits a critical detail: Lincoln never asked them. Instead, Lincoln managed Mr. Mullins's claim almost

exclusively through requests to Mr. Mullins for medical records and claimant information forms.

All Lincoln's requests from 2015-2019 convey substantially the same information:

> On [date], we requested updated medical documentation from [your doctors]. This information is necessary to complete our ongoing claims investigation. Please provide us with the following information to assist us with our review of your eligibility for benefits:
>> Office treatment notes, test results, operative reports, prescription histories, and treatment plans from [date] through the present day from [your doctors].

*(See*, for example, Lincoln letters to Mr. Mullins at AR143, 146, 149, 940, 952, 955, 965, 970, 980, 983, 1237, 1247).

Lincoln did not receive opinions on whether Mr. Mullins could work a sedentary job from his many treating physicians because it didn't ask for them.[2] Instead, it asked the doctors for:

> Office treatment notes, test results, prescription histories, and treatment plans from [date] through the present.

*(See*, for example, Lincoln letters to doctors at AR867, 903, 1063, 1068, 1112, 1117, 1123, 1133, 1143, 1148, 1158, 1163, 1168, 1173, 1183, 1195, 1200, 1221, 1230, 1277).

Consol argues that as part of his peer review, Dr. Patel did attempt to contact Mr. Mullins's doctors: "Before offering his assessment, Dr. Patel ***called and sent letters*** to Dr. McGarry and another orthopedic surgeon who had treated Plaintiff (Dr. Fullager) to confirm that they agreed with his findings that Plaintiff, though functionally impaired, was capable of sustaining a full-time work capacity subject to the above-identified restrictions and limitations." (Def. Br at 12) (emphasis in the original).

---

[2] There is only one Attending Physician's Statement (APS) in Mr. Mullins' claim file. (AR2204-05, duplicate at AR2666-67). That form was returned blank on October 28, 2019 by the treating provider because Lincoln had not properly requested it. (*See* AR2206, requesting "records.") The medical office replied, "please request for the completed form." (AR2207). On October 30, 2019, Lincoln noted, "Received medical records . . . blank APS included." (JA 3533, n. 79). Lincoln took no further action to correctly request the completed form. And it did not notify Mr. Mullins that it needed the form, either.

Consol cites to AR575, Lincoln's initial termination letter. Dr. Patel's complete report, however, reveals that Lincoln was not telling Mr. Mullins the full story in the denial letter. Dr. Patel's report begins on AR 808. It is dated December 16, 2019, which was a Monday. At AR808 and 809, Dr. Patel relates that he left messages for Dr. McGarry and Dr. Fullagar on the previous Tuesday and Wednesday (December 10 and 11). Dr. Patel does not say what the content of his messages was, or, importantly, whether he told these presumably very busy surgeons a few weeks before Christmas that they must return his call within 2-3 business days.

Consol says that in addition to the phone calls, Dr. Patel ***sent letters*** to the treating providers when they did not promptly return his calls. But again, that is not the full story. The letters, at AR820-21 (Dr. McGarry) and AR822-23 (Dr. Fullagar) are dated December 16, 2019 – *the same day Dr. Patel's peer review report was received by Lincoln*. (AR3532, n. 87). Eight minutes after receiving Dr. Patel's report, Lincoln referred the claim for a Transferrable Skills Analysis (TSA) to see whether, based on Dr. Patel's restrictions and limitations, there were any positions suitable for Mr. Mullins given his vocational training, experience or education. (*Id.* at n. 88). If Dr. Patel's letters were sent at all to Dr. McGarry and Dr. Fullagar (which is doubtful, since neither letter has an address or a fax number for the treating provider), it was certainly unreasonable for Lincoln to allow them zero days to reply.

During the appeal review, Dr. Kohan also left messages for the treating providers during his initial review and his addendum review (Dr. Kohan left messages on Friday, May 29, 2020 and Monday, June 1, 2020, before issuing his final addendum report the next day, on Tuesday, June 2, 2020.) (AR851). Dr. Kohan does not appear to have written any letters to the treating doctors telling them why he was calling or explaining what he wanted to discuss.

At no point during the initial claim review or the appeal did anyone from Lincoln ever tell Mr. Mullins that its reviewers needed to speak with his doctors or share their reports with him. 29 C.F.R. § 2560.503-1(h)(2)(iii) now requires administrators to provide the *claimant*, not only the claimant's doctors, with copies of any reports that it plans to use in advance of a denial.[3]

**F.  The 2019 Claim Reinstatement and Mental Health Limitation.**

Consol explains, "By letter dated March 14, 2019, Lincoln reopened Plaintiff's claim for LTD benefits, finding that Plaintiff remained disabled ***principally due to his mental health conditions***." (Def. Br. at 10) (emphasis in the original). Benefits were limited to 12 months under the policy mental health limitation provision, which would run out March 13, 2020. On its face, this limitation does not make much sense.[4] Mr. Mullins was initially disabled due to his ankle injury and other physical conditions, not a mental illness. Indeed, Dr. Patel reported that Mullins

---

[3] Even though those regulations were amended in 2018, the DOL has always held the position that the regulations require administrators to provide claimants with copies of new reports prior to denial. *See* Claims Procedure for Plans Providing Disability Benefits, 81 F. Reg. 92, 316 at *92, 234 & n.17, 2016 WL 7326455 (Dec. 19, 2016) (DOL states that it amended the regulations to make explicit what has always been required under ERISA). *See also Hughes v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 386, 403 (D. Conn. 2019) (discussing new 2018 regulations and citing several sources, including the DOL, to find that – even though the new regulations did not apply to that claim – the claimant did not receive a full and fair review when the administrator failed to provide him with a copy of the peer reviews prior to denial). *See also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011); *Abram v. Carill, Inc.*, 395 F.3d 882, 886 (8th Cir. 2005) (failing to disclose medical reports until after denial a "type of 'gamesmanship' [] inconsistent with full and fair review. There can hardly be a meaningful dialogue between the claimant and the Plan administrators if evidence is revealed only after a final decision. A claimant is caught off guard when new information used by the appeals committee emerges only with the final denial. [Claimant] should have been permitted to review and respond to the report by [administrator's peer reviewer]").

[4] While Mr. Mullins has the initial burden to show that he is disabled, Lincoln has the burden of proof to show that any exclusion or limitation applies, such as the Mental Illness limitation. *See Viera v. Life Ins. Co. of N. Am.*, No. CIV.A. 09-3574, 2012 WL 3194394, at *7 (E.D. Pa. Aug. 6, 2012) ("Under an ERISA benefits plan, as is generally the case in insurance law, the claimant bears the burden of proof that a benefit is covered by the plan. An ERISA administrator, however, has the burden of proof to show that an exclusion precludes coverage.").

has underwent multiple orthopedic surgeries to his shoulder, back, and knee regions. The claimant has radiological evidence of arthritic and degenerative changes of the cervical, shoulder, lumbar, and knee regions. The claimant also has impairment due to his right wrist/hand pain from carpal tunnel syndrome. Based on the severity of these conditions, he would be functionally impaired; and would be supported for restrictions/limitations from the Date of Disability of 6/12/15 through the present date.

(AR817).

Neither Dr. Patel nor Lincoln ever argued that Mr. Mullins's physical condition had improved in the years since he first became disabled on June 12, 2015. The only disagreement was over whether or not he had retained the capacity for full-time work continually throughout all those "multiple orthopedic surgeries to his shoulder, back, and knee regions," (Dr. Patel omitted mention of the three ankle surgeries), especially considering the "radiological evidence of arthritic and degenerative changes of the cervical, shoulder, lumbar, and knee regions." The application of the Mental Illness limitation is more fully explained in the claim handling notes.

After Lincoln terminated his claim a second time, in November 2018, Mr. Mullins appealed. When Lincoln received the appeal on March 11, 2019, claim manager Amanda Pipenbacher wrote, "Claim to be referred to appeal unit as atty has submitted appeal letter for review. Refer to [manager] for review." (AR3538, n. 53). A few days later, though, on March 14, 2019, Manager Tiffany Massaro wrote,

> Disagree w/[Amanda Pipenbacher's] recommendation to refer to [appeal review unit] at this time - recommend reopen. Appeal records not[sic] that [Mullins] began hip injections in Oct, required hip aspiration in Nov, additional injections and eferred [sic] for PT in Dec. Additionally, SS award outlined significant psych issues s/p psych eval. Recommend DCM add 12mos [mental nervous condition] limit as it does not appear to have been applied previously.

(AR3537, n. 54).

Ms. Massaro is referring to the Social Security Administration's "fully favorable" review of Mr. Mullins's claim, which was issued in April 2018 (6 months before the Lincoln peer

reviewer Dr. Albers determined that Mr. Mullins had <u>no</u> mental health restrictions or limitations, AR800, *see* Def. Br. at 9).  Ms. Massaro's note was the entire extent of the appeal review and the sole basis for application of the Mental Illness claim limitation. The claim was reopened later that same day. (*Id.* at n. 55).

There simply is no support for Consol's claim now that in 2018 Lincoln found Mr. Mullins "remained disabled ***principally due to his mental health conditions***." (Def. Br. at 10) (emphasis in the original). Lincoln deliberately performed no analysis of the appeal at all, except to note that Mr. Mullins continued to actively treat for his <u>physical conditions</u>, including hip injections in October, hip aspiration in November, additional injections and a referral to physical therapy in December. The mental health component is listed as an additional basis for reinstating the claim. Lincoln sidestepped the entire 2019 appeal review by applying the mental health limitation in lieu of having its appeal review unit conduct a medical review of the full appeal.

### G.  "Social Media Information"

Consol explains that "Lincoln further noted that during its review of Plaintiff's claim, it obtained from social media information indicating a level of activity and functionality inconsistent with what Plaintiff reported to his treating providers." (Def. Br. at 15). Indeed, Lincoln cited "social media information" in the appeal denial letter as a reason why Mr. Mullins's appeal was denied (AR638). To be clear, if an insurance company has credible surveillance of a claimant doing something that he told his doctors he could not do, that is a claim-killer. Insurance companies normally do not bury information like that on page 9 of a denial letter, (*id.*), or page 15 of a legal brief. (Def. Br. at 15).

In this case, the "social media information" is not substantial evidence, and would not even be admissible as "evidence" in any Court. It is undated pictures of an unidentified man

standing, in some shots alone, in some shots with his family. (AR622-27). In one shot he is pointing to a sign. In one shot he is kissing his wife. There are no action shots of this man running, hiking, climbing, riding a bike, etc. The pictures are clearly taken at different times. There's no information about when they were posted to Facebook, and there's no information about whether they were posted as current activity or, as is popular on social media these days, as "Throwback Thursday" memories of happier, more active times.

A Lincoln "Appeal Referral" form notes, "*Please also review social media information in the doc list dated 4/23/2020*" (AR1602), but there is no corresponding Claim Handling Note on that day to indicate where the "social media information" came from or who obtained it. (AR3528). There is no formal surveillance report or any analysis. While the appeal denial letter says that the information "indicates a level of activity and functionality inconsistent with what Plaintiff reported to his treating providers," (AR638), no further information is provided. What activity and functionality is inconsistent with other reports – standing? Pointing? Kissing? To which treating providers did Mr. Mullins report that he could not do these things? Lincoln did not share the "social media information" with any treating providers to get their opinion about whether standing, pointing, kissing, etc. was inconsistent with the level of functionality that Mr. Mullins reported to them. Lincoln never shared this information with Mr. Mullins or questioned him about it before revealing it for the first time in the final denial letter.

### H.  Can Mr. Mullins safely lift 5 lbs. or 10 lbs.? Does it matter?

Consol discusses at length why it was reasonable for Lincoln to believe the paper peer reviewers, who never met or examined Mr. Mullins, over treating physician Dr. McGarry about whether Mr. Mullins could safely lift more than 5 pounds. (Def. Br. at 22-25).

13

Notably, Consol is not relating an analysis that Lincoln or either of its peer reviewers conducted on this issue. No medical professional ever explained during the administrative process why (as Consol argues) Dr. McGarry was wrong or outdated in prescribing a 5-pound lifting limitation. In fact, Drs. Patel and Kohan said that Mr. Mullins's treatment was appropriate (AR834, 849). Despite that, neither peer reviewer acknowledged or discussed Dr. McGarry's lifting restriction. They both simply prescribed their own, less restrictive limitations.

Mr. Mullins maintains that a doctor conducting a paper records review alone cannot accurately determine whether he can safely lift more than his doctor says he should. The lawyers reviewing the doctors' reports are undoubtedly even less qualified and able to accurately determine how much he can safely lift.

Consol relies on several unreported cases to support the position that it did not need to examine Mr. Mullins in person, (Def. Br at 24), but those cases are easily distinguishable. In *Person-Rhoads v. Aetna Life Ins. Co.*, NO. CIV.A. 10-1076, 2011 WL 5116633 (E.D. Pa. Oct. 28, 2011), "more than a year had passed since the [Plaintiff's] accident," so any IME would not have shown what the claimant's functionality was at the time she allegedly became disabled. *Id.* at *12. Likewise, in *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612 (E.D. Pa. 2003), there was no convincing reason the administrator would have scheduled an IME because his "objective evidence of disability [was] notably lacking" and only consisted of normal MRI and EEG scans. *Id.* at 627. Finally, *Bluman v. Plan Adm'r & Trs.*, 491 F. App'x 312 (3d Cir. 2012), involved a claimant who had returned to work after a short-term disability claim and then tried to claim short-term disability benefits again after he was notified that he was going to be laid off, and whose medical records, at every level of the claim, showed that he had normal functioning. *Bluman v. Plan Adm'r & Trs.*, No. CIV.A08-0415GEB/DEA, 2010 WL 2483884, at *10 (D.N.J.

14

June 4, 2010), *aff'd*, 491 F. App'x 312 ("At each level, the claim was denied because his medical examinations were essentially normal.").

Unlike those weak cases, where either too much time had passed to show how disabled a claimant was when he became first claimed disability or there were normal findings, in this case *even Lincoln's peer reviewers* recognized that the objective medical evidence supports permanent functional impairment. The only disagreement is over the severity of those impairments.

Consol argues that "the differences between Dr. McGarry's opinion and those of Drs. Patel and Kohan were not that stark." (Def. Br. at 24). That is incorrect. The DOT says a sedentary job requires that a worker be able to "Exert[] up to 10 pounds of force occasionally . . . and/or a negligible amount of force frequently." (*See* https://occupationalinfo.org/appendxc_1.html). If Mr. Mullins cannot exert 10 pounds of force occasionally, or is unable to frequently exert negligible force (such as 5 pounds), he is not physically qualified for a sedentary job. The difference between 5 pounds and 10-20 pounds, therefore, is indeed stark, because it is one more reason why Mr. Mullins is unable to work a sedentary job. If Lincoln's reviewers think Mr. Mullins's doctors are wrong about his capacity for exerting force, that's all the more reason for them to have explained why, or for Lincoln to see for itself and have Mr. Mullins examined.

## I.   Consol refuses to acknowledge established standards under ERISA

Consol falsely asserts that *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 38 (3d Cir. 2003) is no longer good law due to the fact that it applied the pre-*Glenn* heightened standard of review, and that, therefore, the *Lasser* burden of proof is no longer applicable.[5] (Def. Br. at 26).

---

[5] *Lasser* held that the burden of proof in *all* "disability cases" (*not just* "heightened review disability cases") is as follows:

> We conclude with a clarification regarding the burden of proof in disability cases.
> While the burden of proving disability ultimately lies with Dr. Lasser, to require
> him to provide statistics detailing the harm that working in his regular occupation

15

But this court, and others in the Third Circuit, have continued to apply that burden of proof in post-*Glenn*[6] cases. *See*, *e.g.*, *Strott v. Dimensional Inv., LLC Health & Welfare Plan*, No. 2:13CV1245, 2015 WL 1299773, at *10 (W.D. Pa. Mar. 23, 2015) (in an arbitrary and capricious standard of review case the court held, "if Prudential had reason to question the scientific basis of those reports, it was Prudential's burden to support its basis of contention"). Other than pointing out that *Lasser* involved a heightened standard of review, Consol provides no other argument to rebut the fact that once a claimant has met his prima facie burden of providing evidence that he is disabled, it is up to the administrator to provide a scientific basis for its objection. *Lasser*, 344 F.3d at 391. Just because Consol dislikes the burden of proof that this Court applies does not somehow make that burden of proof no longer good law.

Likewise, Consol argues that *Hession v. Prudential Ins. Co. of Am.*, 307 F. App'x 650 (3d Cir. 2008) is no longer good law because it used a heightened standard of review. (Def. Br. at 26). But the string of cases Mr. Mullins cited in his brief to show that courts have looked skeptically at determinations where an administrator refused to conduct a physical examination <u>are all post-Glenn</u>, showing that courts continue to apply that standard first articulated in *Hession*. *See, e.g.*, *Kelly v. Reliance Standard Life Ins. Co.*, 2011 WL 6756932, at *6 (D.N.J. 2011); *Kaufmann v.*

---

might precipitate — as the dissent would require — raises the bar too high. Most disability claimants will not have the means at their disposal (financial or otherwise) to obtain this kind of evidence. Therefore, once a claimant makes a prima facie showing of disability through physicians' reports (as Dr. Lasser has done here through physicians' reports stating that stress will exacerbate his heart condition) and if the insurer wishes to call into question the scientific basis of those reports (as Reliance has attempted to do here), then the burden will lie with the insurer to support the basis of its objection. It has not met that burden here.

*Lasser*, 344 F.3d at 391. Courts continue to apply that same standard today in arbitrary and capricious standards of review.

[6] The Supreme Court decided *Glenn* in 2008.

*Metro. Life Ins. Co.*, 658 F. Supp. 2d 643, 650 (E.D. Pa. 2009); *Schwarzwaelder v. Merrill Lynch & Company, Inc.*, 606 F. Supp. 2d 546, 559-60 (W.D. Pa. 2009). Again, just because Consol dislikes one of the factors courts look to in arbitrary and capricious cases does not somehow make those standards no longer good law.

**J.   Consol leans heavily into the fact that it recently won on an unrelated matter to somehow say that it should not pay benefits to Mr. Mullins.**

Consol relies heavily on *Addington v. Senior Vice President of Human Resources Consol Energy Inc.*, 841 F. App'x 443 (3d Cir. 2020). But that non-precedential opinion is easily distinguished on the facts of this case. That case was decided at the district court level on the recommendations of a magistrate judge. In that case, the claimant's surgeon recommended that he could return to work. *Addington v. Senior Vice President-Hum. Res., Consol Energy, Inc.*, No. CV 17-444, 2019 WL 3416098, at *3 (W.D. Pa. Mar. 15, 2019), *report and recommendation adopted*, No. CV 17-444, 2019 WL 3414285 (W.D. Pa. July 29, 2019), *aff'd*, 841 F. App'x 443 (3d Cir. 2020). And Plaintiff "heavily relie[d] on deposition testimony" which was inadmissible. *Id.* at *6. The claims administrator performed two Transferrable Skills Analyses, which appropriately identified Addington's job title and skills and experience. *Id.* at *3.

Here, all the doctors, even Lincoln's, agree that Mr. Mullins has functional impairments stemming from permanent, degenerative changes. The current disagreement is whether those same degenerative changes, which Lincoln earlier said were disabling, actually were never disabling and, as per Dr. Patel, Mr. Mullins could <u>always</u> have continued working full-time at a sedentary job. (AR815). With all of Lincoln's reviewers finding that Mr. Mullins has unimproved and permanent disabilities which were present when Lincoln first approved his claim, this action is hardly analogous to a case where the claim administrator had new information (namely,

17

Addington's doctor saying he was able to return to work). Moreover, unlike here, Addington's vocational reviews did not try to attribute skills and vocational experience that he did not have.

Consol also suggests that this Court should disregard decisions the Third Circuit has made in other ERISA contexts. (Def. Br. at 26). But Consol does not point to any cases or the text of ERISA itself to support the proposition that one fiduciary under ERISA should be held to different standards than other fiduciaries. There is no support for the conclusion that administrators should have one standard when hiring financial experts but a lesser or, in fact, *no standard* for hiring medical experts. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 218-19 (2004) (ERISA's purpose is *uniformity* over benefit plans and "a benefit determination is part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan."). Consol's suggestion that this Court hold that fiduciaries be held to different standards and that disability plan participants be afforded less protections than ERISA plan participants are afforded elsewhere is directly contrary to ERISA's fundamental purpose of uniformity.

### K.  Consol reinterprets the Plan inconsistently with Lincoln's interpretation.

Consol claims that "impairments that arose after Plaintiff exhausted the twenty-six (26) weeks of STD coverage could not be considered in determining whether Plaintiff was Totally Disabled under the LTD Plan." (Def. Br. at 10). That is not a position Lincoln ever took during the administration of Mr. Mullins's claim. The Plan states, "After the first 18 months of your Total Disability . . . you must be completely unable to engage in any Suitable Employment. Your Total Disability must be the same Total Disability that you had during the Qualifying Disability Period." (AR18). To make its argument, Consol again ignores the plain language of the Plan, this time by omitting the definition of "Qualifying Total Disability Period," which is:

> A period of 26 weeks during which you (a) receive benefits under the CONSOL Energy Inc. Flexible Benefits Program Short Term Disability Plan for a continuous Total

Disability that is due to the same cause <u>or is related to the same cause</u> of your Total Disability…

(*Id.*) (emphasis added).

During the administrative period, Lincoln never told Mr. Mullins that any of his physical or mental health conditions were not "due to the same cause or related to the same cause" as the conditions he had when he first became Totally Disabled. Indeed, Lincoln's peer reviewers agree that Mr. Mullins's functional limitations stem from the same conditions that he has had since 2015. They are the natural progression of degenerative changes in his body from a lifetime of hard manual labor and years of adjusting to an injury which required repeated surgeries and many months on crutches and in a walking boot that further stressed his musculoskeletal system.

**L.   The improper Dependent SSDI offset issue is ripe for review.**

Consol argues that Mr. Mullins "waived" the issue of whether Consol improperly offset his LTD benefits based on the SSDI benefits that his dependent children receive, and which are assigned to their mother, Cynthia Mullins. (Def. Br. at 34). However, ERISA is a non-adversarial system. *Grossmuller*, 715 F.2d at 857. As such, claimants are not required to exhaust every single argument or theory during the administrative process. Consol relies on a 16-year-old decision from outside this Circuit to support its conclusion that Mr. Mullins cannot advance new arguments that were not made in his administrative claim. *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 552 (7th Cir. 2005). However, "ERISA does not require either issue or theory exhaustion; it requires *only* claim exhaustion." *Wolf v. Nat'l Shopmen Pension Fund*, 728 F.2d 182, 186 (3d Cir. 1984) (allowing plaintiff to advance a new theory in litigation that was not made during the appeals process).

As Mr. Mullins discussed in his opening brief at 29-30, the Third Circuit clearly held that the same language Consol chose for its Plan does not grant discretion to offset for dependent

19

benefits. *In re. Unisys Corp. Long-Term Disability Plan ERISA Litig.*, 97 F.3d 710, 715-17 (3d Cir. 1996). Tellingly, Consol does not address *Unisys* at all. While the accounting of who owes what to whom after all the offsets and overpayments and repayments are reconciled will appropriately be determined after the Court issues its decision, the underlying issue that Lincoln improperly offset Mr. Mullins's LTD benefits is indeed ripe for review.

### III.   Conclusion

Timothy Mullins worked for Consol mining coal. There is unanimous medical agreement that he can no longer do that job because of his many functional impairments, which are permanent and degenerative and have persisted since 2015. The Plan gives Lincoln discretionary authority to make claim decisions, but with that discretion comes fiduciary responsibility to interpret and apply the Plan provisions properly, to ensure that claimants for whom Suitable Employment does not exist can receive disability benefits to protect themselves and their families. Consol has cited no substantial evidence that Drs. Patel and Kohan were correct to say Mr. Mullins has been able to work full-time since 2015 in a job that is less physically demanding than the position he is trained for, mining coal. Even if Drs. Patel and Kohan were correct, Lincoln did not identify any positions that would be Suitable Employment for Mr. Mullins, because it based its vocational analysis on the mistaken determination that he worked as the Mine Superintendent of the Buchanan Mine and not a Section Foreman mining coal alongside his crew.

Therefore, Mr. Mullins respectfully requests that this Court reverse Lincoln's decision, order the removal of any offset for SSA dependent benefits (and repayment of benefits already offset by those amounts), reinstate benefits or, in the alternative, remand the claim to Lincoln for further consideration, and award pre- and post-judgment interest, and attorneys' fees.

20

Respectfully submitted,

BY:   /s/ Benjamin W. Glass, III
   Benjamin W. Glass, III (VSB #23152)
   *Admitted Pro Hac Vice*

21

## CERTIFICATE OF SERVICE

I hereby certify that I have, on July 27, 2021, filed a copy of the foregoing document electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

BY:    /s/ Benjamin W. Glass, III
Benjamin W. Glass, III (VSB #23152)
*Admitted Pro Hac Vice*