PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2930

_____

TIMOTHY MULLINS,
                      Appellant

v.

CONSOL ENERGY, INC. LONG
TERM DISABILITY PLAN

_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 2-20-cv-1883)
District Judge:  Honorable J. Nicholas Ranjan

_____

Argued
September 13, 2023

Before:  JORDAN, BIBAS, and PORTER, *Circuit Judges*

(Filed:  March 22, 2024)
_____

Tybe A. Brett

Feinstein Doyle Payne & Kravec
429 Fourth Avenue
Law & Finance Bldg – Ste. 1300
Pittsburgh, PA   15219

Benjamin W. Glass, III   [ARGUED]
#250
3998 Fair Ridge Drive
Fairfax, VA   22033
    *Counsel for Appellant*

William P. Lewis   [ARGUED]
Erin J. McLaughlin
Buchanan Ingersoll & Rooney
1001 Liberty Avenue, Suite 1000
Pittsburgh, PA   15222
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**JORDAN**, *Circuit Judge*.

Timothy Mullins, a second-generation coal miner, suffered an ankle stress fracture in 2015 while working as a Section Supervisor at a coal mine owned by CONSOL Energy, Inc. ("Consol"). He initially received benefits from Consol under its ERISA-governed Long-Term Disability Plan (the "Plan"), administered by Lincoln Financial Group ("Lincoln"),[1] but then went through a series of denials,

_____

    [1] Lincoln acquired Liberty Life Assurance Company of

reconsiderations, and reinstatements. The present appeal arises from a final adverse disability benefits determination in 2020. Relying on a series of peer-reviewed medical evaluations and a third-party vocational assessment, Lincoln found that Mullins failed to demonstrate "total disability," as required under the Plan, because, while physically limited, he did not prove that he could not conduct any suitable sedentary occupation.

Because Lincoln relied on a 2019 vocational report that incorrectly listed Mullins's job as "Mine Superintendent," rather than Section Supervisor, and analyzed his background and skill set, it also wrongly terminated his long-term disability benefits. Lincoln's termination of his benefits was not based on substantial evidence in the record and was therefore an abuse of its discretion. Consequently, the District Court erred in upholding the decision.

We will vacate the judgment and remand for reinstatement of Mullins's long-term disability benefits.

## I.    BACKGROUND

### A.    Facts

Timothy Mullins was a Section Supervisor[2] at Consol's Buchanan Mine, in Raven, Virginia, from 2010 through June

Boston around May 2018 and assumed its responsibilities as Claims Administrator under the Plan.

[2] The parties use "Foreman" and "Supervisor" interchangeably. However, because the Vocational Report at issue uses the job title "Section Supervisor," we will adopt that

2015.  He has a 10th grade education and a GED.  As Section Supervisor, he was a "working supervisor" who "extracted coal manually and by machine with his crew" of 10 to 15 people, "set up ventilation systems," and "built roof supports."  (J.A. at 333.)  The job required him to be "on his feet all day," and to acquire state certifications for "First Class Mine Foreman, General Coal Miner, [and] Methane Gas Detection."  (J.A. at 333.)

In early June 2015, Mullins sustained an ankle injury and sought disability benefits from Consol.[3]  Consol's Plan – administered by Lincoln as Claims Administrator – provides two phases of long-term disability benefits to eligible employees: the first covering up to 12 months of the insured being unable to perform his own occupation (the "own occupation" period (Opening Br. at 14; J.A. at 369)), and the subsequent long-term disability phase when the insured cannot perform any other suitable employment (the "other occupation" period).  The Plan defines "Total Disability," as an employee being either "unable to perform the material and substantial duties of [his] regular occupation or any reasonable alternative offered by the Company" during the "own occupation" period or "completely unable to engage in any Suitable Employment" during the "other occupation" period.

term for consistency.

[3] The parties do not list the exact date when the injury occurred, but Mullins was absent from work beginning June 12, 2015.  The record shows that the date of disability for Mullins was June 12, 2015, according to Consol's records, but June 11, 2015, according to the Social Security Administration.

(J.A. at 33.)  The Plan further defines "Suitable Employment" as "employment in a position for which [the employee was] trained in vocational training, or for which [the employee is] qualified by experience or education.  This may be inside or outside of the Company."  (J.A. at 33.)  The Plan grants Consol and Lincoln "sole discretion to determine what is Suitable Employment for any individual and what is a reasonable compensation for that position."  (J.A. at 33.)

Mullins was granted short-term disability benefits in June 2015 for the first six months of his "own occupation" period because his ankle injury prevented him from being able to perform his job as Section Supervisor.  In December 2015, based on the same disability, he was approved for long-term disability benefits for the remaining 12 months of his "own occupation" period.  Although the long-term disability determination was based on his original ankle injury, the record shows over time a deterioration in Mullins's overall health and additional medical events that slowed his rehabilitation.[4]

In November 2016, Lincoln denied Mullins continued benefits, finding that his medical records did not show that he could not perform any other "suitable employment," because

---

[4] For example, in September 2016, Mullins was diagnosed with "major depressive disorder" (J.A. at 301); in February 2017, he underwent a total ankle replacement surgery; in August 2017, he was involved in a car accident, causing a right shoulder injury, which required surgery; and in October 2017, he suffered a heart attack, which also delayed his shoulder surgery.

he could work full-time with some physical limitations. Lincoln determined, after a vocational review, that Mullins could perform the jobs of "Transportation-Maintenance Supervisor[,] Dispatcher (non-emergency)[, and] Supervisor-Production Control." (J.A. at 104.) He appealed the denial and provided additional records of a forthcoming ankle surgery and a diagnosis of "[m]ajor [d]epressive [d]isorder." (J.A. at 106-31.) In February 2017, Lincoln reversed its denial and granted him benefits because the "information [it] received on appeal supports a level of impairment to preclude work capacity." (J.A. at 502.)

The following November, Lincoln terminated Mullins's benefits based on peer reviewed medical reports of his disability. He again appealed and provided Lincoln updated psychiatric evaluations. In March 2019, Lincoln granted him benefits for 12 months based on his mental health condition.[5]

Mullins previously also applied for and was denied Social Security disability benefits, but in 2018 those benefits were granted retroactively to 2015 by an Administrative Law Judge ("ALJ") who determined that he was legally disabled under the Social Security Act based on an updated treatment history.[6]

---

[5] According to the Plan, disability based on mental illness is limited to a maximum term of 12 months. *See infra* note 11.

[6] The ALJ found that Mullins suffered from "degenerative disc disease, degenerative joint disease of the knee and ankle, osteoarthritis, affective/depressive disorder,

In December 2019, Lincoln terminated his benefits for a third time, with his benefits ending at the expiration of the mental health benefits maximum term in March 2020, because peer review reports demonstrated that he had no physical disability that justified continued long-term benefits. Lincoln's determination that Mullins lacked a "total disability" under the "other occupation" period, however, relied on an erroneous vocational report that listed Mullins's job as "Mine Superintendent" instead of "Section Supervisor." (J.A. at 328.) Accordingly, based on the qualifications and experience associated with that incorrect job title, the report recommended three sedentary positions: "Production Planner; Supervisor, Terminal Operations; [and] Manager, Branch."[7] (J.A. at 329.)

---

drug and alcohol abuse, and anxiety disorder." (J.A. at 139.)

[7] Mullins's denial letter listed his "Skills & Abilities" as follows:

> Planning and directing work of others; knowing technical details of specialty area; working with different kinds of people in a variety of situations; making decision that may affect work activities, costs, or safety of others; using charts, maps, blueprints, or plans; and using numbers to plan budgets. Obtaining and seeing to the appropriate use of equipment, facilities, and materials to do certain work; assessing performance individuals; communicating with

In 2020, Mullins again appealed his termination of benefits and provided Lincoln additional medical records for review. This time, though, Lincoln maintained its denial after conducting an additional peer review of the new medical records. The reviewing doctor found that, while the pain Mullins was experiencing "is consistent with the severity and scope of [his] medical conditions[,]" "[t]he medical evidence supports [that] the claimant has the ability to sustain full time capacity [work] within the identified [physical] restrictions and limitations[.]" (J.A. at 319.) Ultimately, Lincoln "acknowledge[d] Mr. Mullins['s] claim of total impairment[]" and that the "medical evidence does support impairment with associated restrictions and limitations," but it concluded that "it does not support a *total inability to function in an occupational setting*." (J.A. at 250 (emphasis added).) Lincoln also asserted that, due to Mullins's Social Security disability award, the Plan had overpaid him $70,576.39, and it sought repayment.

## B.    Procedural History

In December 2020, Mullins filed a two-count ERISA complaint against the Plan under 29 U.S.C. § 1132(a)(1)(B) and (e), alleging wrongful denial of long-term disability benefits (Count One) and improper offset of benefits due to Social Security disability benefits (Count Two). He alleged that Lincoln improperly terminated his long-term disability

---

others in a professional and tactful manner; and
basic computer skills.

(J.A. at 230.)

8

benefits under the Plan "without [evidence of] any improvement in [his] medical condition" (J.A. at 570 ¶ 28), and, as relief, he sought past-due long-term disability benefits and reinstatement of monthly benefits under the Plan. The District Court granted summary judgment for the Plan and denied summary judgment for Mullins, holding that Lincoln's benefits denial was backed by substantial medical and vocational evidence and was not arbitrary and capricious. Mullins has timely appealed.

## II.   DISCUSSION[8]

### A.   ERISA Standard of Review

ERISA is silent on the standard of review applied to benefits denials. *Noga v. Fulton Fin. Corp. Emp. Benefit Plan*, 19 F.4th 264, 272 (3d Cir. 2021). Accordingly, courts have "develop[ed] a federal common law" for reviewing ERISA-regulated plans. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (internal quotation marks omitted). Supreme Court precedent instructs that a denial of benefits is reviewed de novo, "unless the benefit plan gives the

---

[8] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo. *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011). "Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002).

administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" in which case courts review those determinations for abuse of discretion. *Id.* at 115.

The parties here have stipulated that the Plan Administrator and Claims Administrator – Consol and Lincoln, respectively – have discretionary authority over the Plan. We therefore review the administrator's decision for abuse of discretion. *See id.* "In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011). When applying that standard, we do "not … substitute [our] own judgment for that of the defendants in determining eligibility for plan benefits[,]" *Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (citation omitted), and a plan administrator's decision "will not be disturbed if reasonable[,]" *Firestone*, 489 U.S. at 111. Instead, a decision is arbitrary and capricious only "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (citation omitted). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

### B.    Lincoln's Final Decision to Terminate Benefits Was Arbitrary and Capricious

To properly determine that Mullins did not suffer a total disability which precluded him from working at any suitable occupation under the Plan, Lincoln must have relied on adequate evidence that Mullins has the physical capacity, as

well as the relevant education, training, or experience, for alternative employment. Lincoln decided that Mullins could perform suitable sedentary employment because, based on reviews of his medical records, it said he could work with some physical limitations, and, based on a vocational review, he had the qualifications for three alternative jobs. We address each of those conclusions in turn.

> 1.   *Lincoln's medical conclusion was reasonable and supported by substantial medical evidence.*

Mullins asserts that there was a procedural irregularity in Lincoln's determination that the "medical evidence … support[ed] impairment with associated restrictions and limitations," but did "not support a total inability to function in an occupational setting." (J.A. at 250.) There was, he says, no change in his medical condition, and Lincoln relied on its own paper reviews instead of Mullins's treating physicians' opinions. Hence, he argues, the decision was arbitrary and capricious. We disagree.

Initially, Mullins met his burden to make a "*prima facie* showing of disability through physicians' reports[.]" *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2003). He did so based on his medical history of multiple injuries, chronic pain, and degenerative joint disease, along with the determination by the Social Security Administration granting him disability benefits retroactive to June 2015. The burden then switched to Lincoln "to support the basis of its objection" – "call[ing] into question the scientific basis of those reports[.]" *Id.* Lincoln carried its burden by relying on two peer reviews by board-certified physicians in the relevant

11

fields of Physical Medicine and Rehabilitation and Pain Medicine.  The opinion of Dr. Neil Patel supported the termination of benefits, and Dr. Kevin Kohan and Dr. Patel supported that decision on appeal.  The physicians reviewed at least thirty-five different medical records and test results, described each examined record, and provided an analysis. They gave credence to Mullins's physicians' opinions and found that Mullins had demonstrated physical impairments, some of which restricted his abilities.  Nonetheless, both concluded that he was capable of limited, sedentary work.

Dr. Patel found Mullins to be "functionally impaired" (J.A. at 286), but determined that he could still perform full-time work with some limits on lifting, sitting, standing, and typing.[9] Dr. Kohan's conclusions were like Dr. Patel's, stating

---

[9] The full limitations were as follows:

- Lifting, carrying, pushing, and pulling up to 10 pounds frequently, and up to 20 pounds occasionally;
- Reaching in all planes, with overhead reaching occasionally;
- Typing/fingering/using hands for fine manipulations for up to 15 minutes at a time, with ability to take a five-minute break before resuming these activities;
- Sitting for up to 30 minutes at a time, with the ability to change positions for comfort for up to 6 hours in a day;
- Standing for up to 15 minutes at a time, for a total of 2.5 hours in a day;
- Walking for up to 30 minutes at a time,

that, although Mullins's "pain is consistent with the severity and scope of [his] medical conditions and intensity of treatment[,] … [t]he medical evidence supports [that] [he] has the ability to sustain full time [employment] capacity … within the identified restrictions and limitations[.]"  (J.A. at 319.)

Mullins says Lincoln's review process was not sufficient.  He contends that Lincoln was required to provide further evidence because the reviewers it retained made findings contrary to his treating physician and did so without having conducted a physical examination.  But, unlike his assertions, there is no requirement that an additional evidentiary showing be made if an administrator's rejection of a disability claim arises from reports differing from the claimant's own doctors.  Indeed, the Supreme Court has expressly held that ERISA does not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion[,]" "nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 834 (2003).

In support of his argument that additional proof was necessary before termination of his benefits, Mullins alleges that Lincoln's reviewers issued "conclusory peer reviews" unsupported by substantial evidence because the record fails to

---

for a total of 4 hours in a day; and,

- No kneeling, bending, stooping, climbing, crawling, and squatting.

(J.A. at 286.)

demonstrate any change in his condition that would justify termination of benefits. (Reply Br. at 3-5.) We have said that a reversal of position without additional medical information may "counsel[] towards finding an abuse of discretion." *Miller*, 632 F.3d at 848. However, Lincoln's peer reviewers made evaluations based on medical evidence that did not support Mullins's claim of continued total disability. For example, Dr. Kohan found that while Mullins's spine and shoulder impairments were previously limiting, the records "do not show objective findings supporting *continued* functional impairment." (J.A. at 317 (emphasis added).) Additionally, as noted by the District Court, Mullins's five-pound lifting restriction was either removed or reasonably contradicted in the record by opinions from Mullins's own treating physicians.[10] And to the extent that the peer reviews

---

[10] The parties contest how much Mullins can lift in his disability. That fact is relevant because the Department of Labor defines "sedentary" work as being able to "[e]xert[] up to 10 pounds of force occasionally … and/or a negligible amount of force frequently.[]" U.S. Dep't of Lab. Off. of Admin. L. Judges L. Libr., *Dictionary of Occupational Titles* app. C (4th ed., rev. 1991), https://www.dol.gov/agencies/oalj/PUBLIC/DOT/REFEREN CES/DOTAPPC (last visited Feb. 7, 2024). Mullins argues that the medical records do not support his ability to lift more than 5 pounds, and thus he cannot qualify for sedentary work. He cites his post-operation orthopedic consultant, Dr. McGarry, who repeated the verbatim instruction to "[a]void heavy lifting (anything over 5 lbs.) until instructed otherwise" in his provider notes from September 2019 through March 2020. (J.A. at 214, 217, 220, 223.) But Mullins's orthopedic surgeon, Dr. Scott, twice affirmed that Mullins

14

differed from his treating physician's, it was not unreasonable for Lincoln to weigh the peer reviews over his treating physicians'. *Cf. Black & Decker*, 538 U.S. at 834 (allowing administrators to give credence to reliable peer review evidence contrary to treating physicians, even without explaining why). And an independent medical exam is not required. The "failure to order [and conduct] an [independent medical examination]" is merely one "factor we can consider in determining whether [the administrator's] decision to terminate benefits was arbitrary or capricious." *Reed v. Citigroup Inc.*, 658 F. App'x 112, 115 (3d Cir. 2016) (per curiam). In short, a "reasonable mind" could view the medical record as supporting the conclusions of Drs. Patel and Kohan that Mullins failed to demonstrate continued total disability, even while functionally impaired. *Fleisher*, 679 F.3d at 121 (citation omitted).

Moreover, Lincoln's most recent grant of benefits, one year earlier in 2019, was based on mental illness, which the Plan limits to 12 months of additional coverage. Mullins disputes that and says it is an "insinuation" and a "new [argument] in litigation." (Reply Br. at 10.) But his November 2018 denial letter confirms Lincoln's position; it denied benefits because "[t]he medical records d[id] not reasonably

---

could lift 10 pounds "frequently" (and 25 pounds "occasionally") as soon as six months after his ankle surgery. (J.A. at 468-71.) And, in addition to Lincoln's peer reviewers, an independent Board-Certified Orthopedic surgeon physician in 2018 opined that Mullins could lift up to 10 pounds. Thus, it is not unreasonable that Lincoln concluded that Mullins could lift up to 10 pounds, based on evidence in the record, and thus that he qualified for sedentary work.

support [that] the insured ha[d] impairments attributable to the presence of mental illness[.]" (J.A. at 145.) So did the reinstatement letter, which awarded benefits based "[u]pon review of additional information provided" and laid out the Plan's policy regarding disability based on Mental Illness,[11] containing the disclaimer that "[i]f your condition no longer fits the criteria of 'mental nervous limitation' but remains disabling … your claim will be evaluated for continued benefits." (J.A. at 225-26.) The letter stated further that if Mullins felt that he "continue[d] to be disabled due to a non-mental … diagnosis," he should submit additional information to that effect "prior to the maximum benefit date." (J.A. at 226.) Thus, the March 2019 grant of benefits was based on mental illness disability and limited to 12 months, ending in March 2020, unless additional physical disability evidence was provided. None was.

In the end, Mullins failed to carry his burden of demonstrating that he was totally disabled. *See Lasser*, 344 F.3d at 391 ("[T]he burden of proving disability ultimately lies with [the claimant.]"). He proffered no evidence from his treating physicians, before termination of benefits or while on appeal, that concerned his ability to perform sedentary work. Mullins says that was because Lincoln never expressly asked for such evidence and that Lincoln's requests for a response

---

[11] "If Mental Illness is the primary cause or a contributing cause of your Total Disability … the Company will pay monthly benefits under this Plan on a limited basis. Once a maximum of 12 monthly Long Term Disability benefit payments have been paid, no future benefits will be payable[.]" (J.A. at 225.)

from his doctors to the peer review findings did not give the doctors "meaningful time to reply." (Reply Br. at 7, 9.) But Mullins fails to explain why he did not submit additional documentation during his appeal – six months passed from the initial denial in December 2019 until the final, reconsidered denial in June 2020 – nor why his doctors never responded to the requests at all.

In light of all that, we cannot say that Lincoln's decision that Mullins was physically capable of performing limited, sedentary work was an abuse of discretion.

> 2.  *Lincoln's reliance on an erroneous vocational report was arbitrary and capricious.*

We now turn to the second prong of the test for total disability: whether Mullins could satisfy the relevant occupational education, training, or experience necessary for alternative employment. In 2019, Lincoln found that alternative suitable employment exists for Mullins and thus denied him benefits. In doing so, it relied on a vocational review, or Transferable Skills Analysis ("TSA"), that determined positions suitable for Mullins based on his training, experience, and education. That was the second TSA Lincoln conducted in Mullins's case. In December 2016, it used a TSA that accurately listed Mullins's job as a "Section Supervisor[.]" (J.A. at 332.) The report identified three potential jobs Mullins could perform given his physical limitations and his experience and training as a Section Supervisor: Transportation-Maintenance Supervisor, Dispatcher (non-emergency), and Supervisor-Production Control.

In 2019, however, Lincoln relied on an updated TSA to terminate Mullins's benefits. And yet, as Consol conceded, that TSA used the wrong job title. Instead of using Mullins's correct title of Section Supervisor, Lincoln listed his position as "Mine Superintendent[.]" (J.A. at 328.) That was consequential. The error produced three different sedentary position suggestions: Production Planner, Supervisor of Terminal Operations, and Branch Manager. Thus, Lincoln's erroneous statement of Mullins's job resulted in an erroneous statement of alternative positions as well.

Mullins has never been a Mine Superintendent, for Consol or for any other mining company. The Mine Superintendent while Mullins was employed at Buchanan held two college degrees (a Bachelor of Science in Mining Engineering Technology and a Bachelor of Science in Business Administration) and had held supervisory positions. In contrast, Mullins had neither the variety of experience nor educational background that the Mine Supervisor had.

The Department of Labor job description for a Mine Superintendent, as referenced in the TSA, includes duties like planning and coordinating activities of personnel engaged in mining, reviewing survey reports and geological records, calculating mine operation costs, and reading mining laws and safety regulations and enforcing them. 181.117-014 Mine Superintendent (mine & quarry), *Dictionary of Occupational Titles* (4th ed., rev. 1991). In contrast, Mullins's 2016 TSA describes his skills and experience as Section Supervisor to include "[u]se of hand tools[,]" "[o]peration of equipment[,]" and "[o]btaining and seeing to the appropriate use of equipment, facilities, and materials to do certain work[,]" all

commensurate with operating as a working supervisor of a team of coal miners.  (J.A. at 103.)

Similarly, the Department of Labor lists duties for the new roles suggested by the 2019 TSA – Production Planner, Supervisor of Terminal Operations, and Branch Manager – to include analyzing production and plant capacities; performing mathematical calculations to determine manufacturing processes; planning and scheduling workflow for departments and conferring with department supervisors; preparing purchase orders; studying revenue reports; inspecting terminal facilities for conformance to safety standards; recommending personnel actions; directing production, distribution, and marketing; and recommending budgets to management. 012.167-050 Production Planner (profess. & kin.), *Dictionary of Occupational Titles*; 184.167-242 Supervisor, Terminal Operations (motor trans.), *id.*; 183.117-010 Manager, Branch (any industry), *id.*  Those duties are plainly different from Mullins's listed skills of "[m]aintaining records[,]" "[k]now[ing] and apply[ing] basic computer skills[,]" "[i]nstructing individuals and groups on how to improve performance/adhere to regulations[,]" and "[u]nderstanding written sentences … in work related documents." (J.A. at 103-04.)

Therefore, the District Court erred in concluding that Mine Superintendent and Section Supervisor are similar managerial positions because the 2016 and 2019 reports describe Mullins's "experience and skill in largely the same way." (J.A. at 9.)  That is a bit like saying that because a TSA lists the skills "teaching," "lesson planning," and "grading students' work," there is no difference between an elementary school teacher and a university professor.   There is a

19

difference, no matter how fine both teachers may be at their jobs.

Consol attempts to defend its conceded error by stating that "the 2016 [TSA] is referenced and incorporated into the 2019 [TSA]." (Answering Br. at 50.) While the 2019 TSA does indicate that consideration was given to, among other things, the 2016 TSA, it clearly did not incorporate the analysis of the earlier review. The 2019 TSA can hardly be said to stand on the 2016 review when the job title itself differed between the two reports. Moreover, the 2019 denial letter sent by Lincoln cites only to the 2019 TSA and its three inaccurately derived positions. The 2019 letter does not refer to the 2016 TSA nor its suggested occupations. As a result, Consol's position runs contrary to law. Under ERISA, a fiduciary cannot tell a beneficiary that he should have ignored express statements in the 2019 letter and should instead have relied on conflicting information from the 2016 communication, supposedly included by incorporation. *Cf. Grossmuller v. Int'l Union, UAW, Loc. 813*, 715 F.2d 853, 858 (3d Cir. 1983) (requiring a written statement outlining reasons for benefits denial). To allow such sleight of hand would vitiate the statutory notice purpose behind such letters.

Both Consol and the District Court emphasized that, regardless of the 2019 letter, "there is no dispute that the 2016 [TSA] identified suitable positions, which would have been appropriate for … Mullins even in 2019." (J.A. at 10.) Assuming that were true, Lincoln still did not provide Mullins a "full and fair review" of his denial as required under 29 U.S.C. § 1133. That section requires that "every employee benefit plan shall … afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full

20

and fair review[.]"[12] 29 U.S.C. § 1133.  If Lincoln's denial was based on information incorporated from the 2016 TSA, it failed to provide Mullins the protections afforded him by ERISA because it did not "notify [him] promptly, in writing and in language likely to be understood by laymen, that the claim has been denied with the *specific reasons* therefor."  *Grossmuller*, 715 F.2d at 858 (emphasis added).  Accepting Consol's claim would necessarily compromise Mullins's ERISA rights.  *Id.*

Furthermore, Consol doubled down on its error in 2020. Lincoln could have updated Mullins's job history in its 2019 TSA when Mullins appealed.  Rather, on appeal, Lincoln's vocational case manager reviewed the final peer review doctor report by Dr. Kohan and again stated Mullins's job history as "Mine Superintendent for 11 years," before concluding that the sedentary positions from the 2019 report "remain[ed] viable." (J.A. at 326.)  This further undermines Consol's argument that it was really relying on the 2016 TSA, and it creates additional § 1133 issues because the 2020 denial is even further removed from the 2016 TSA.[13]

---

[12] Full and fair review includes providing 60 days to appeal, providing opportunity to submit written comments on appeal, and providing reasonable access – "upon request and free of charge" – to copies of all documents and records.  29 C.F.R. § 2560.503-1 (h).

[13] Mullins also claims that "Lincoln was required to provide [him] with … information in advance of its [final] appeal decision and to give him an opportunity to respond." (Reply Br. at 12.)  However, on appeal, an administrator is only required to provide "reasonable access to, and copies of, all documents, records, and other information relevant to the

In the end, identification of alternative suitable jobs by Lincoln or Consol is required under the Plan before benefits can be terminated.  (J.A. at 58 (defining total disability, which is required to receive long-term disability benefits after 18 months, as requiring complete inability to engage in any suitable employment, and defining suitable employment as alternative employment determined by the Plan or Claims Administrator).)  Thus, Consol could terminate benefits only if Lincoln determined that there was no other suitable job that Mullins could perform, after first correctly identifying "any Suitable Employment."  (J.A. at 33.)

While determination of what jobs fall into this category is in the "sole discretion" of the plan and claims administrators, this discretion presumes that a set of suitable jobs has been correctly identified; Lincoln "must exercise that discretion based on substantial evidence and in accordance with the terms of the plan."  (Reply Br. at 21.)  As discussed, Lincoln did not do that.  It attributed an incorrect job title (and thus skills and experience) to Mullins when it called him a "Mine Superintendent."   In turn, this error produced a series of suggestions of jobs suitable for a Mine Superintendent, not a Section Supervisor, and that error piled on error led to the ultimate termination of Mullins's benefits.   Thus, Lincoln

---

claimant's claim for benefits" "*upon request*[.]"   29 C.F.R. § 2560.503-1(h)(2)(iii) (emphasis added); *see also* 29 U.S.C. § 1133(2) (affording claimants "a reasonable opportunity … for a full and fair review" *after* denial of a claim for benefits). There is no evidence in the record that Mullins requested the records, nor that Lincoln denied any requests.

abused its discretion, and the termination of Mullins's benefits was arbitrary and capricious; there are no genuine issues of material fact that could lead a reasonable jury to find otherwise.

We are accordingly required to vacate the District Court's decision and remand for entry of summary judgment in favor of Mullins. The District Court, in turn, must order Lincoln to retroactively reinstate Mullins's benefits, effective from the date of termination. *Miller*, 632 F.3d at 857 ("In the termination context, … a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully. Accordingly, benefits should be reinstated to restore the status quo."); *see also Noga*, 19 F.4th at 279 (affirming reinstatement of benefits after wrongful termination). This, of course, is without prejudice to Consol's ongoing opportunity to again review Mullins's benefit status as permitted by the Plan.

### C.      The District Court Should Decide the Offset Issue in the First Instance

Lastly, Mullins argues that Lincoln, on behalf of Consol, improperly offset his benefits by including in the offset the Social Security benefits received by his dependent children. The amount of the offset was consequently and wrongly increased. In its final termination of benefits, Lincoln informed Mullins that the Plan overpaid him $70,576.39 and requested repayment. Because the District Court did not reinstate his benefits, it ruled that "it need not reach the Social Security offset claim." (J.A. at 10 n.5.)

Absent an extraordinary circumstance, the District Court should decide an issue in the first instance. *See*

*O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 763 n.3 (3d Cir. 2021) ("[A]s a 'court of review, not of first view,' we will analyze a legal issue without the district court's having done so first only in extraordinary circumstances." (quoting *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) (per curiam) (citation omitted))).  No such extraordinary circumstance exists here. Because we will remand for the District Court to reinstate Mullins's benefits, we will also remand for the District Court to determine the correct amount of the Social Security offset in the first instance.  *Cf. Sciarotta v. Bowen*, 837 F.2d 135, 141 (3d Cir. 1988) (remanding to the district court for a calculation of benefits because the record was "not sufficiently complete[,]" and the determination was "more appropriate for the district court in the first instance").

## III.   CONCLUSION

For the foregoing reasons, we will vacate the judgment of the District Court and remand for entry of summary judgment in favor of Mullins, with his benefits to be retroactively reinstated, effective from the date of termination. The District Court should also consider Mullins's claim that the Social Security offset was in error.